**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **BANDY LEE, MD, MDiv,** | : | **CASE NO.** |
| **Plaintiff,** | : | |
| **v.** | : | |
| **YALE UNIVERSITY,** | : | |
| **Defendant.** | : | **MARCH 22, 2021** |

## COMPLAINT

## I.   PRELIMINARY STATEMENT

1.      This is an action for damages, declaratory and injunctive relief, and other equitable relief, arising out of Yale University's ("Yale") unlawful termination of Dr. Bandy Lee's ("Dr. Lee" or "Plaintiff") faculty appointment on its own and at the behest of Professor Alan Dershowitz ("Mr. Dershowitz"), due to her exercise of free speech about the dangers of Donald Trump's presidency.  Her public statements, which further included commentary about the influence that President Trump's persona had on his "inner circle", including Mr. Dershowitz, and opposition to the American Psychiatric Association's ("APA") gag order of its member psychiatrists under a reinterpretation of the Goldwater Rule were protected by the First Amendment of the Connecticut and United States Constitutions as codified in Conn. Gen. Stat. § 31-51q and by Yale's guarantees of academic freedom.  Yale violated its contractual obligations to Dr. Lee and violated the implied covenant of good faith and fair dealing. Yale further committed the tort of negligent misrepresentation by not adhering to its policies on academic freedom, upon which Dr. Lee had relied.

## II.  THE PARTIES

2.      Dr. Lee graduated from Yale School of Medicine in 1994 and earned a Masters of Divinity from Yale Divinity School in 1995.  After completing a psychiatric residency at Massachusetts General Hospital and a fellowship at Harvard Medical School, in 2003, Dr. Lee was appointed as Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine.  Her research focuses on formulating the multiple, interlinked determinants of violence by exploring the interaction between biological, psychological, social, and environmental processes for effective prevention.

3.      Dr. Lee is a resident of the State of New York.

4.      Yale is a university incorporated in Connecticut, with its principal place of business in New Haven, Connecticut.  Yale School of Medicine is a medical school within Yale University. Yale Law School is a law school within Yale University.

## III.  JURISDICTION AND VENUE

5.      Dr. Lee is alleging, *inter alia*, retaliation based upon her exercise of free speech rights guaranteed by the United States and Connecticut Constitutions in violation of Conn. Gen. Stat. § 31-51q.  Accordingly, this Court has federal question jurisdiction over Plaintiff's § 31-51q claim and supplemental jurisdiction over Dr. Lee's remaining state law tort claims pursuant to 28 U.S.C. § 1367.

6.      This Court also has subject matter jurisdiction over the dispute due to diversity of citizenship, as there is complete diversity between the parties, and the amount in controversy is in excess of $75,000.  In addition to the economic loss Dr. Lee suffered as a result of Defendant's actions, Conn. Gen. Stat. § 31-51q provides for recovery of attorney's fees for a prevailing plaintiff.

7.      This Court has personal jurisdiction over the parties, as Yale is domiciled in Connecticut, and all of the acts that give rise to this action occurred within the State of Connecticut.

8.      Venue is proper in Connecticut as all of the acts giving rise to this action occurred in Connecticut.

## IV.    FACTS

9.      Dr. Lee served as a faculty member of the Law and Psychiatry Division at Yale School of Medicine for 17 years. She taught at Yale Law School for 15 of those years, covering the mental health aspects of asylum law, criminal justice, and immigration legal services.  Her reappointment was renewed every three years, ending on June 30, and renewing on July 1.

10.     Dr. Lee's appointment required that she participate in four hours of student-related, teaching, or supervisory activities per week.  These activities could be satisfied through teaching a course, through advising students in connection with their thesis preparation, supervising residents, participating in seminars and grand rounds, engaging in scholarly activity, participating in department administration, and other activities. Dr. Lee more than satisfied this weekly requirement on an annual basis.

11.     In exchange for her student-related and teaching activities, Dr. Lee received benefits, privileges, and opportunities, as well as related compensation and other indirect but significant remuneration, that she would not have otherwise received but for her academic affiliation with Yale.

