**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **BANDY LEE, MD, MDiv,** | |
| **Plaintiff,** | **CASE NO: 3:21-cv-00389-MPS** |
| **v.** | |
| **YALE UNIVERSITY,** | |
| **Defendant.** | **JUNE 11, 2021** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 3

LEGAL STANDARD ......................................................................................................... 11

ARGUMENT ....................................................................................................................... 12

   I.   **Plaintiff's Contract Claim Fails to State a Claim (Count One)**................................. 12

      A.   Relevant Portions of the Faculty Handbook and Other Yale Policies................... 12

      B.   Yale's Decision Not to Reappoint Plaintiff Was An Academic Judgment Entitled to Deference................................................................................................................ 14

      C.   Plaintiff's Breach of Contract Claims Fail for Other Reasons and Should Be Dismissed .............................................................................................................. 20

          1.   Statements on Academic Freedom.................................................................... 22

          2.   Faculty Handbook Section Governing Decisions Not to Reappoint or Promote 23

          3.   Statements on Investigation of Academic Misconduct.......................................... 27

  II.   **Plaintiff Fails to State a Claim for Violation of the Covenant of Good Faith and Fair Dealing (Count Two)** ..................................................................................... 27

  III.  **Plaintiff's Negligent Misrepresentation Claim Fails to State a Claim (Count Four)** 28

  IV.  **Plaintiff's § 31-51q Claim Fails to State a Claim (Count Three)** ............................... 29

      A.   Plaintiff Has Not Alleged An Employment Relationship Within The Meaning of § 31-51q ................................................................................................................ 29

      B.   Plaintiff Has Not Alleged a "Discipline or Discharge" Within The Meaning of § 31-51q ................................................................................................................ 34

      C.   Section 31-51q Does Not and Cannot Limit a University's First Amendment Rights ..................................................................................................................... 36

CONCLUSION ................................................................................................................... 38

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Consulting, LLC v. Alexion Pharms., Inc.*,
194 Conn. App. 316, 220 A.3d 890 (2019) ....................................................................21, 26

*Ames v. Commissioner of Motor Vehicles*,
267 Conn. 524, 839 A.2d 1250 (2004) ...................................................................................36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................11, 17, 32

*Avedisian v. Quinnipiac Univ.*,
387 F. App'x 59 (2d Cir. 2010) ...............................................................................................34

*Bellsite Dev., LLC v. Town of Monroe*,
155 Conn. App. 131, 122 A.3d 640 (2015) ............................................................................29

*Beverley v. Douglas*,
591 F. Supp. 1321 (S.D.N.Y. 1984).............................................................................31, 32, 33

*Brantley v. Residential Makeover, LLC*,
2012 WL 3518072 (Conn. Super. Ct. July 25, 2012) ............................................................21

*Comm'n on Hum. Rts. & Opportunities v. Echo Hose Ambulance*,
322 Conn. 154, 140 A.3d 190 (2016) .....................................................................................30

*Craine v. Trinity College*,
259 Conn. 625, 791 A.2d 518 (2002) .............................................................................. *passim*

*Daley v. Wesleyan Univ.*,
63 Conn. App. 119, 772 A.2d 725 (2001) ....................................................................16, 17, 19

*Douglas v. The Board of Trustees for Connecticut State University*,
1999 WL 240736 (Conn. Super. Ct. April 8, 1999) ...............................................................35

*Edwards v. E. Connecticut State Univ.*,
2017 WL 6601935 (Conn. Super. Ct. Nov. 22, 2017) ............................................................34

*Est. of Brooks v. Comm'r of Revenue Servs.*,
325 Conn. 705, 159 A.3d 1149 (2017) ...................................................................................38

*Faigel v. Fairfield University*,
75 Conn. App. 37 (2003) ........................................................................................................20

*Finn v. Barney*,
    471 F. App'x 30 (2d Cir. 2012) ....................................................................................3

*Geysen v. Securitas Sec. Servs. USA, Inc.*,
    322 Conn. 385, 142 A.3d 227 (2016) .........................................................................27

*Glaser v. Upright Citizens Brigade, LLC*,
    377 F. Supp. 3d 387 (S.D.N.Y. 2019) .......................................................................33

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ..............................................................................................15, 36

*Gupta v. New Britain General Hospital*,
    239 Conn. 574, 687 A.2d 111 (1996) .......................................................16, 17, 19, 20, 24

*Hesse v. Godiva Chocolatier, Inc.*,
    463 F. Supp. 3d 453 (S.D.N.Y. 2020) .........................................................................3

*Hope Acad. v. Friel*,
    2004 WL 1888909 (Conn. Super. Ct. July 22, 2004) ...............................................20

*Hughes v. Twenty-First Century Fox, Inc.*,
    304 F. Supp. 3d 429 (S.D.N.Y. 2018) ........................................................................33

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ..............................................................................................36, 37

*Keller v. Beckenstein*,
    117 Conn. App. 550, 979 A.2d 1055 (2009) ..............................................................21

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014) ......................................................................................11

*Landry v. Spitz*,
    102 Conn. App. 34, 925 A.2d 334 (2007) .................................................................28

*Legnos v. Flow Int'l Corp.*,
    2014 WL 5099279 (Conn. Super. Ct. Sept. 8, 2014) ................................................21

*Lieberman v. Gant*,
    630 F.2d 60 (2d Cir. 1980) ........................................................................................16

*Madej v. Yale Univ.*,
    2020 WL 1614230 (D. Conn. Mar. 31, 2020) ......................................................16, 20

*McIntyre v. Fairfield University*,
    34 Conn. L. Rptr. 219, 2003 WL 1090690 (Conn. Super. Ct. March 3, 2003) .......35

*McNeil v. Yale Univ.*,
    436 F. Supp. 3d 489 (D. Conn. 2020) .............................................................................20, 27

*Meadowbrook Ctr., Inc. v. Buchman*,
    149 Conn. App. 177, 90 A.3d 219 (2014) ..............................................................................25

*Menaker v. Hofstra Univ.*,
    935 F.3d 20 (2d Cir. 2019) .................................................................................................4, 12

*Miami Herald Publishing Co. v. Tornillo*,
    418 U.S. 241 (1974) .................................................................................................................36

*Mohan v. UBS Fin. Servs. Inc.*,
    2020 WL 1274602 (D. Conn. Mar. 17, 2020) .......................................................................34

*Neidig v. Heilig*,
    2007 WL 4215479 (Conn. Super. Ct. Nov. 7, 2007) ...........................................................21

*O'Connor v. Davis*,
    126 F.3d 112 (2d Cir. 1997) ...................................................................................................32

*O'Donnell v. AXA Equitable Life Ins. Co.*,
    2019 WL 4667932 (Conn. Super. Ct. Aug. 22, 2019) ..........................................................25

*Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*,
    475 U.S. 1 (1986) ..............................................................................................................36, 37

*Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*,
    180 F.3d 468 (2d Cir. 1999) ...................................................................................................33

*Rafalko v. Univ. of New Haven*,
    129 Conn. App. 44, 19 A.3d 215 (2011) ................................................................................25

*Ramirez v. Health Net of the Northeast, Inc.*,
    285 Conn. 1, 938 A.2d 576 (2008) .........................................................................................28

*Redgrave v. Boston Symphony Orchestra, Inc.*,
    855 F.2d 888 (1st Cir. 1988) ..................................................................................................37

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) .................................................................................................................15

*Richards v. Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019) .....................................................................................................28

*Sans–Syzmonik v. Hartford Public School*,
    2014 WL 7156776 (Conn. Super. Ct. Nov. 7, 2014) ...........................................................35

*Schifano v. Bank of New York Co.*,
    2013 WL 1715731 (Conn. Super. Ct. Apr. 1, 2013).................................................................21

*Soyak v. Town of New Fairfield, Ct.*,
    2008 WL 3992713 (D. Conn. Aug. 21, 2008) ...........................................................................3

*State v. Williams*,
    205 Conn. 456, 534 A.2d 230 (1987) ......................................................................................38

*Stuart v. Freiberg*,
    316 Conn. 809, 116 A.3d 1195 (2015) ....................................................................................28

*Sturm v. Harb Development, LLC*,
    298 Conn. 124, 2 A.3d 859 (2010) ..........................................................................................29

*Tadros v. Coleman*,
    717 F. Supp. 996 (S.D.N.Y. 1989) ..........................................................................31, 32, 33

*Tadros v. Coleman*,
    898 F.2d 10 (2d Cir. 1990)...........................................................................................31, 32

*Varley v. First Student, Inc.*,
    158 Conn. App. 482, 119 A.3d 643 (2015) ........................................................................29, 30

*Visconti v. Pepper Partners Ltd. P'ship*,
    2002 WL 1293224 (Conn. Super. Ct. May 14, 2002)...............................................................21

*Warning Lights & Scaffold Service, Inc. v. O & G Industries, Inc.*,
    102 Conn. App. 267, 925 A.2d 359 (2007) .............................................................................25

*Weinstein v. Univ. of Connecticut*,
    66 Conn. L. Rptr. 400, 2018 WL 2222131 (Conn. Super. Ct. Apr. 25, 2018) ........................34

*Wilson v. GMAC Mortgage Corp.*,
    1996 WL 409338 (Conn. Super. Ct. June 27, 1996)................................................................21

*York v. Ass'n of Bar of City of New York*,
    286 F.3d 122 (2d Cir. 2002)........................................................................................31, 32, 33

**Statutes**

Conn. Gen. Stat. § 31-51q...................................................................................... *passim*

Connecticut Fair Employment Practices Act ....................................................................30, 35

Conn. Gen. Stat. § 31-51m..........................................................................................................35

Conn. Gen. Stat. § 31-51pp(a)(2)...............................................................................................36

Massachusetts Civil Rights Act ....................................................................................37

**Other Authorities**

Rule 12(b)(6)...............................................................................................................11

## INTRODUCTION

Dr. Bandy Lee served for several years as an unpaid volunteer professor in the Psychiatry Department (the "Department") at Yale University. When her last term as a volunteer faculty member expired, Yale did not offer her another term, concluding that she lacked important skills for teaching psychiatry trainees. She acknowledges that a committee in the Department, responding to complaints and concerns, interviewed her and determined that her diagnoses of public figures, whom she had not examined, did not adequately reflect the process of differential diagnosis, did not meet criteria set out in the DSM-5, and failed to consider alternative explanations for the data. Ultimately, the committee concluded that she was deficient in three of the six core competencies required to teach psychiatry trainees: medical knowledge, interpersonal and communication skills, and professionalism. Accordingly, the Department chose not to seek a new teaching role for her. And because her voluntary faculty appointment could not be renewed without a teaching role, the voluntary faculty appointment was not renewed.