12.     Through her appointment at Yale, Dr. Lee was entitled to receive and did receive benefits, privileges, opportunities, and related compensation and other indirect but significant remuneration, including but not limited to: office space, facilities, libraries, subscription-based access to research databases and journal articles, statisticians, laboratories, statistical programs and

software, IT and technology services, computer programs and software, media studios (radio and television), and campus transportation, all of which she used for her research, writing, to assist with her speaking engagements, advocacy and other professional obligations. Notably, Dr. Lee was informed by the Law & Psychiatry Division Head, Dr. Howard Zonana, that in connection with her faculty appointment, she was covered by Yale's professional malpractice insurance policy for her forensic consultations. Through her faculty appointment, she was given additional "perks" in the form of discounts on food items sold on campus, as well as other retail stores in New Haven, and access to workout facilities. These benefits, privileges, opportunities, and related compensation or other indirect but significant remuneration would cost Dr. Lee thousands, if not tens of thousands, of dollars if she were to obtain the same on her own.

13. Through her faculty appointment, she was able to provide clinical work consisting of psychiatric services at maximum-security prisons and in state hospitals, in addition to working as an expert witness for the state and federal courts.

14. Additionally, through this faculty appointment with Yale, she became a Resident Consultant for the World Health Organization in Geneva, Switzerland and later became the Director of the Violence and Health Study Group of the MacMillan Center for International and Area Studies at Yale University, with membership in the Violence Prevention Alliance, World Health Organization as the project leader of an academic collaborators group, a position she held from 2011 until the termination of her faculty appointment from Yale Medical School effective on June 30, 2020. She also served as the Director of Research for the Center for the Study of Violence at Harvard, University of Pennsylvania, New York University, and Yale. Through her faculty appointment with Yale, she obtained opportunities to consult with governments on prison reform and community violence prevention, such as for France, Ireland, Alabama, California,

Connecticut, Massachusetts, and New York. Further, Yale Law School and its Legal Clinics referred asylum, criminal justice, and veteran cases to her for expert review and consultation in support of the applicants' petitions for asylum in the federal immigration courts, criminal cases in the State of Connecticut Judicial Branch of New Haven, and veteran claims in the United States Court of Appeals for Veterans Claims. These opportunities directly resulted from her academic affiliation with Yale.

15.     Through her faculty appointment at Yale, she contributed to the launch of Yale's Global Health Initiative and created a popular Global Health Studies course at Yale College, "Violence: Causes and Cures," which led to the most comprehensive textbook on the subject to date, *Violence: An Interdisciplinary Approach to Causes, Consequences, and Cures* (Wiley-Blackwell, 2019). Also, through her faculty appointment, she was able to publish over 100 peer-reviewed articles and chapters, 17 edited scholarly books and journal special issues, almost 300 op-eds in outlets such as *The Guardian*, *The New York Times*, *The Boston Globe*, *The Independent*, and *Politico*, as well as *The New York Times* bestseller, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President* (Macmillan, 2017 and 2019).

16.     Through the resources and benefits she received due to her faculty appointment at Yale, as well as the courses she taught, Dr. Lee became a well-known and reputable scholar on violence prevention, with students seeking to study with her from both within and outside of Yale. Her appointment allowed her to be retained to serve as an expert witness. Further, Dr. Lee received grants that she could only obtain based upon her academic affiliation.

17.     A majority of Dr. Lee's income was derived from her faculty appointment and relationship with Yale.

18.     In March 2017, shortly after Donald Trump's inauguration, the American Psychiatric Association (APA) reinterpreted its *Goldwater Rule*. The reinterpreted *Goldwater Rule* created a gag order, recommending that its members not comment on public figures, even without diagnosing them and even where there is a responsibility to society to protect public health.