Plaintiff had no contractual right to receive another appointment at all, let alone to receive one despite Yale finding that she lacked skills essential for teaching psychiatry trainees. The Yale Faculty Handbook, which Plaintiff points to as the source of her contractual rights, does not vest voluntary faculty with a right to be eternally reappointed. Voluntary faculty in the Yale School of Medicine (the "Medical School"), where the Department is located, receive a "term appointment," and the Faculty Handbook plainly states that "[f]aculty members on term appointments **do not have a right to reappointment** or promotion." Instead, reappointment decisions "are subject to the exercise of professional and scholarly judgment by competent University authorities."

Plaintiff asks this Court to second-guess Yale's exercise of professional and scholarly judgment, but Connecticut law forbids that. The Connecticut Supreme Court recognizes that a

1

"university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom," one "rooted in the first amendment," which "prevents courts from substituting their judgment for the judgment of the school." *Craine v. Trinity College*, 259 Conn. 625, 646, 791 A.2d 518, 536 (2002). Dr. Lee repeatedly invokes "academic freedom" in her complaint, but she misunderstands its legal meaning. Academic freedom means that universities have a constitutionally protected right to determine who may teach their students, not that every volunteer teacher has a right to teach forever, even when the university where they volunteer determines that they are no longer willing or able to teach students appropriately.

Perhaps seeking to evade Connecticut's longstanding deference to universities' exercise of professional judgment in the selection of teachers, Plaintiff augments her vague invocations of academic freedom with a technical claim based on an internal-notification rule in the Faculty Handbook. That rule requires that a "decision" not to reappoint a faculty member be sent to another office within the Medical School before it is "communicated" to the faculty member. Dr. Lee alleges that the internal-notification rule was not followed in her case. But the Faculty Handbook states that this internal-notification rule does not apply to unpaid volunteer teachers like Dr. Lee. Moreover, Plaintiff has not alleged that the result would have been any different if another office within the Medical School had been notified internally before the Department communicated to her its decision not to reappoint her.

Plaintiff also alleges that the decision not to reappoint her was based on her political speech and thus violated Conn. Gen. Stat. § 31-51q. That statute provides certain remedies to "employees" whose employers subject them "to discipline or discharge" for exercising constitutionally protected free speech rights. She cannot state a claim under that statute, both because she was a

volunteer (not an employee) and because a decision not to reappoint a volunteer faculty member whose appointment has expired does not constitute "discipline or discharge." In any event, a university—which unequivocally has its own First Amendment rights—cannot be forced by a state statute to associate with professors it does not wish to associate with, whether because those professors are inadequate teachers or because their individual speech runs counter to the university's values. Section 31-51q should not be read so broadly that it violates Yale's constitutional rights, but if it were, it would be unconstitutional here as applied.

## BACKGROUND

Plaintiff is a psychiatrist who has served as a volunteer Yale faculty member. In 2003, she was appointed as Assistant Clinical Professor within the Law and Psychiatry Division of the Medical School. (Compl. ¶¶ 2, 62). Her appointment was for three-year terms, running July 1 to June 30. (Compl. ¶ 9). Plaintiff did not earn a salary or wages from Yale, but her voluntary service provided her with perks like library access, use of computer programs and software, office space, and campus transportation. (Compl. ¶ 12).

Plaintiff shared her political opinions with the press,[1] as do other Yale professors, both volunteer and paid. Unlike other Yale professors, volunteer or paid, she began using her credentials as a licensed psychiatrist to make public statements using psychiatric diagnostic terminology,

---

[1] *See, e.g.,* https://www.msn.com/en-us/news/politics/psychiatrist-who-evaluated-trump-s-mental-state-on-cnn-and-msnbc-argues-president-is-worse-than-hitler/ar-BB1aCK7R ("Lee declared on Twitter, 'Donald Trump is not an Adolf Hitler. At least Hitler improved the daily life of his followers, had discipline, and required more of himself to gain the respect of his followers. Even with the same pathology, there are varying degrees of competence.'"). This Court can take judicial notice of Dr. Lee's public commentary even though she does not reference them all in her complaint. *See Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (judicial notice of webpages and media reports); *see also Soyak v. Town of New Fairfield, Ct.*, 2008 WL 3992713, at *1 (D. Conn. Aug. 21, 2008) (collecting cases); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453 (S.D.N.Y. 2020).

describing what she believed was the mental health of public figures. Most of her public statements

focused on then-President Trump. She began speaking of what she called his "psychosis," which

over time she began to describe as a psychosis "shared" by his followers.

The first major step in her public diagnoses of public figures came in 2017, when Plaintiff

organized a conference at Yale, which led to the publication of a book, *The Dangerous Case of*

*Donald Trump: 27 Psychiatrists and Mental Health Experts Assess A President*. In that book,

Plaintiff and several other mental health professionals claimed that "President Trump's mental

health was affecting the mental health of the people of the United States…." (Compl. ¶¶ 23, 21).

The conference criticized an ethics rule promulgated by the American Psychiatric Association

("APA"). The APA rule states that:

> On occasion psychiatrists are asked for an opinion about an individual who is in the
> light of public attention or who has disclosed information about himself/herself
> through public media. In such circumstances, a psychiatrist may share with the
> public his or her expertise about psychiatric issues in general. However, it is
> unethical for a psychiatrist to offer a professional opinion unless he or she has
> conducted an examination and has been granted proper authorization for such a
> statement.[2]

---

[2] *See* The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry,
2013 Edition, American Psychiatry Association, https://www.psychiatry.org/psychiatrists/
practice/ethics. On a motion to dismiss, a "complaint is deemed to include any written instrument
attached to it as an exhibit or any statements or documents incorporated in it by reference."
*Menaker v. Hofstra Univ.*, 935 F.3d 20, 28 (2d Cir. 2019) (quoting *Chambers v. Time Warner*, 282
F.3d 147, 152 (2d Cir. 2002) (considering, on review of ruling on motion to dismiss,
correspondence referred to in complaint, "including those portions not specifically quoted").  The
Complaint incorporates by reference several documents not attached to the Complaint: Dr.
Krystal's January 13, 2020 email to Plaintiff (Compl. ¶ 30) (attached as Exh. A); Dr. Krystal's
September 4, 2020 letter to Plaintiff (Compl. ¶¶ 47, 48) (attached as Exh. B); Dr. Krystal's May
17, 2020 letter to Plaintiff regarding Plaintiff's non-reappointment (Compl. ¶ 33) (attached as Exh.
C); President Salovey's response to Plaintiff's letter of appeal (Compl. ¶ 49) (attached as Exh. D);
the Faculty Handbook that Plaintiff asserts as the basis for Plaintiff's breach of contract claim
(Compl. ¶¶ 41, 44, 55, 56) (attached as Exh. E, and also available at
https://provost.yale.edu/sites/default/files/files/Faculty%20Handbook_8-22-19.pdf); Dr. Brown's
August 21, 2020 denial (Compl. ¶¶ 46) (attached as Exh. F); and the Provost's September 8, 2020
response to Plaintiff's letter of appeal (Compl. ¶ 46) (attached as Exh. G).

Plaintiff has a different view of psychiatric ethics and criticizes the American Psychiatric Association rule. (*See* Compl. ¶¶ 18, 21).

Later in 2017, when she was interviewed in a *Salon* podcast and article, Plaintiff stated as a psychiatrist that then-President Trump had "a grave mental disability" and "mental impairment." She described "Trump and his followers' pathology," and stated that "[w]hen you see a person falling into [mental] illness, the deeper the illness grows, the less aware they will be of their illness. The more insistent they will be on destructive ways…. At a later point, doctors and hospitals will be the thing that they will avoid at all costs. That is why sometimes physicians have to hospitalize against the person's will or put them on a stretcher."[3]

By 2019, Plaintiff was regularly reported as making public statements about the mental health of public figures whom she had not examined. In July 2019, for example, in a lengthy interview, she was quoted as saying that the "president is deteriorating rapidly." He had a "lack of mental capacity," she said. She called his verbal attacks on others "a maladaptive means of coping with stress." Finally, she noted that while "[m]ost mental disorders cause suffering on the afflicted person and violence against the self…there is a small subset that inflicts suffering on and violence against others.  It should be no secret which category the president's impairments fall."[4]

In November 2019, she wrote that the "president's cognitive functioning alone, in terms of his ability to process information and thoughts, has deteriorated to the point where he has difficulty stringing together a single coherent sentence. His word-finding difficulties, repetitions, and loose connections are only superficial indicators of a more serious, deeper process. He has additionally

---

[3] https://web.archive.org/web/20171106052424/https://www.salon.com/2017/05/25/psychiatrist-bandy-lee-we-have-an-obligation-to-speak-about-donald-trumps-mental-health-issues-our-survival-as-a-species-may-be-at-stake/