19.     The American Psychiatric Association (APA) is a voluntary professional organization of psychiatrists.

20.     Dr. Lee has not been a member of the APA since 2007.

21.     Dr. Lee believed the newly reinterpreted *Goldwater Rule* was in conflict with psychiatrists' duties, responsibilities, and role in the interest of public health in light of her belief that Donald Trump posed a dangerous threat to this country and the world. For this reason, she held an ethics conference at Yale in April 2017 with some of the most respected members of her profession. This conference initially had approximately two dozen attendees and then drew national attention and led to the public-service book, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President*. Although Yale did not officially sponsor the conference, Dr. Lee discussed the conference with Yale, and she was able to use an auditorium at Yale without charge.

22.     That book became an unprecedented *New York Times* bestseller of its kind. The featured authors represented only a small sample of the many thousands of mental health professionals who came forth in historically unprecedented ways. These psychiatrists formed a professional organization, the National Coalition, which then expanded internationally, becoming the World Mental Health Coalition (WMHC), by the end of 2017. It is the only professional organization to address the issue of dangerous leadership, intending to step in where the American

Psychiatric Association demurred. It also remains the largest organization of mental health professionals to speak up against Donald Trump's presidency.

23. Dr. Lee and the other authors assert in the book that President Trump's mental health was affecting the mental health of the people of the United States, and further, that he was placing the country at grave risk of involving it in multiple forms of violence and undermining democracy itself as a result of objective signs of dangerous pathology. Consequently, Dr. Lee and the other authors claim that Trump's presidency represented an emergency which not only allowed, *but required*, psychiatrists in the United States to sound the alarms. The authors maintain that pointing out danger and calling for an evaluation differs from the medical processes of patient diagnosis, and they have criticized the American Psychiatric Association for manipulating professional norms and standards, from reasonable ethical guidelines into a gag order under political pressure, because mental health professionals provide a check against mental pathology.

24. Following the assassination of Qasem Soleimani in January 2020, these professionals opined that Donald Trump would meet the criteria for an involuntary mental health evaluation, and some of these professionals in the WMHC were contemplating seeking court intervention.

25. In July 2019, Mr. Dershowitz, who was under public scrutiny following revelations about his ties to the late financier Jeffrey Epstein, claimed on Fox News that he had a "perfect, perfect sex life." Prior to July 2019, Mr. Dershowitz was a known supporter of Donald Trump. Indeed, he has been quoted in articles dating back to at least 2018 complaining that he was shunned by his political allies "who have stopped inviting him to dinners" and friends who have excluded him from "social circles on Martha's Vineyard." *See* "Alan Dershowitz Says 'Friends on Martha's Vineyard are Shunning Him For Defending Trump," *Washington Post*, July 3, 2018.

26.     In December 2019, the United States Congress initiated impeachment proceedings against President Trump for, among other things, abuse of power following, *inter alia*, a telephone call between President Trump and the Ukrainian President Volodymyr Zalensky on or about July 25, 2019. Since September 2019, and again in November 2019, President Trump had publicly and repetitively defended said call as a "perfect conversation" or "perfect call." The impeachment proceedings were completed in February 2020. Mr. Dershowitz was one of many lawyers on Trump's legal team.

27.     Before the completion of impeachment proceedings, on January 2, 2020, University of Minnesota Law Professor and Yale Law School alumnus Richard Painter tweeted and tagged Dr. Lee to Mr. Dershowitz's characterization of his "perfect sex life," stating that Dershowitz's phrasing was similar to Trump's recount of the "perfect" call. Dr. Lee responded, "Alan Dershowitz's employing the odd use of 'perfect'…might be dismissed as ordinary influence in most contexts." She added that "given the severity and spread of 'shared psychosis' among just about all of Trump's followers, a different scenario is more likely," and that scenario was "that he has wholly taken on Trump's symptoms by contagion."