[4] https://www.rawstory.com/2019/07/yale-psychiatrist-trump-using-racism-as-a-coping-mechanism-as-his-mental-state-rapidly-deteriorates/

shown multiple neurological signs, including slurred speech, movement abnormalities, and confabulations (filling in gaps of memory with fabricated stories)…. These are not actions that are explainable as rational or political strategy, as much as a typical manifestation of the mental impairments we have been observing for a long time."[5]

In December 2019, in an interview with *The Independent* (U.K.)*,* Plaintiff concluded that the President was experiencing "delusions."[6] The President's tweets did not represent calculated political moves, she said. Rather, they revealed mental illness: "they fit the pattern of delusions rather than just plain lies." She acknowledged that some observers "might dismiss the warning she and her colleagues are delivering as just a product of differences of political opinion." But she rejected that notion. She urged the public to take her diagnoses seriously because her psychiatric training allowed her to recognize what ordinary political observers could not: that the President was exhibiting "definitive signs of severe pathology of someone who requires an advanced level of care" and who "meets every criterion of lacking a rational decision making capacity." Plaintiff emphasized that it was her psychiatric training that allowed her to "distinguish between what is healthy and what is abnormal," between what is "pathology" and what is not. She claimed to have recognized "a pattern of disease," not just "another political ideology or another political style." While an "everyday person who is unfamiliar with pathology" might think that the President was operating politically rather than pathologically, her psychiatric training allowed her to determine that the President was delusional, diseased, pathological, "lacking a rational decision making

---

[5] https://www.rawstory.com/2019/11/trumps-53-minute-fox-rant-is-another-dangerous-sign-of-his-worsening-mental-state-yale-psychiatrist/

[6] https://www.independent.co.uk/news/world/americas/us-politics/trump-mental-state-impeachment-psychiatrist-petition-congress-a9232386.html

capacity," and requiring "an advanced level of care." Plaintiff concluded that the President's delusions risked drawing members of the public into a "shared psychosis at the national level."

On January 2, 2020, Alan Dershowitz was reported as saying that he had a "perfect sex life." (Compl. ¶ 27). Plaintiff noted that then-President Trump frequently used the word "perfect" to describe himself, and from that similarity in word usage, she leaped to a psychiatric diagnosis: "given the severity and spread of 'shared psychosis' among just about all of Trump's followers," Plaintiff wrote, Dershowitz had likely "wholly taken on Trump's symptoms by contagion." (*Id.*). She also described Dershowitz as "delusional."[7]

On January 13, 2020, Dr. John Krystal, Chair of the Psychiatry Department, emailed Plaintiff, requesting a meeting to review her public statements. (Compl. ¶ 30) (quoting selectively from the letter but not attaching it to the Complaint). He wrote:

> Here is the problem for me. It seems to me that you have been increasingly reckless and irresponsible in your public statements. I have tried very hard to find a path that would enable you to continue your teaching role. However, you are putting me in a position where I have to ask, "Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?" I have consulted [Professor of Psychiatry and Professor (Adjunct) of Law] Howard Zonana on this question and he is equally concerned that you are not showing good medical judgement in your public statements. It is our shared opinion that if your behavior does not change, we will have no alternative but to terminate your teaching role at Yale University. As you have no other duties at Yale, termination of your teaching role would also terminate your faculty appointment.

(January 13, 2020 Email, Exh. A.).

Three days later, Plaintiff went to Twitter to elaborate on her "shared psychosis" statements. She stated that "[p]sychosis is particularly contagious" and that it had been given a new name in the current Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"). She

---

[7] https://twitter.com/bandyxlee1/status/1212895680273899520?lang=en

wrote that she suspected "shared psychosis with Donald Trump's followers" and noted that shared psychosis had been a diagnosis in the previous DSM-4.[8]

Later that month, Plaintiff met with a review committee (the Committee) composed of Dr. Krystal (Chair of the Department), Dr. Zonana (Head of the Law and Psychiatry Division) and two other faculty members in the Psychiatry Department to discuss her activities and consider how her statements reflected her ability to teach psychiatry trainees. (September 4, 2020 Letter, Exh. B; Compl. ¶ 47, 9). At the time, Plaintiff had no formal teaching activities sanctioned by the Psychiatry Department. (September 4, 2020 Letter, Exh. B). Her only teaching role was outside the Department, where she supervised two undergraduates and a medical student. (*Id.*) Plaintiff alleges that her meeting with the Committee was prompted by an email Dershowitz sent to Yale, complaining that Plaintiff had publicly diagnosed him as "psychotic" despite never having examined or even met him. (Compl. ¶ 29). Following its meeting with Plaintiff, the Committee found that her behavior was relevant to her capacity to teach trainees the core competencies required by the Accreditation Council for Graduate Medical Education ("ACGME"), and accordingly recommended that the Department should not seek a new teaching role for Plaintiff.[9] (Compl. ¶ 47; September 4, 2020 Letter, Exh. B).

On May 17, 2020, Dr. Krystal wrote to Dr. Lee, informing her that because she no longer had a formal teaching role in the Division of Law and Psychiatry, her voluntary faculty term appointment would end as scheduled on June 30, 2020 and would not be renewed. (Compl. ¶ 33; May 17, 2020 Letter, Exh. C).

---

[8] https://twitter.com/bandyxlee1/status/1217812518992842755?lang=en

[9] As noted, Plaintiff was not teaching within the Psychiatry Department, where she had her appointment, in 2020. (September 4, 2020 Letter, Exh. B).

Plaintiff appealed the non-reappointment to the Dean of the Medical School. (Compl. ¶ 46). The Dean wrote back, noting that Section III.L.3 of the Faculty Handbook describes the procedures through which faculty members may appeal non-reappointment decisions. (Aug. 21, 2020 Letter; Exh. F). Because that section excludes "voluntary faculty in the Schools of Medicine and Nursing" from its coverage, the Dean explained that the review procedures were not available to Plaintiff. (*Id.*) A few days later, she appealed to the Yale Provost. (Compl. ¶ 46). The Provost wrote back on September 8, 2020, noting that as the Dean had explained, the Faculty Handbook "explicitly excludes voluntary medical school faculty members from Yale's appeal procedures." (Sept. 8, 2020 Letter; Exh. G; *see* Compl. ¶ 46). The Provost also said that he had "asked Dr. Krystal to write to you and explain the reasons that the Department declined to reappoint you…." (Sept. 8, 2020 Letter; Exh. G).

Dr. Krystal had written that letter to Dr. Lee on September 4, 2020, explaining the basis of the Department's non-renewal of her appointment following its decision not to seek a new teaching role for her. (Compl. ¶ 47; September 4, 2020 Letter, Exh. B). That letter reminded Plaintiff that the Committee had met with her for an hour-long discussion of her role in the Department, "which consisted of teaching and mentorship in the Division of Law and Psychiatry." (September 4, 2020 Letter, Exh. B). Dr. Krystal noted that in recent years her role in the Division had been mainly providing case evaluations and consulting with law students in the clinical program, but that her consultations with law students had ended at the beginning of the year, partly because her "psychiatric opinions were open to challenge in court." (*Id.*) By the beginning of 2020, Dr. Krystal noted, Plaintiff was not doing any teaching within the Department and her "only teaching role was outside the Department." (*Id.*) That led to the purpose of the meeting, which was "to consider whether the Department could offer [her] a continuing teaching role." (*Id.*) Dr. Krystal stated the

9

"key question" in the Committee's mind was whether Dr. Lee "had the clinical judgment and professionalism to teach trainees key aspects of their profession." (*Id.*) Noting that the Department and Yale had publicly defended Plaintiff's academic freedom and her right to express her opinions, the Committee was nevertheless concerned with what her "diagnoses and treatment recommendations" revealed about her "clinical abilities and professionalism." (*Id.*) Dr. Krystal recounted several of Plaintiff's diagnostic opinions of President Trump. He noted that Dr. Lee had made these statements not "as a layperson offering a political judgment," but rather in her "professional capacity as a psychiatrist." (*Id.*) He stated that the Committee had concluded that it should consider how Dr. Lee's statements reflected her "ability to teach trainees." (*Id.*) The letter related that, at the meeting, Dr. Lee had failed to address questions put to her about whether her diagnosis and treatment recommendations of public figures "should have included a disclaimer regarding limited evidence" and "whether they adequately reflected the process of differential diagnosis," among other things. (*Id.*) Dr. Krystal also stated that when Dr. Lee was asked to explain the basis for her diagnosis of a shared delusional disorder, "none of the evidence [she] offered met the DSM-5 criteria for shared delusional disorder," and that she had "explored no other explanations that might have accounted for the data that led" her to that diagnosis. (*Id.*) Dr. Krystal stated that after the meeting, the Committee had considered Dr. Lee's responses in its assessment of her "capacity to teach trainees the core competencies required by the ACGME." (*Id.*) The Committee determined that Plaintiff lacked the capacity to teach psychiatry trainees three of the six ACGME core competencies: medical knowledge, interpersonal and communication skills, and professionalism. (*Id.*; *see also* Compl. ¶ 47). The Committee thus concluded that the Department should not seek a new teaching role for Plaintiff. (*Id.*) Its report was shared with the Executive Committee of the Department of Psychiatry and discussed at length, and the Executive Committee

10

unanimously endorsed the Committee's recommendation not to reinstate her teaching duties. (September 4, 2020 Letter, Exh. B). Without "a formal teaching role, [her] voluntary appointment lapsed." (*Id.*)

Dr. Lee submitted a letter of appeal to the Yale President on September 24, 2020. (Compl. ¶ 46). The President wrote back to her, saying that he had given her letter "careful thought," and that her request that he "intervene to reverse or suspend a reappointment decision made by a Yale department" would be "highly unusual and serious because the right of the senior faculty to determine their department's members without interference is fundamental to Yale's tradition of faculty governance." The President concluded by noting that the Department had "made a reasoned decision based on legitimate academic concerns," making it inappropriate for him to intervene in the decision. (Compl. ¶ 46; September 25, 2020 Email, Exh. D).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In reviewing the sufficiency of a complaint, [courts] accept only its factual allegations, and the reasonable inferences that can be drawn therefrom, as true." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *id*. (quoting *Iqbal*, 556 U.S. at 678), or "to accept as true allegations that are wholly conclusory," *id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

For motion to dismiss purposes, a "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."