28.     When Dr. Lee stated "symptoms by contagion," she was not diagnosing Mr. Dershowitz, but rather commenting on a widespread phenomenon of "shared psychosis," also known as "folie à plusieurs," which refers to the contagion of symptoms that can happen in a situation where a highly symptomatic individual is placed in an influential position. Under such conditions, the person's symptoms may spread through the population through emotional bonds: heightening existing pathologies ("folie simultanée"), triggering personality predisposition ("folie impose"), or inducing symptoms in previously healthy individuals ("folie communiquée"). Despite the English phrase, "psychosis" is not always present, but the more commonly induced symptoms

are delusions, paranoia and propensity for violence. Dr. Lee has extensive experience with this phenomenon, having worked almost exclusively in public-sector and prison settings, where severely symptomatic individuals often go untreated and influence entire families or gangs. She believed that President Trump's followers were likely to be influenced to some degree by his pathology because of the level of exposure, not necessarily because of the specific use of the word "perfect" but by the exaggerated sense of self and impunity they seemed to share.

29.     Following this tweet, on January 11, 2020, Mr. Dershowitz sent an email to, *inter alia*, Yale spokesperson Karen Peart, University President Peter Salovey's Chief of Staff Joy McGrath, and Yale Law School Dean Heather Gerken, asserting "Dr. Bandy Lee of the Yale Medical School has publicly 'diagnosed' me as 'psychotic,' based on my legal and political views, and without ever examining or even meeting me." He continued, "This constitutes a serious violation of the ethics rules of the American Psychiatric Association. I am formally asking that association to discipline Dr. Lee. By this email, I also formally ask Yale University, Yale Law School and its medical school to determine whether Dr. Lee violated any of its rules."

30.     As a result of and in immediate response to Mr. Dershowitz's actions, in an email dated January 13, 2020, Dr. John Krystal, the Chair of the Psychiatry Department, warned Dr. Lee that the department would be compelled to "terminate [her] teaching role at Yale University" if her "behavior d[id] not change." He indicated that Yale would terminate her faculty appointment. Referring to public statements Dr. Lee had made regarding the mental health of President Donald Trump and Mr. Dershowitz, Dr. Krystal stated, "It seems to me ... that the published quotes suggest that you are not making cautious, reasoned statements qualified by the limitations of the information you have .... Worse, the recklessness of your comments creates the appearance that they are self-serving in relation to your personal political beliefs and other possible personal

aspirations." He added, "You are putting me in a position where I have to ask, 'Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?'"

31.     Following Mr. Dershowitz's January 11, 2020 complaint, Yale Law School and its Legal Clinic ceased its referral of student cases to Dr. Lee, including one that was actively in process.

32.     On January 17, 2020, in immediate response to Mr. Dershowitz's January 11, 2020 complaint, Dr. Krystal called Dr. Lee to a meeting that included three additional faculty members during which Dr. Lee was told that she had breached psychiatric ethics by "diagnosing" Mr. Dershowitz, a conclusion with which Dr. Lee strongly disagreed. Dr. Lee expressed her desire for a discussion and asked for an investigation, as she felt that what constitutes psychiatric ethics had been distorted under the Trump presidency. Yale refused to have further discussions with Dr. Lee and refused to investigate the matter.

33.     No further word came before the notice of her termination on May 17, 2020. That termination letter cited that the reason for her termination was because she did not have a formal teaching role. That reason was pretextual, as other faculty members were permitted to remain on staff who had not had formal teaching roles and who had not attended seminars regularly. In fact, Dr. Lee had been attending three hours of seminar and one hour of grand rounds per week. Further, she was assisting multiple students with their theses, and another student with a research project, all who had sought her out on the basis of her affiliation with the Law and Psychiatry Division.

34.     Prior to Mr. Dershowitz's communication to Yale, Division Head Dr. Zonana complimented her on how she was handling her public statements. Prior to the publication of her book, she discussed it with her Division Head, who agreed to its publication and her involvement

and understood her position regarding the APA's change in its interpretation of its *Goldwater Rule*, which was a recommendation without enforcement mechanisms even for APA members.

35.    Prior to Mr. Dershowitz's communication to Yale, Dr. Krystal also commended Dr. Lee's work.

36.    Yale administration, including Dr. John Krystal, had no concerns about Dr. Lee's involvement in the World Mental Health Coalition or her speaking engagements. In late 2017, Yale requested that she disclaim that her opinions were her own and were not endorsed by Yale. Dr. Lee complied with the request.