*Menaker v. Hofstra Univ.*, 935 F.3d 20, 28 n.7 (2d Cir. 2019) (quoting *Chambers v. Time Warner*, 282 F.3d 147, 152 (2d Cir. 2002) (considering on review of ruling on motion to dismiss full contents of correspondence referred to in complaint, "including those portions not specifically quoted"). The Court may also take judicial notice of a document when it is "publicly available and its accuracy cannot reasonably be questioned." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (*citing* Fed. R. Evid. 201(b)); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

## ARGUMENT

### I.   Plaintiff's Contract Claim Fails to State a Claim (Count One)

Plaintiff asserts that "Yale terminated Dr. Lee's appointment in violation of her right to academic freedom, and other rights with Yale's Faculty Handbook, policy statements, guidance, regulations, and rules." (Compl. ¶ 56) The contract claim does not specify the promises allegedly breached, but elsewhere the Complaint alleges breaches of: Yale policies regarding academic freedom (Compl. ¶43); unspecified "procedures" on Yale's website regarding investigations of "academic misconduct"; and a specified internal-notification rule for non-reappointments set out in Section III.L of the Faculty Handbook. (Compl. ¶¶ 44, 41). None state a claim for relief.

### A.   Relevant Portions of the Faculty Handbook and Other Yale Policies

***"Academic misconduct."*** The Faculty Handbook references "academic misconduct" in its section on Research and Scholarship. The relevant portion states:

> All members of the faculty are expected to conduct their scholarly research and publish the results of that research consistent with the highest standards of ethical conduct, truth, and accuracy. Any instance of suspected academic misconduct should be reported to the Dean of the relevant school or of the FAS. In accordance with federal regulations, the University has established policies and procedures for responding to allegations of academic or research misconduct. The policies and procedures describe the University process for conducting resulting inquiries and investigations. Faculty and students are required to cooperate fully in any inquiry

or investigation of such allegations, e.g., by providing requested documents and information.

Faculty Handbook at 162.[10] The words in blue are hyperlinked to a section of the "Policies" portion of the Provost's website entitled "Dealing with Allegations of Academic Misconduct."[11] That section is limited to "academic fraud," i.e., "falsification or fabrication of data, plagiarism, or grossly negligent data collection or analysis," and sets out procedures for addressing such allegations.

*"Academic freedom."* Section II of the Faculty Handbook addresses "Academic Freedom and Faculty Standards of Conduct." It begins with its "Policy on Freedom of Expression":

> Members of this University have freely associated themselves with Yale and in doing so have affirmed their commitment to a philosophy of mutual tolerance and respect. Physical restriction, coercion, or intimidation of any member of the community is contrary to the basic principles of the University. It is also a violation of these principles and of the University's rules of conduct for any member of the faculty, staff, or student body to prevent the orderly conduct of a University function or activity, such as a lecture, meeting, interview, ceremony, or other public event. It is similarly a violation of these principles to block the legitimate activity of any person on the Yale campus or in any Yale building or facility.

Faculty Handbook at 5. It then sets out expectations of faculty members in their roles as educators, scholars, and members of the community.

*Reappointment rules.* The Faculty Handbook states that:

> The reappointment of persons holding term appointments is not automatic at Yale. Schools and departments are expected to make a careful evaluation of each candidate's work and promise, as well as the programmatic needs of the school or department, before deciding whether or not to recommend reappointment or

---

[10] The phrase "academic misconduct" appears in only two other places in the 183-page Faculty Handbook, neither relevant. *See id.* at 7 (stating that the description of faculty's "Role as Members of the Yale Community" does not "replace or supersede any other established Yale policies, such as those pertaining to academic misconduct, conflict of interest, discrimination, or sexual misconduct"); 124 (section addressed to postdoctoral appointees, noting that they are subject to the "Policies and Procedures for Dealing with Allegations of Academic Misconduct at Yale University").

[11] https://provost.yale.edu/policies/academic-integrity/dealing-allegations-academic-misconduct

promotion. Notice of non-reappointment for persons holding fulltime term appointments will be given in writing…although failure to provide such notice does not create any right to extension or reappointment.

Faculty Handbook at 12. Section III.L of the Faculty Handbook governs "Decisions Not to Reappoint or Promote and Their Review." The first paragraph of that section states in full:

> In making any appointment to the faculty, the University seeks to appoint the best candidate for the position. Faculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities.

Faculty Handbook at 19.[12] The Faculty Handbook provides extensive procedural rights for faculty members who believe that that their reappointment or promotion decision was improper. *Id.* at 20-23. The rules also contain an internal paperwork procedure: "When a decision not to reappoint … is made on a candidate who has held an appointment at Yale for more than one year, the school submits to the Provost a brief report of the action to be taken before that decision is conveyed to the candidate.  In the School of Medicine, departments submit such reports to its Office for Faculty Affairs." (Compl. ¶ 41) (citing Section III.L.1). However, the Faculty Handbook limits the procedural rights regarding reappointment or promotion to certain faculty:

> These procedures are available to all members of the teaching and research faculty, **with the exception of voluntary faculty in the Schools of Medicine and Nursing.**

Handbook at 20 n.11.[13] Plaintiff acknowledges that she served as voluntary faculty in the School of Medicine. (Compl. ¶ 46).

### B.  Yale's Decision Not to Reappoint Plaintiff Was An Academic Judgment Entitled to Deference

---

[12] "Appointments to the faculty are to a given rank and generally for a specified period of time ranging from one semester to five years… Many term appointments are renewable, though the time permitted in non-tenure ladder ranks is generally limited." Faculty Handbook at 10.

[13] Throughout this brief, unless otherwise indicated, all emphasis is added, and citations and internal quotation marks are omitted.

14

Plaintiff acknowledges that her term appointment as a volunteer faculty member expired. (Compl. ¶ 9). She nevertheless claims that Yale breached a contract with her by not reappointing her to another term as a volunteer faculty member. As noted above, the Faculty Handbook states that "[t]he reappointment of persons holding term appointments is not automatic at Yale," and that "departments are expected to make a careful evaluation of each candidate's work and promise, as well as the programmatic needs of the school or department, before deciding whether or not to recommend reappointment or promotion." Faculty Handbook at 12. Moreover, the Faculty Handbook is clear that "[f]aculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities." *Id.* at 19.

Plaintiff does not claim that she had a right to reappointment. Nor could she, since reappointment "is not automatic," *id.* at 12, and "[f]aculty members on term appointments do not have a right to reappointment." *Id.* at 19. The Faculty Handbook does not guarantee that Yale will engage in any specific process when deciding whether to offer another term of appointment to voluntary faculty. It states only that such decisions "are subject to the exercise of professional and scholarly judgment by competent University authorities." *Id.* Plaintiff's claim that she should have been reappointed thus amounts to the contention that Yale improperly exercised its "professional and scholarly judgment." *Id.*

Connecticut law forecloses such a claim. A university has a First Amendment right "to make its own judgments as to education," *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), a right that necessarily includes the right "to determine for itself on academic grounds" not only "what may be taught [and] how it shall be taught," *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312

(1978), but also *who* may teach. *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (*quoting*

*Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957)

(Frankfurter, J., joined by Harlan, J., concurring in the result)). As the Connecticut Supreme Court

has held:

> A university's prerogative to determine for itself on academic grounds who may
> teach is an important part of our long tradition of academic freedom.... This
> academic freedom is rooted in the first amendment.... First amendment protection
> of academic freedom prevents courts from substituting their judgment for the
> judgment of the school.

*Craine v. Trinity College*, 259 Conn. 625, 646, 791 A.2d 518 (2002). This deference applies where

"the employment decision is based on an academic judgment." *Id.* at 664; *see also Madej v. Yale*

*Univ.,* 2020 WL 1614230, at *8 (D. Conn. Mar. 31, 2020) ("in matters involving academic

judgment, courts must defer to academic institutions", and "be careful not to substitute [their]

judgment improperly for the academic judgment of the school").

Connecticut law is clear that a university's academic judgments about faculty

reappointment or promotion are not subject to judicial second-guessing. In *Daley v. Wesleyan*

*Univ.*, 63 Conn. App. 119, 133, 772 A.2d 725, 735–36 (2001), for instance, the plaintiff was a

tenure-track faculty member on a four-year term appointment. He applied for tenure and was

rejected, and when his term appointment expired, he received no further reappointment. He then

sued, alleging that the university breached its contract with him because the faculty

recommendations against his receiving tenure were "biased, inexpert, and inaccurate." *Id.* at 128.

Applying *Gupta v. New Britain General Hospital*, 239 Conn. 574, 687 A.2d 111 (1996), the

Appellate Court recognized that a university relationship with a faculty member can include both

"requirements representative of an employment relationship as well as requirements representative

of an academic relationship." *Daley*, 63 Conn. App. at 132.[14] The employment relationship involves matters like whether the employee is paid what was promised. "In contrast, an inquiry into whether an evaluation of a faculty member's 'teaching,' 'scholarship' or 'colleagueship' was accurate, … concerns a requirement representative of an academic relationship because conducting such evaluations is a specialty that is strongly associated with institutions of higher learning, and such an evaluation 'has little to do with the normal attributes of an employee relationship.'" *Id.* at 133 (citing *Gupta*, 239 Conn. at 586-87, n.12). *Daley* easily concluded that the decision not to promote plaintiff was not a standard employment decision, but an academic decision "afforded considerable discretion." *Daley*, 63 Conn. App. at 133. There was no claim because there was no proof "that the tenured faculty's decision not to recommend him for tenure was made arbitrarily, capriciously or in bad faith." *Id.* at 134.