37.    Dr. Lee's faculty appointment was covered by the Faculty Handbook.

38.    The latest version of the Faculty Handbook, dated August 22, 2019, states: "The policies included and referred to in this *Handbook* form part of **the essential employment understandings** between members of the faculty and the University." (emphasis added).

39.    Rights of academic freedom and freedom of expression are expressly preserved in the Faculty Handbook, and elsewhere on Yale's website.

40.    Dr. Lee's appointment as Assistant Clinical Professor is listed under the "Voluntary Ranks" for the School of Medicine within the Faculty Handbook.  The Faculty Handbook states "Voluntary faculty are typically clinicians or others who are employed outside of the School but make significant contributions to department programs at the medical center or at affiliate institutions. Each department has **established guidelines** for the nature of required participation, such as the relative importance of teaching students, supervising residents, engaging in scholarly activity, participating in department administration, and other activities. Voluntary faculty typically do not receive compensation or benefits from the School." (emphasis added). Notwithstanding Dr. Lee's designation as "voluntary," Dr. Lee maintained a mutually beneficial

contractual employment relationship with Yale: in return for her requirements to engage in teaching and other scholarly activities, she received benefits, privileges, and other opportunities through her faculty appointment, as well as related compensation and other indirect but significant remuneration, as described herein.

41.     The Faculty Handbook also provides in Section III.L.1 (emphasis added):

> In making *any* appointment to the faculty, the University seeks to appoint the best candidate for the position. Faculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities.
>
> To ensure that there is no misunderstanding about the availability of positions, that extra-department and extra-school interests of the University have not been overlooked, and that the department or school consideration of each member of the non-tenured faculty has been adequate, deans will, as a matter of course (and prior to any formal action on appointments by the department or school), discuss with a representative of the Office of the Provost all members of their faculties who might expect to be considered for reappointment or promotion. ***When a decision not to reappoint or promote is made on a candidate who has held an appointment at Yale for more than one year, the school submits to the Provost a brief report of the action to be taken before that decision is conveyed to the candidate. In the School of Medicine, departments submit such reports to its Office for Faculty Affairs***. In the FAS, departments submit such reports to the Office of the Dean of the FAS.

42.     Upon information and belief, the procedures described in the previous paragraph were not followed in connection with Yale's termination of Dr. Lee's faculty appointment.

43.     Yale's website also provides for additional procedures relating to investigation of allegations of academic misconduct against faculty members. Upon information and belief, the procedures describe on Yale's website were not followed in connection with Yale's termination of Dr. Lee's faculty appointment.

44.     Further, Yale has adopted a formal policy and practice of providing for academic freedom for all its faculty, whether tenured or not.  It regularly and publicly publishes its policy

through various means. One such statement provides: "Yale University is committed to the free expression of ideas by members of the University community, including expression of political views; and to the freedom of students and faculty to engage in scholarship related to political life and discourse. The Woodward Report (http://yalecollege.yale.edu/deans-office/policies-reports/report-committee-freedom-expression-yale) reinforces these commitments, and reminds us that within the diversity of the Yale community there coexist many points of view." The so-called Woodward Report states:

> We value freedom of expression precisely because it provides a forum for the new, the provocative, the disturbing, and the unorthodox. Free speech is a barrier to the tyranny of authoritarian or even majority opinion as to the rightness or wrongness of particular doctrines or thoughts.

> If the priority assigned to free expression by the nature of a university is to be maintained in practice, clearly the responsibility for maintaining that priority rests with its members. By voluntarily taking up membership in a university and thereby asserting a claim to its rights and privileges, members also acknowledge the existence of certain obligations upon themselves and their fellows. Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed.

> The policy of academic freedom is incorporated in the Faculty Handbook, and other policy statements, rules, guidelines and regulations of the University, and constitutes an essential restraint against interference by the administration and university of its exercise by the faculty.