Plaintiff here asserts that "Yale did not act in good faith." (Compl. ¶ 59). That is a legal assertion not entitled to weight under *Iqbal*. 556 U.S. at 678 (courts should not "accept as true a legal conclusion couched as a factual allegation"). The Complaint offers no plausible *factual* allegations that could support a finding of arbitrariness, caprice, or bad faith in Yale's decision not to offer Plaintiff another term as volunteer faculty. Instead, the Complaint (including the documents incorporated into it by reference) reveals growing concerns within the Department about Plaintiff's use of psychiatric diagnostic terms in describing public figures. (Compl. ¶¶ 30, 32, 47; January 13, 2020 Email, Exh. A; Sept. 4, 2020 Letter, Exh. B). While Plaintiff criticizes the Goldwater Rule, she recognizes that it is an ethical rule endorsed by the American Psychiatric Association. (Compl. ¶ 18). And while Plaintiff disagrees with those who support the ethical rule

---

[14] *Craine* also found that a university's "employment decision" that "is based on an academic judgment" is entitled to deference, while ordinary employment decisions are not. *Craine*, 259 Conn. at 664.

promulgated by the largest professional organization of psychiatrists and trainee psychiatrists in the United States, she does not (and could not) contend that those who support the ethical rule act in bad faith. She simply thinks they are mistaken in supporting the rule. (Compl. ¶ 21).

Months before Plaintiff's term expired, the Department Chair wrote her, stating that her diagnostic statements about public figures suggested that she was "not making cautious, reasoned statements qualified by the limitations of the information [she] [had] or considering alternatives to the conclusions that [she] present[ed]." (Compl. ¶ 30; *see also* January 13, 2020 Email, Exh. A.) He informed her that the statements put him "in a position where I have to ask, 'Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?'" (Compl. ¶ 30). The Committee met with Plaintiff to explore the question, and after the meeting, concluded that the Department should not seek a new teaching role for her. (Compl. ¶ 47; September 4, 2020 Letter, Exh. B). About six weeks before her term expired, she was told that she would not receive another appointment due to her lack of a teaching role. (May 17, 2020 Letter, Exh. C; Compl. ¶ 33). She acknowledges that Dr. Krystal wrote to her informing her that the Committee had concluded that she could not adequately teach psychiatry trainees three of the six ACGME core competencies (medical knowledge, interpersonal and communication skills, and professionalism), and that it had chosen not to seek a new teaching role for her or to reappoint her to another term as volunteer faculty. (Compl. ¶ 47; September 4, 2020 Letter, Exh. B) (explaining that reappointment to the voluntary faculty would not occur due to the lack of "a formal teaching role")). Finally, the Yale President responded to her request to intervene, replying that he had "given [her] letter careful thought," but that her request that he "intervene to reverse or suspend a reappointment decision made by a Yale department" would be "highly unusual and serious because

the right of the senior faculty to determine their department's members without interference is fundamental to Yale's tradition of faculty governance." (September 25, 2020 Email, Exh. D).

None of that alleges bad faith, arbitrariness, or caprice. "Bad faith means more than mere negligence; it involves a dishonest purpose." *Gupta*, 239 Conn. at 598. "The plaintiff bears a heavy burden in proving that [her] [non-reappointment] resulted from arbitrary, capricious, or bad faith conduct on the part of the [University]. To prevail, [she] must show that the [University's] decision had no discernible rational basis." *Id.* at 596.

The Complaint (and the documents it incorporates) acknowledges a difference of opinion on an APA ethical rule and Yale's repeatedly expressed concerns about Plaintiff's deliberate flouting of that rule. (Compl. ¶¶ 33, 47; *see also* September 4, 2020 Letter, Exh. B (relating January 17, 2020 review committee meeting)). Indeed, Plaintiff uses her Complaint as a forum to criticize that ethical rule. A psychiatry department's determination to adhere to an American Psychiatric Association ethical rule cannot be characterized as a decision lacking a "discernible rational basis." Importantly, the Complaint recognizes that the Department concluded that Plaintiff lacked key skills for teaching psychiatry trainees, as determined by the ACGME. (Compl. ¶ 47). Her diagnoses of public figures in violation of the APA ethical rule, and her inability to answer basic questions about those diagnoses, revealed important gaps in her teaching ability. (September 4, 2020 Letter, Exh. B) Yale determined that it could not "trust [Plaintiff] to teach medical students, residents, and forensic psychiatry fellows." (January 13, 2020 Email, Exh. A.). Evaluating whether a psychiatry faculty member is a competent teacher of psychiatry is a core academic judgment. *See Daley*, 63 Conn. App. at 133; *Craine*, 259 Conn. at 664. Because the Complaint lacks factual allegations that could support a conclusion that Yale's decision not to reappoint her "had no 'discernible rational basis,'" *Gupta*, 239 Conn. at 596, her contract claim must be dismissed.

### C.  Plaintiff's Breach of Contract Claims Fail for Other Reasons and Should Be Dismissed

*Gupta* recognizes an exception for claims alleging the violation of "a specific contractual promise" not involving the exercise of academic discretion. *Gupta*, 239 Conn. at 593. This exception has an "exacting standard" that requires a plaintiff to identify "a special promise outside the purview of normal educational expectations." *Faigel v. Fairfield University*, 75 Conn. App. 37, 37 (2003). This special, specific promise must be "precise and based on specific contractual terms or provisions," *Kloth-Zanard,* 2012 WL 2397161, at *4 (D. Conn. June 25, 2012), and not some "[g]eneral or vague promises," *Hope Acad. v. Friel*, 2004 WL 1888909, at *2 (Conn. Super. Ct. July 22, 2004). This "narrow" exception applies in limited circumstances. *Hope Acad.*, 2004 WL 1888909, at *2. Courts have found a promise insufficiently specific when a university promised to give a foreign student "many credits" for her study abroad, *Faigel,* 75 Conn. App. at 42, when a university promised to "eradicate sexual misconduct," *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 532 (D. Conn. 2020), or when a school expelled a foreign student despite a "steadfast commitment to [its] international students" and statements that international students are "welcome and respected on [its] campus," *Madej*, 2020 WL 1614230, at *11. By contrast, courts have found promises sufficiently specific when made in objectively measurable language, such as a promise that an institution would stay "properly accredited," *Gupta*, 239 Conn. at 593, or that a tenure decision would be based on "standards of improvement . . . specified in the last letter of reappointment," *Craine*, 259 Conn. at 632. In sum, unless there is a specific and objectively measurable promise, *Gupta* requires dismissal.

Even outside the *Gupta* context, Connecticut contract principles require plaintiffs to identify the specific promise they contend was breached and how the breach injured them. "'The elements of a breach of contract action are [1] the formation of an agreement, [2] performance by

one party, [3] breach of the agreement by the other party and [4] damages.'… 'To survive a motion to [dismiss], the plaintiff's complaint must allege all of the requisite elements of a cause of action.'" *A.C. Consulting, LLC v. Alexion Pharms., Inc.*, 194 Conn. App. 316, 329, 220 A.3d 890, 898 (2019).

Plaintiff's allegations are too vague to meet that standard. She alleges that her breach of contract claim is based generally on the "Faculty Handbook, policy statements, guidance, regulations, and rules applicable to her faculty appointment." (Compl. ¶¶ 55, 56) That claim describes a set of documents containing promises; it does not identify the promise allegedly breached. Connecticut courts often strike contract claims when a plaintiff cannot identify the specific provision that the defendant allegedly breached.[15]

Beyond the catch-all allegation, the Complaint seems to allege breaches of three things: (i) Yale's policy regarding academic freedom; (ii) Section III.L of the Faculty Handbook; and (iii) unspecified "procedures" on Yale's website regarding investigations of "academic misconduct."

---

[15] *See, e.g., Schifano v. Bank of New York Co.*, 2013 WL 1715731, at *10 (Conn. Super. Ct. Apr. 1, 2013) (striking breach of contract claim where "the plaintiff failed to specifically identify which provisions of the contracts the defendants breached"); *Brantley v. Residential Makeover, LLC*, 2012 WL 3518072, at *5 (Conn. Super. Ct. July 25, 2012) (granting motion to strike breach of contract counterclaim because "plaintiffs . . . failed to point to any specific promise that was alleged to have been breached by the defendant"); *Neidig v. Heilig*, 2007 WL 4215479, at *2 (Conn. Super. Ct. Nov. 7, 2007) (striking breach of contract claim based on plaintiff's failure to identify any violated terms of contract and "mere conclusion of law"); *Wilson v. GMAC Mortgage Corp.*, 1996 WL 409338, at *1-2 (Conn. Super. Ct. June 27, 1996)(striking breach of contract claim failing to identify contract at issue); *see also Keller v. Beckenstein*, 117 Conn. App. 550, 560-61, 979 A.2d 1055, 1062 (2009) (plaintiffs "cannot identify any contractual provision breached by the defendants' conduct"); *Legnos v. Flow Int'l Corp.*, 2014 WL 5099279, at *4 (Conn. Super. Ct. Sept. 8, 2014) ("A breach of contract action cannot be maintained when the plaintiff cannot identify any contract provision violated by the defendant's actions."); *Visconti v. Pepper Partners Ltd. P'ship*, 2002 WL 1293224, at *7 (Conn. Super. Ct. May 14, 2002), *aff'd*, 77 Conn. App. 675, 825 A.2d 210 (2003) (granting motion for summary judgment where "amended complaint asserts a breach of contract claim but does not articulate the specific provision of the sales contract, note or mortgage which was allegedly breached").

(Compl. ¶¶ 41, 43, 44). For each, Plaintiff has either failed to identify a specific promise, failed to plead how the breach of a promise harmed her, or both.