45.     By terminating Dr. Lee's faculty appointment, Yale did not maintain its commitment to its faculty and students.

46.     After multiple informal attempts to elicit an opportunity to be heard from her department failed, Dr. Lee filed an appeal related to her termination on or about August 14, 2020 with Dr. Nancy J. Brown, Dean of the School of Medicine. Her appeal was not considered. Rather, on or about August 21, 2020, her appeal was dismissed by Dr. Brown, for procedural reasons. On

or about August 25, 2020, Dr. Lee filed a letter of appeal with Dr. Scott A. Strobel, Yale's Provost, and then to President Salovey, Yale's President, on or about September 24, 2020. These appeals and subsequent requests for review were summarily denied.

47. On September 4, 2020, Dr. Krystal sent Dr. Lee a letter explaining the basis of the decision to terminate her faculty appointment. In his letter, Dr. Krystal stated, in part:

> The key question in our minds was whether you had the clinical judgment and professionalism to teach trainees key aspects of their profession. Your diagnostic impressions of President Trump and several other public figures and your recommendations for treating President Trump played a role in our discussion. This was not because of the political content of your speech. … As detailed below, the Committee's concern was what your diagnoses and treatment recommendations said about your clinical abilities and professionalism.
>
> Since 2017, you have taken the position that you have a "duty to warn" the public that President Trump presents a threat to public safety. The duty to warn derives from the Tarasoff decision and subsequent legal developments, and it applies to clinicians in a treatment relationship with a potentially dangerous person. It has never been applied outside that context. In public comments, you said that President Trump was incapacitated by a psychiatric disorder, and you identified symptoms such as aggressive speech, sexual misconduct, incitement to violence, belief in conspiracies, declining cognitive functioning, and neurological deficits. Initially, you did not identify the disorder causing these supposed symptoms. In December 2019, you said publicly that President Trump exhibited a "pattern of delusions," was "lacking rational decision-making capacity," and had "definitive signs of severe pathology" that required "an advanced level of care." In January 2020, you called for "an involuntary evaluation" of President Trump, and you said, "I am beginning to believe a mental health hold . . . will become inevitable." That same month, you publicly suggested that President Trump, Rudolph Giuliani and Alan Dershowitz had a "shared psychosis."
>
> I want to emphasize that you did not make these statements as a layperson offering a political judgment; you made them explicitly in your professional capacity as a psychiatrist and on the basis of your psychiatric knowledge and judgment. For that reason, the committee decided it was appropriate to consider how these statements reflected your ability to teach trainees.

***

Our discussion then turned to your statement that President Trump and Mr. Dershowitz had a shared psychosis.

***

Following our discussion with you, the committee considered whether the information that you shared with us was relevant to your capacity to teach trainees the core competencies required by the ACGME. We decided that our discussion with you implicated three of the six competencies: medical knowledge, interpersonal and communication skills, and professionalism.

***

Finally, the ACGME requires trainees "to demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population." Although the committee does not doubt that you are acting on the basis of your personal moral code, your repeated violations of the APA's Goldwater Rule and your inappropriate transfer of the duty to warn from the treatment setting to national politics raised significant doubts about your understanding of crucial ethical and legal principles in psychiatry.

In light of the above concerns, the Committee concluded that the Department should not seek a new teaching role for you. The Committee report was shared with the Executive Committee of the Department of Psychiatry and discussed at length. Its recommendation, that your teaching duties not be reinstated, was endorsed unanimously by the Executive Committee. In the absence of a formal teaching role, your voluntary appointment lapsed.

I hope that this letter clarifies the process leading to the Department decision to not reinstate your teaching responsibilities. We recognize that without formal teaching responsibilities your appointment could not be reinstated.

48.    The September 4, 2020 correspondence from Dr. Krystal provided new and distinct reasons for terminating Dr. Lee's faculty appointment than those expressed in the May 17, 2020 correspondence, thereby further demonstrating that the reasons stated for terminating Dr. Lee's faculty appointment are pretextual. Further, the September 4, 2020 correspondence demonstrates that the decision to terminate Dr. Lee's faculty appointment directly resulted from Dr. Lee's protected speech. The May 17, 2020 correspondence stated that the reason for her termination was because she did not have a formal teaching role; however, the September 4, 2020 letter clarified

15

Yale could have reinstated Dr. Lee's teaching role, but it chose not to do so because of her protected speech.