### 1.  Statements on Academic Freedom

The Complaint alleges that "Yale terminated Dr. Lee's appointment in violation of her right to academic freedom in her faculty appointment," and that "[b]y terminating Dr. Lee's appointment, Yale did not maintain its commitment to its faculty and students." (Compl. ¶¶ 56, 45). These vague proclamations lack any reference to a contractual promise of academic freedom made to Plaintiff.

The Faculty Handbook provision on academic freedom does not promise reappointment to voluntary faculty members. It does not promise that Yale will ignore public statements violating a rule of professional ethics when considering whether to reappoint a voluntary faculty member. It does not promise that if a voluntary faculty member engages in public commentary, her teaching deficits will be ignored when a reappointment decision is made. In fact, the provision on academic freedom is directed at faculty, staff, and students, warning them not to attempt to block the speech of others in the Yale community. Section II of the Faculty Handbook, entitled, "Academic Freedom and Faculty Standards of Conduct," provides in relevant part:

> Members of this University have freely associated themselves with Yale and in doing so have affirmed their commitment to a philosophy of mutual tolerance and respect. Physical restriction, coercion, or intimidation of any member of the community is contrary to the basic principles of the University. It is also a violation of these principles and of the University's rules of conduct for any member of the faculty, staff, or student body to prevent the orderly conduct of a University function or activity, such as a lecture, meeting, interview, ceremony, or other public event. It is similarly a violation of these principles to block the legitimate activity of any person on the Yale campus or in any Yale building or facility.

(Faculty Handbook, Exh. E, Section II).[16]

Plaintiff does not allege that she could not express her views due to physical restriction, coercion, or intimidation, or that any of her work on the Yale campus was blocked. She alleges that Dr. Krystal warned her that that she would not have a teaching role if her "behavior" did not change. (Compl. ¶ 30). The email referenced in that allegation identifies the "behavior" and how it needed to change: Dr. Krystal was insisting that Dr. Lee make "cautious, reasoned, statements qualified by the limitations of the information you have." (January 13, 2020 Email, Exh. A.). A psychiatry department chair's exhortation to abide by the ethical obligations of the profession, consistent with the core qualities of a teacher of psychiatry, does not constitute coercion or intimidation at odds with academic freedom.

### 2. Faculty Handbook Section Governing Decisions Not to Reappoint or Promote

Section III.L of the Faculty Handbook governs decisions not to reappoint or promote existing faculty members. While Plaintiff does not cite the opening portion of this section, it states that "[f]aculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities."[17] (Faculty

---

[16] Plaintiff also cites a Report of the Committee on Freedom of Expression at Yale (the Woodward Report). (Compl. ¶ 44). (The URL she provides is incorrect, but the Report can be found at https://yalecollege.yale.edu/get-know-yale-college/office-dean/reports/report-committee-freedom-expression-yale.) The Woodward Report is a statement of principles, not a set of contractual promises. In fact, it calls for the principles to be implemented through the Faculty Handbook. *See id.* ("We urge that all University catalogues, as well as the faculty and staff handbooks, include explicit statements on freedom of expression and the right to dissent."). The Handbook thus determines the extent of any contractual promise of academic freedom.

[17] Under the Faculty Handbook, "[a]ppointments to the faculty are to a given rank and generally for a specified period of time ranging from one semester to five years… Many term appointments are renewable, though the time permitted in non-tenure ladder ranks is generally limited." (Faculty Handbook, Exh. E at Section III.E).

Handbook, Exh. E at Section III.L.1). She has not alleged a breach of that provision. As noted above, the Department convened a Committee to recommend whether to reappoint Plaintiff. The Committee report recommending that she not be offered another teaching role was shared with the Executive Committee of the Department, which discussed the report at length and then unanimously endorsed it. That decision represents an exercise of professional and scholarly judgment to which the Court must defer under *Gupta* and its progeny. *See* above at Section II.B.

Ignoring the fact that she does "not have a right to reappointment," Plaintiff gloms onto an internal paperwork procedure set out a few sentences later: "When a decision not to reappoint … is made on a candidate who has held an appointment at Yale for more than one year, the school submits to the Provost a brief report of the action to be taken before that decision is conveyed to the candidate.  In the School of Medicine, departments submit such reports to its Office for Faculty Affairs." (Compl. ¶ 41) (citing Section III.L.1). Plaintiff alleges (upon information and belief) that the brief report was not sent to the Office for Faculty Affairs ("OFA"). This allegation fails to state a claim of breach of contract for two reasons: (i) Plaintiff had no contractual right to have notice of her decision sent to OFA; and (ii) Plaintiff has not alleged that the decision not being sent to OFA caused her any damage.

The Faculty Handbook does not give voluntary faculty the same review procedures as paid faculty. Voluntary Medical School faculty are excluded from the Faculty Handbook procedures relating to the review of reappointment decisions. (Faculty Handbook, Exh. E at Section III.L.3, footnote 11) ("These procedures are available to all members of the teaching and research faculty, **with the exception of voluntary faculty in the Schools of Medicine and Nursing**."); *see also id.* at Section III.M, footnote 13) (stating that procedures for complaint about issues other than reappointment likewise are not open to voluntary faculty in the Medical School)). As a voluntary

faculty member in the Medical School, Plaintiff was not entitled to have a report sent to OFA regarding the decision not to reappoint her.

Moreover, Plaintiff did not allege that any failure to send a report to OFA caused her any harm. "[P]roof of causation … is … part and parcel of a party's claim for breach of contract damages." *Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 186, 90 A.3d 219, 226 (2014); *see also O'Donnell v. AXA Equitable Life Ins. Co.*, 2019 WL 4667932, at *8 (Conn. Super. Ct. Aug. 22, 2019) (granting motion to strike because the "causation of damages the plaintiff has alleged for his breach of contract claim are speculative, and that, as a result, his complaint fails to plead facts that sufficiently allege the causation element of his breach of contract claim"). "[I]n order to recover for breach of contract, a plaintiff must prove that he or she sustained damages as a direct and proximate result of the defendant's breach." *Warning Lights & Scaffold Service, Inc. v. O & G Industries, Inc.*, 102 Conn. App. 267, 271, 925 A.2d 359 (2007). Here, Plaintiff does not allege that she would have been reappointed if the Psychiatry Department had sent a "brief report" of the "decision" that had already been "made" to OFA. There can be no breach of contract where there is no contention that compliance with the handbook term would have changed the outcome and prevented identifiable damages. *See*, *e.g.*, *Meadowbrook Ctr., Inc.*, 149 Conn. App. at 191–92 (holding that the absence of evidence to establish that "had the defendant complied with his obligations under the agreement, the department would have granted, and the plaintiff would have received, those Medicaid benefits" was fatal to breach of contract claim); *Rafalko v. Univ. of New Haven*, 129 Conn. App. 44, 50, 19 A.3d 215, 220 (2011) (fact that university did not provide professor with annual reviews as required by faculty handbook did not provide basis for breach of contract claim where faculty member was denied tenure because he did not meet publication requirement and there was no evidence that annual reviews would have provided him with any

additional information about the publication requirement). Absent a claim of damages tied to this putative breach, the claim based on alleged non-compliance with Section III.L is unsustainable. *A.C. Consulting, LLC*, 194 Conn. App. at 331 (affirming striking of contract claim where "plaintiff made no factual allegation that it had been damaged by that particular alleged breach").

Plaintiff fails to tie her alleged damages to this alleged breach because there is no possible connection.  The provision does not call for the OFA to *decide* on the termination but only to be notified of it. The provision speaks of a "a decision not to reappoint" that has already been "made," and it requires only that a "brief report" of that employment decision be sent to OFA "before that decision is conveyed to the candidate." (Faculty Handbook, Exh. E at Section III.L.1). Nothing in the provision asks OFA to determine the propriety of the already-made decision; it is merely given notice. And certainly nothing in the language of the provision remotely hints at a contractual promise to faculty.

Moreover, Plaintiff does not allege that the result would have been different if a brief report of the decision not to reappoint her had been sent to OFA before she was notified. She appealed the non-renewal to the Dean of the Medical School, then the Provost, then the President. (Compl. ¶¶ 46, 49). When she asked the Yale president to review the decision, he wrote to her personally, noting that he had concluded that "the department made a reasoned decision based on legitimate academic concerns." (September 25, 2020 Email, Exh. D).

Both because Section III.L.1 does not apply to her as a voluntary faculty member, and also because she has not alleged that she was harmed by any absence of the internal notification procedure, she has failed to state a claim for breach of this provision.

### 3. *Statements on Investigation of Academic Misconduct*

Plaintiff vaguely alleges that Yale breached "additional procedures relating to investigation of allegations of academic misconduct against faculty members." (Compl. ¶ 43). She does not explain what she thinks those procedures are, how they applied to her, how they were violated, or how any violation harmed her.

As noted above, the Faculty Handbook references "academic misconduct" in its section on Research and Scholarship, requiring that in their "scholarly research" and publications, faculty adhere to "the highest standards of ethical conduct, truth, and accuracy." Faculty Handbook at 162. The section notes that Yale has established "policies and procedures for responding to allegations of academic or research misconduct," with the blue words containing a hyperlink to the "Policies" portion of the Provost's website, entitled "Dealing with Allegations of Academic Misconduct." That section is limited to "academic fraud," i.e., "falsification or fabrication of data, plagiarism, or grossly negligent data collection or analysis," and sets out procedures for addressing such allegations. Plaintiff does not allege that anyone ever accused her of academic fraud.