49.     On or about December 4, 2020, Dr. Lee sent President Salovey a letter inquiring whether Yale would consider a reappointment following its decision to terminate her longstanding relationship with Yale after it received communication from Mr. Dershowitz in January 2020. Dr. Lee requested that they meet to discuss how Dr. Lee could continue her role at the University. Yale declined the request.

50.     The extramural speech that Dr. Krystal cited as a basis for Dr. Lee's non-reappointment is protected expression under principles of academic freedom. Moreover, the speech is protected by the First Amendment of the United States Constitution and the First Amendment of the Connecticut Constitution.

51.     Dr. Lee has suffered damages as a result of Defendant's actions. Dr. Lee's speech was not self-serving or self-aggrandizing. Dr. Lee has not profited from her fulfilment of her responsibility to society as a psychiatrist. The effects of the pandemic, as well as the insurrection on the Capitol, demonstrate that Dr. Lee was not speaking frivolously or without deep deliberation, and that she was not off-base in invoking a responsibility to society, as outlined in the preamble of the American Psychiatric Association's own ethics code. Since she was acting on a citizen's duty to contribute her gifts to society, including her professional training and knowledge, and not as a psychiatrist under private employment, her speech is protected under the First Amendment. At the same time, this freedom happens to be compatible with her professional responsibility to protect society as specified in the APA's ethics code and with her non-collusion with a destructive government as clarified under the Declaration of Geneva.

## V.      FIRST CAUSE OF ACTION – BREACH OF CONTRACT AGAINST YALE

52.     Dr. Lee realleges Paragraphs 1 - 51 as if fully set forth herein.

53.     As set forth above, Dr. Lee and Yale had a contractual and beneficial relationship through Dr. Lee's faculty appointment.

54.     As set forth above, Dr. Lee enjoyed academic freedom in her faculty appointment.

55.     As set forth above, Dr. Lee's faculty appointment was governed by a Faculty Handbook, policy statements, guidance, regulations, and rules, which provided the essential employment understandings between members of the faculty and Yale.

56.     Yale terminated Dr. Lee's faculty appointment in violation of her right to academic freedom, and other rights contained within Yale's Faculty Handbook, policy statements, guidance, regulations, and rules applicable to her faculty appointment.

57.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

## VI.     SECOND CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST YALE

58.     Dr. Lee realleges Paragraph 1 - 57 as if fully set forth herein.

59.     Yale did not act in good faith when it deprived Dr. Lee of her right to academic freedom and/or the rights and guarantees provided by the Faculty Handbook, policy statements, guidance, regulations and rules applicable to her faculty appointment, thereby depriving Dr. Lee of the benefit of the contract.

60.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

## VII.    THIRD CAUSE OF ACTION - WRONGFUL TERMINATION IN VIOLATION OF CONN. GEN. STAT. § 31-51q AGAINST YALE

61.     Dr. Lee realleges Paragraphs 1 - 60 as if fully set forth herein.

62.     Dr. Lee and Yale entered into an employment relationship when Yale appointed

Dr. Lee to Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine. This relationship was ongoing at all material times, and it was contractual and mutually beneficial in nature.

63.     Dr. Lee was exercising rights protected by the First Amendment to the United States Constitution and the Connecticut Constitution when she tweeted as set forth in Paragraph 29 of the Complaint.

64.     Yale terminated Dr. Lee's faculty appointment on account of her exercise of her protected speech rights.

65.     Dr. Lee's exercise of her free speech rights was not disruptive in the workplace and did not substantially or materially interfere with her bona fide job performance or with her working relationship with Yale.

66.     Yale's termination of Dr. Lee's faculty appointment on account of Dr. Lee exercising rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Connecticut Constitution violated Conn. Gen. Stat. § 31-51q.