## II.   Plaintiff Fails to State a Claim for Violation of the Covenant of Good Faith and Fair Dealing (Count Two)

"Because Plaintiff['s] breach of contract claim fails, [her] breach of the implied covenant of good faith and fair dealing claim also fails." *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 533 (D. Conn. 2020). The breach of the implied covenant of good faith and fair dealing is "an implied duty" that "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399, 142 A.3d 227, 237 (2016). "Stated otherwise, the claim that the covenant has been breached must be tied to an alleged breach of a specific contract term." *Id.*

27

Even if Plaintiff had a viable breach of contract claim, she has not plausibly alleged bad faith. "To constitute a breach of [the implied covenant of good faith and fair dealing], the act by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1, 16-17 n.18, 938 A.2d 576 (2008). "Bad faith has been defined in our jurisprudence in various ways. 'Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest purpose.'" *Landry v. Spitz*, 102 Conn. App. 34, 42-43, 925 A.2d 334, 342 (2007). "Because this is a high bar, the covenant will be breached only in a narrow range of cases." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 97 (2d Cir. 2019) (applying Connecticut law). As noted above, the Complaint offers no plausible factual averments of bad faith. *See* above at Section II.B.

## III.    Plaintiff's Negligent Misrepresentation Claim Fails to State a Claim (Count Four)

Plaintiff bases her negligent misrepresentation count on her allegation that "Yale did not abide by its own terms relating to academic freedom of expression when it terminated Dr. Lee's faculty appointment." (Compl. ¶ 74). That is wrong for the reasons given above: the Complaint does not allege the violation of any promise relating to academic freedom. *See* Section II.C.1. The allegation is also insufficient to state a claim for negligent misrepresentation.

A negligent misrepresentation claim requires proving "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result.'" *Stuart v. Freiberg*, 316 Conn. 809, 821-22, 116 A.3d 1195, 1204 (2015). In regard to the

second element, "[t]he correct standard is whether [defendant] knew, or should have known, [its] statements were untrue *at the time they were made*." *Bellsite Dev., LLC v. Town of Monroe*, 155 Conn. App. 131, 151, 122 A.3d 640, 654 (2015). "It is not enough to simply present evidence of a statement of present intention that, in retrospect, did not come to fruition." *Id*. The Complaint does only that. It states that "Yale did not abide by its own terms relating to academic freedom." (Compl. ¶ 74) And then it states the baseless conclusion that "*Thus*, the representations made in the Handbook… were false, and they were known or should have been known to be false by Yale." (*Id.*) The "[t]hus" is telling. Plaintiff's only basis for alleging that Yale knew or should have known that its statements in the Faculty Handbook were false is Plaintiff's (mistaken) belief that Yale did not live up to those statements. Accordingly, the count should be dismissed. *See Sturm v. Harb Development, LLC*, 298 Conn. 124, 144, 2 A.3d 859 (2010) (affirming order striking negligent misrepresentation claim).

## IV.   Plaintiff's § 31-51q Claim Fails to State a Claim (Count Three)

Section 31-51q protects employees against "*discipline or discharge* on account of the exercise by such *employee* of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state ..." Conn. Gen. Stat. § 31-51q. This count fails to state a claim for three reasons, each independently fatal: Plaintiff has not alleged facts showing that she was a Yale employee (as opposed to volunteer); she has not alleged facts showing that she was disciplined or discharged (as opposed to not re-appointed), and the state statute cannot be applied in a way that violates Yale's federal constitutional rights.

### A.   Plaintiff Has Not Alleged An Employment Relationship Within The Meaning of § 31-51q

"[A]n employer-employee relationship is required to establish standing" under § 31-51q. *Varley v. First Student, Inc.*, 158 Conn. App. 482, 497, 119 A.3d 643, 652 (2015). Plaintiff does

29

not and cannot allege that she is an employee covered by Section 31-51q. Because Section 31-51q does not define "employer" or "employee," the terms are "given their ordinary meaning." *Id.* (affirming trial court's definition of employer as "[o]ne who employs the services of others; one for whom employees work and who **pays their wages or salaries**" and finding it consistent with other employment statutes).

As the Connecticut Appellate Court found in *Varley*, an "employer" within the meaning of Section 31-51q is "one for whom employees work and who pays their wages or salaries." 158 Conn. App. at 497. That means an employee is necessarily someone who works for an employer and is paid a wage or salary. That is consistent with the definition of employee under Connecticut anti-discrimination laws. In *Comm'n on Hum. Rts. & Opportunities v. Echo Hose Ambulance*, 322 Conn. 154, 159, 140 A.3d 190, 192 (2016), the Connecticut Supreme Court addressed whether the phrase "any person employed by an employer" in the Connecticut Fair Employment Practices Act ("CFEPA") included unpaid volunteers. The Court noted that "[t]wo tests—the right to control test and the remuneration test—have emerged from the federal courts to determine whether an individual is an employee in the context of the substantively identical definition of that term under Title VII." *Id.* at 160. While the right to control test appropriately determined whether a hired party was an employee or independent contractor, the Connecticut Supreme Court found that the "remuneration test" was better-suited for "circumstances in which, in contrast to the employee versus independent contractor situation, it was not clear that the putative employee had been 'hired' in the first instance, and accordingly, approximated the conventional master-servant relationship." *Id.* at 161. Applying the remuneration test to the plaintiff, the Court found she did not fall within the statutory definition of employee because she was an unpaid volunteer, not remunerated, so she was not protected by the CFEPA. *Id.* at 166.

The Second Circuit routinely applies the remuneration test to assess federal employment-based claims advanced by unpaid volunteers. In applying the remuneration test to define when a plaintiff is an "employee" within the meaning of Title VII, the Second Circuit has held:

> Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because although '**compensation** by the putative employer to the putative employee **in exchange for his services is** not a sufficient condition, ... it is **an essential condition to the existence of an employer-employee relationship**.'

*York v. Ass'n of Bar of City of New York*, 286 F.3d 122, 126 (2d Cir. 2002) (*quoting O'Connor v. Davis*, 126 F.3d 112, 115-16 (2d Cir. 1997)). The Second Circuit has "identified the following factors as indicative of 'financial benefit': salary or other wages; employee benefits, such as health insurance; vacation; sick pay; or the promise of any of the foregoing." *Id.* Moreover, "benefits must meet a minimum level of 'significance,' or substantiality, in order to find an employment relationship in the absence of more traditional compensation." *Id.*

The Second Circuit has expressly rejected a claim that a voluntary medical school faculty member was an employee for the purposes of Title VII. In *Tadros v. Coleman*, 898 F.2d 10, 11 (2d Cir. 1990), the court upheld the dismissal of Title VII claims by a plaintiff who worked as a volunteer on the faculty of Cornell Medical College, finding that the plaintiff was not an employee. Though the plaintiff had library privileges as a volunteer, he received no salary, health benefits, or retirement benefits, and he had no regular hours assigned to him by the Medical College. *Tadros v. Coleman*, 717 F. Supp. 996, 998 (S.D.N.Y. 1989). Similarly, in *Beverley v. Douglas*, 591 F. Supp. 1321, 1323 (S.D.N.Y. 1984), the plaintiff applied for, and was denied, a voluntary faculty appointment at the Cornell University Medical College and voluntary admitting privileges at Cornell's affiliated hospital. The plaintiff alleged racial discrimination in violation of Title VII, but the court concluded that there was "no room to doubt that **the relationship between the**

**Hospital (and the College) and the voluntary staff is not one of employment**." *Id.* at 1327. The Court pointed to the "sharp delineation in the duties, functions, and relationship to the Hospital and the College" of full-time staff as opposed to voluntary staff, including that the voluntary staff received no salary, retirement benefits, health insurance, or life insurance. *Id.*[18]

Plaintiff's allegations here regarding the perks she received as a voluntary faculty member fall short of the minimum level of significance needed to meet the threshold remuneration test in the absence of traditional compensation. The Complaint makes the legal assertion that Plaintiff and Yale "entered into an employment relationship when Yale appointed Dr. Lee to Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine." (Compl. ¶ 62.) *Cf. Iqbal*, 556 U.S. at 678-79 (legal assertions are not factual pleadings). And she offers the threadbare contention that she received "indirect but significant remuneration." (Compl. ¶ 11). She does *not* allege that she was paid for her work. Instead, she offers a laundry list of fringe benefits that she allegedly received "through her appointment": "office space, facilities, libraries, subscription-based access to research databases and journal articles, statisticians, laboratories, statistical programs and software, IT and technology services, computer programs and software, media studios (radio and television) and campus transportation," along with malpractice coverage limited to the forensic consultations she provided at Yale, retail discounts, and access to workout facilities. (Compl. ¶ 12). These benefits do not establish employee status under the remuneration test. *York*,

---

[18] *Tadros* and *Beverly* predate the Second Circuit's ruling in *O'Connor* that the remuneration test should be applied as a threshold matter where there is an "antecedent question of whether [a plaintiff] was hired by [the defendant] for any purpose." *O'Connor*, 126 F.3d at 115. Thus, in both *Tadros* and *Beverly* the courts assessed the plaintiffs' relationships with their putative employers under the general common law of agency, i.e. the "right to control test." *Tadros*, 717 F. Supp. at 1004; *Beverley*, 591 F. Supp. at 1327. They are nonetheless instructive, as the volunteer plaintiffs in both cases could not even establish that they were employees under the right to control test, let alone the applicable remuneration test.

286 F.3d at 126 (dismissing Title VII claim because unpaid volunteer, who alleged benefits including use of workspace, clerical support, publicity, reimbursement for out-of-pocket expenses, limited tax deductions, and networking opportunities, was not an employee); *Glaser v. Upright Citizens Brigade, LLC*, 377 F. Supp. 3d 387, 398 (S.D.N.Y. 2019) (alleged benefits of free drinks, free admission tickets and publicity insufficient to establish employee status of unpaid plaintiff under Title VII on motion to dismiss); *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018) (alleged benefits of publicity associated with appearance on Fox network as commentator, boosting of career prospects, reimbursement for transportation, hair, and makeup insufficient to establish employee status of unpaid plaintiff under Title VII on motion to dismiss); *cf. Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 471 (2d Cir. 1999) (non-salary remuneration of "(1) a retirement pension, (2) life insurance, (3) death benefits, (4) disability insurance, and (5) some medical benefits" sufficient to establish employee status of otherwise unpaid plaintiff under Title VII).