67.     Plaintiff has suffered and continues to suffer damages as a result of Yale's conduct, including but not limited to lost income, lost benefits, loss of resources, loss of enjoyment of profession, emotional distress, harm to reputation and loss of enjoyment of life, as well as attorneys' fees and costs.

## VIII.   FOURTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION AGAINST YALE

68.     Dr. Lee realleges Paragraphs 1 - 67 as if fully set forth herein.

69.     Yale provided Dr. Lee the Faculty Handbook, which included provisions relating to the faculty's right to academic freedom and the right to freedom of expression. The Handbook

provided the essential employment understandings between members of the faculty and the University.

70.     Yale also issued policy statements, guidance, regulations, and rules related to academic freedom, the right to free expression, and other rights applicable to Dr. Lee's faculty appointment.

71.     Dr. Lee, therefore, believed that she was protected by academic freedom and the right to free expression.

72.     Dr. Lee relied on Yale's representations when she tweeted about Mr. Dershowitz.

73.     Dr. Lee's faculty appointment was terminated due to her conduct that was supposed to be protected by academic freedom and freedom of expression.

74.     Yale did not abide by its own terms relating to academic freedom and freedom of expression when it terminated Dr. Lee's faculty appointment for pretextual reasons.  Thus, the representations made in the Handbook, as well as its policy statements, guidance, regulations, and rules, were false, and they were known or should have been known to be false by Yale.

75.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

## IX.    FIFTH CAUSE OF ACTION – DECLARATORY JUDGMENT AGAINST YALE

76.     Dr. Lee realleges Paragraphs 1 - 75 as if fully set forth herein.

77.     An actual, present, and justiciable controversy has arisen between Plaintiff and Yale as alleged in this Complaint.

78.     Pursuant to 28 U.S.C. § 2201, Dr. Lee seeks declaratory judgment from this Court declaring the rights and legal relations Plaintiff has with Yale, including but not limited to Plaintiff's legal rights, contractual rights, employment rights, and civil rights, available by statute and/or common law. Specifically, Plaintiff requests the Court to declare that Yale violated Dr.

Lee's rights, including but not limited to:

    a.   Yale breached its contract with Plaintiff.

    b.   Yale breached the implied covenant of good faith and fair dealing.

    c.   Yale violated Plaintiff's employment rights.

    d.   Yale retaliated against Plaintiff in violation of Conn. Gen. Stat. § 31-51q.

    e.   Yale negligently misrepresented its commitment to academic freedom and the right to freedom of expression as it relates to Plaintiff's faculty appointment.

    f.   Yale did not comply with its commitment to academic freedom and the right to freedom of expression as it relates to Plaintiff's faculty appointment.

WHEREFORE, Plaintiff claims a trial by jury, judgment against defendant, and damages as follows:

1.    Reinstatement;

2.    Compensatory economic and non-economic damages, including lost income, lost benefits, lost resources, lost privileges, lost indirect but significant remuneration, future economic losses, emotional distress, harm to reputation and loss of enjoyment of life;

3.    Injunctive and other equitable relief;

4.    A declaratory judgment pursuant to 28 U.S.C. § 2201;

5.    Punitive damages as provided by Conn. Gen. Stat. § 31-51q and/or common law;

6.    Interest pursuant to Conn. Gen. Stat. § 37-3a and costs;

7.    Attorney's fees and costs; and

8.    Such other relief in law or equity the Court deems appropriate.

PLAINTIFF,
BANDY LEE, MD, MDiv

By     /s/ Robin B. Kallor
       Robin B. Kallor (ct26536)
       Cindy M. Cieslak (ct29117)
       Melinda A. Powell (ct17049)
       Rose Kallor, LLP
       750 Main Street, Suite 309
       Hartford, CT 06103
       Tel #:  (860) 361-7999
       Fax #:  (860) 270-0710
       Email:  rkallor@rosekallor.com
       ccieslak@rosekallor.com
       mpowell@rosekallor.com