Perhaps anticipating the deficiencies of the "benefits" conferred by Yale, the Complaint looks outside Yale, pointing to opportunities she allegedly had elsewhere because of her status as a voluntary faculty member. (Compl. ¶ 13, 14, 15). But a plaintiff "must come forward with substantial benefits not merely incidental to the activity performed in order to satisfy this Circuit's remuneration test." *York*, 286 F.3d at 126 (allegations of publicity, networking opportunities found insufficient); *Tadros*, 717 F. Supp. at 1005, n. 14 ("The value of Cornell's presence on Dr. Tadros's resume is not the type of salary or other 'benefit' contemplated by Title VII."); *Glaser*, 377 F. Supp. 3d at 398 (allegation of publicity found insufficient); *Hughes*, 304 F. Supp. 3d at 445 (allegations of publicity, boosting of career prospects, increased influence, "opportunities … which burnished her reputation as a political commentator" found insufficient); *Beverley*, 591 F.

Supp. at 1317-28 (denial of application for voluntary admitting privileges at New York Hospital and corresponding voluntary faculty appointment at Cornell University Medical College was not actionable as employment claim despite allegation that the denials "interfered with plaintiff's employment opportunities"). That Plaintiff allegedly leveraged her status as a voluntary faculty member at Yale into paid opportunities elsewhere does not change her from a voluntary faculty member into a paid Yale employee under the remuneration test.

### B.  Plaintiff Has Not Alleged a "Discipline or Discharge" Within The Meaning of § 31-51q

The Section 31-51q claim also fails because the non-renewal of an expired appointment is not "discipline or discharge." The statute requires a plaintiff to "show that [she] was, among other things, 'discharged or disciplined.'" *Mohan v. UBS Fin. Servs. Inc.*, 2020 WL 1274602, at *7 (D. Conn. Mar. 17, 2020) (citing *Schumann v. Dianon Sys., Inc.*, 304 Conn. 585, 43 A.3d 111, 121 (Conn. 2012). As the Second Circuit has noted, all "Connecticut courts that have considered whether the denial of tenure or the failure to renew a nontenured faculty member's employment contract constitutes 'discipline or discharge' within the meaning of § 31–51q have uniformly answered that question in the negative." *Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 60 (2d Cir. 2010) (citing cases).

That should come as no surprise. If a faculty member's term contract is due to expire, the faculty member is not "discharged" or "disciplined" if she does not receive an offer for *another* term. The relationship is simply ending as initially agreed on its expiration date. *See Weinstein v. Univ. of Connecticut*, 66 Conn. L. Rptr. 400, 2018 WL 2222131, at *7 (Conn. Super. Ct. Apr. 25, 2018) (granting motion to strike claim that nonrenewal of professor's contract qualified as a discharge for the purposes of 31-51q, because "[i]n the absence of an *untimely* separation from employment there can be no discharge"); *Edwards v. E. Connecticut State Univ.*, 2017 WL

6601935, at *4 (Conn. Super. Ct. Nov. 22, 2017) (dismissing § 31-51q claims based on allegations of non-renewal of employment contract upon expiration because "[t]o deny the employee something that neither the employer nor the employee agreed to in the contract, e.g., another contract, cannot amount to discipline or discharge"); *Sans–Syzmonik v. Hartford Public School*, 2014 WL 7156776, at *8-10 (Conn. Super. Ct. Nov. 7, 2014) (granting motion to strike § 31-51q claim, finding that the non-renewal of a term teaching position did not constitute either discipline or discharge); *McIntyre v. Fairfield University*, 34 Conn. L. Rptr. 219, 2003 WL 1090690, at *2-3 (Conn. Super. Ct. March 3, 2003) (striking professor's § 31-51q claim on the ground that "the defendant's denial of the plaintiff's application for tenure and promotion, as well as the non-renewal of his contract was not a discharge..."); *Douglas v. The Board of Trustees for Connecticut State University*, 1999 WL 240736, at *3 (Conn. Super. Ct. April 8, 1999) (non-renewal of assistant professor's contract upon expiration of contract was neither a disciplinary action nor a discharge and not actionable under § 31-51q).

Tellingly, the narrow scope of protection afforded by Section 31-51q stands in sharp contrast to other employee rights laws enacted by the Connecticut Legislature. For example, Connecticut's whistleblower statute makes it unlawful for an employer to "discharge, discipline *or otherwise penalize* any employee because the employee ... reports ... a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body..." Conn. Gen. Stat. § 31-51m. Connecticut's anti-discrimination law likewise encompasses a wide array of adverse employment measures. Conn. Gen. Stat. § 46a-60(a)(1) (making it unlawful "[f]or an employer... to refuse to hire or employ or to bar or to discharge from employment any individual or to *discriminate against such individual in compensation or in terms, conditions or privileges of employment* because of" protected characteristics). Similarly expansive

35

language is found in Connecticut's Family and Medical Leave Act. Conn. Gen. Stat. § 31-51pp(a)(2) ("It shall be a violation... for any employer to discharge or cause to be discharged, *or in any other manner discriminate*, against any individual for opposing any practice made unlawful by said sections or because such employee has exercised the rights afforded to such employee under said sections."). Those differences in language matter. *See Ames v. Commissioner of Motor Vehicles*, 267 Conn. 524, 534, 839 A.2d 1250 (2004) ("Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed."). Section 31-51q addresses discipline and discharge; it does not address a decision not to offer another contract.

## C.  Section 31-51q Does Not and Cannot Limit a University's First Amendment Rights

As noted above, universities have a right of "educational autonomy" that is "grounded in the First Amendment." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Section 31-51q cannot be applied in a manner that infringes a university's First Amendment right of educational autonomy. If § 31-51q penalized Yale for exercising its own First Amendment rights, then the Connecticut statute would be unconstitutional as applied.

States may not compel organizations to associate with or promote the speech of those with whom they disagree. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (city government may not compel private parade organization to include group whose speech it disagrees with); *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*, 475 U.S. 1 (1986) (state commission may not compel private company to include the "speech of a third party with which [it] disagrees") (plurality op.). That is no less true when a state acts through a statute. *See, e.g.*, *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974) (invalidating state statute forcing newspapers to print candidates' replies to editorials, as an impermissible burden on

"editorial control and judgment"); *cf. Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 906 (1st Cir. 1988) (declining to interpret Massachusetts Civil Rights Act [MCRA] to limit a private organization's decision to cancel an outspoken performer's contract because there was "no reason to think that the Massachusetts Legislature enacted the MCRA in an attempt to have its courts, at the insistence of private plaintiffs, oversee the editorial judgments of newspapers, the speech-related activities of private universities, or the aesthetic judgments of artists"); *see also id.* at 904 ("the plaintiff's statutory 'free speech' right against the defendant is to be measured against the defendant's constitutional right against the state").

There are serious questions about the facial constitutionality of Section 31-51q under *Hurley*, *Pacific Gas & Elec. Co.*, and their progeny. But this Court need not address the question of facial unconstitutionality to dismiss Plaintiff's § 31-51 claim. That is because the Connecticut Supreme Court has recognized, decades after Section 31-51q was enacted, that our "long tradition of academic freedom" is "rooted in the first amendment," and that this first amendment freedom includes a "university's prerogative to determine for itself on academic grounds who may teach." *Craine*, 259 Conn. at 646. Even if § 31-51q could curtail the first amendment speech and association rights of parade organizations, utilities, orchestras, and other private employers, it should not be read to limit a university's first amendment prerogative to choose its teachers. If this Court concluded that Plaintiff is an "employee" who was "discipline[d]" or "discharge[d]," it should nevertheless dismiss the § 31-51q claim as unconstitutional as applied in the context of a university decision to offer another term to a teacher.

Alternatively, the Court could avoid the serious constitutional questions that § 31-51q presents by deciding that an unpaid faculty member is not an "employee," or that an unpaid faculty member who fails to receive a new contract when her existing contract expires has not been

"discipline[d]" or "dismisse[d]." This would be in keeping with the Court's duty under Connecticut law "to construe statutes, whenever possible, to avoid constitutional infirmities," *Est. of Brooks v. Comm'r of Revenue Servs.*, 325 Conn. 705, 728, 159 A.3d 1149, 1165 (2017), and to "search for an effective and constitutional [statutory] construction that reasonably accords with the legislature's underlying intent." *Id; see also State v. Williams*, 205 Conn. 456, 473, 534 A.2d 230 (1987) ("this court has the power to construe state statutes narrowly to comport with the constitutional right of free speech" and "[t]o avoid the risk of constitutional infirmity").

Whether this Court avoids constitutional problems through statutory construction, finds the statute unconstitutional as applied to a university's choices about who will teach, or finds the statute facially unconstitutional, Plaintiff's Section 31-51q claim must be dismissed.[19]

## CONCLUSION

The Complaint should be dismissed in its entirety.


Dated:  June 11, 2021                              Respectfully submitted,

                                                   */s/ Jonathan M. Freiman*
                                                   Jonathan M. Freiman (ct24248)
                                                   Caroline B. Park (ct29049)
                                                   WIGGIN AND DANA LLP
                                                   One Century Tower
                                                   P.O. Box 1832
                                                   New Haven, CT 06508-1832
                                                   Tel: (203) 498-4400
                                                   Fax: (203) 782-2889
                                                   jfreiman@wiggin.com
                                                   cpark@wiggin.com

                                                   *Counsel for Defendant*

---

[19] Plaintiff's request for declaratory judgment depends on her other claims. Because those fail, the declaratory judgment claim must also be dismissed.