## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BANDY LEE, MD, MDiv,** | : | **CASE NO. 3:21-cv-00389-MPS** |
| **Plaintiff,** | : | |
| **v.** | : | |
| **YALE UNIVERSITY,** | : | |
| **Defendant.** | : | **NOVEMBER 8, 2021** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## I.    INTRODUCTION

The Defendant has moved for this court to dismiss the entirety of Dr. Lee's complaint, while paying lip service to the standards that this court must employ when reviewing Yale's motion.  In one footnote, Yale teases the Court to "convert the motion" to a motion for summary judgment[1]; other times Yale puts emphasis on some allegations of the complaint over others, requesting that the Court do so too[2], asks the court to ignore allegations in the Amended Complaint which are unfavorable to it, and review the prior complaint instead.[3]

Confusion further arises later in the brief where Yale seems to seek a declaration that Conn. Gen. Stat. § 31-51q is unconstitutional (Def. Br., Doc. 32-1 pp. 2-3), while at the same time offers the Court an "out" by requesting the interpretation of the terms "discipline" and "discharge" to preclude Dr. Lee's enforcement of her free speech rights.

---

[1] Def. Br., p. 37, fn. 20.
[2] "Setting aside the slippery and irrelevant allegations about what "oftentimes" happened or "appeared" to happen, and focusing instead on the language of the Handbook and the allegations of what did happen, it is plain that Plaintiff received notice, consistent with Section 111.G of the Faculty Handbook, that her appointment would not be renewed on its June 30, 2020 expiration (Compl., r 37; May 17, 2020 Letter, Exh. C; July 27, 2017 Email, Exh. H), an action that is not a discharge under § 31-51q. Case 3:21-cv-00389-MPS Document 32-1 Filed 09/17/21 Page 45 of 49.
[3] Def. Br., pp. 38-39.

What Yale has not disputed is that Dr. Lee's public statements were protected by the First Amendment and the Connecticut Constitution. See generally, Def. Br., pp. 2-3. Nor does Yale dispute that: (1) her public statements caused the termination of her faculty appointment; and (2) her public statements caused Yale to withhold a teaching assignment. Rather, Yale argues the merits of its decision. See generally, Def. Br.

As the Defendant has largely ignored certain facts alleged in the complaint, the Plaintiff will reassert the basis of her case. Dr. Lee continuously served as a faculty member to both the Medical School and Law School for 17 and 15 years, respectively. (Am. Compl. ¶ 9). She served as the only regular junior faculty liaison from the Dept. of Law and Psychiatry to the Law School. (Id., ¶ 11). She was told by Law & Psychiatry Division Head, Dr. Howard Zonana that he wanted her to continue to serve in this role, which she did continuously except for one brief interruption in 2009, when she was abroad for a consultative role to the French Ministry of Justice. (Id.). She did not need to apply for any renewal; it appeared automatic. (Id., ¶ 10). It was understood by both the Plaintiff and Defendant that her appointment was ongoing and would continue without any specific end date. (Id.). There was a continuing course of dealing; only two or three times over the course of her 17 years without any regularity, she was only asked to complete a form documenting her seminar hours and other hours that she committed to working with students. (Id.). The Amended Complaint also clearly alleges that her responsibilities were to participate in four hours of student related teaching or supervisory activities per week, which could be satisfied through teaching a course, lectures, through advising students supervising residents, participating in seminars and grand rounds, engaging in scholarly activity, participating in department administration, and other activities. (Id., ¶ 12). During the impeachment proceedings, Dr. Lee responded to a tweet by university of Minnesota law Professor and Yale Law School alumnus

Richard Painter tweeted and tagged Dr. Lee on January 2, 2020, to a statement made by Mr. Dershowitz and she responded, (Id., at ¶ 31).  Nine days later, on January 11, 2020, Mr. Dershowitz made a complaint to the highest ranks of Yale and demanded that Yale Law School and Medical School investigate Dr. Lee and called on the American Psychiatric Association to discipline her. (Id., at ¶ 33).  Immediately, Dr. Krystal came to the defense of the President and his counsel, warning that "the department" would terminate her for her public comments. (Id., at ¶ 35). The Law School and Legal Clinic followed suit by immediately terminating an active case she was working on and ceased further referrals. (Id., at ¶ 35).  However, although they claimed she had no teaching duties, at the time of her discharge, Dr. Lee had been planning a course with Law School faculty, with a curriculum and timetable which Dr. Zonana had approved. (Am. Compl. ¶ 38).

## II.   LAW AND ARGUMENT

### A.   Standard of Review

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." The Federal Rules simply call for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. *Bell Atlantic Corp. v.Twombly*, 550 U.S. 544, 555-57 (2007). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted); *see also Luck v. McMahon*, Docket No. 3:20-cv-00516 (VAB), 2021 U.S. Dist. LEXIS 177166, at *26-27 (D. Conn. Sep. 17, 2021).  Thus, the complaint must contain "factual

amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

**B.      Academic Freedom inures to the Individual Faculty Member and Does not Provide a Cloak of Immunity to the University employer.**

Yale submits that Academic Freedom is a sole right of a University employer. Def. Br., p. 41.  Courts often cite *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957), as one of the earliest authorities discussing state interference with academic freedom. In an effort to root out "subversive" activities, the New Hampshire legislature had authorized its Attorney General to investigate persons, and Sweezy, a professor at a public university, was held in contempt for refusing to answer questions posed to him.  The Sweezy plurality opinion held that Sweezy's due process rights were violated, and explained:

> The State Supreme Court thus conceded without extended discussion that petitioner's right to lecture and his right to associate with others were constitutionally   protected freedoms which had been abridged through this investigation. These conclusions could not be seriously debated. Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and  associations is a measure of governmental interference in these matters. These are rights which are safeguarded by the Bill of Rights and the Fourteenth Amendment. We believe that there unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression -- areas in which government should be extremely reticent to tread.

*Sweezy v. New Hampshire*, 354 U.S. 234, 249-50 (1957).  Yale quotes from one paragraph of the Sweezy opinion discussing the need for autonomy of universities from government interference.

Def. Br. p. 16.  However, it was Sweezy's individual rights which were violated:

> Equally manifest as a fundamental principle of a democratic society is political freedom of the individual.  Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents.

The Connecticut Constitution also protects the right of the individual and is broader than the First Amendment. *Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 192, 123 A.3d 1212 (2015). Article first, § 4, of the Connecticut constitution provides:

> Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article first, § 5, of the Connecticut constitution provides "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." Finally, article first, § 14, of the Connecticut constitution provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance." Id.[4]

Furthermore, it is well established that a university's claim of academic freedom does not provide an absolute shield from a court's inquiry into its decision-making processes. Academic freedom does not allow a university to discriminate on the basis of sex and other impermissible grounds. *Powell v. Syracuse University*, 580 F.2d 1150, 1154 (2d Cir. 1978); *see also Sweeney v. Board of Trustees*, 569 F.2d 169, 175 (1st Cir. 1978) (Particularly in a college or university setting, where the level of sophistication is likely to be much higher than in other employment situations, direct evidence of sex discrimination will rarely be available.)[5]; *Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 313 (2d Cir. 1997) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) (While [a court should] not second-guess an employer's hiring [or termination] standards, the reasons for its employment decision, including its alleged reliance on

---

[4] *Trusz* cited *Ozols v. Madison*, No. 3:11cv1324 (SRU), 2012 U.S. Dist. LEXIS 116992 (D. Conn. August 20, 2012) ("[t]he breadth of the Connecticut [c]onstitution's language suggests that a citizen's speech is protected, even when the speech is about her employment").

[5] However, we voice misgivings over one theme recurrent in those opinions: the notion that courts should keep "hands off" the salary, promotion, and hiring decisions of colleges and universities. **13** [**20**] This reluctance no doubt arises from the courts' recognition that hiring, promotion, and tenure decisions require subjective evaluation most appropriately made by persons thoroughly familiar with the academic setting. **14** Nevertheless, we caution against permitting judicial deference to result in judicial abdication of a responsibility entrusted to the courts by Congress. That responsibility is simply to provide a forum for the litigation of complaints of sex discrimination in institutions of higher learning as readily as for other Title VII suits.

such standards, are subject to scrutiny under [the law], and 'departures from procedural regularity,' for example, 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision.'").  In other words, Defendant's academic freedom does not relieve it of its duty to not retaliate against Dr. Lee based upon impermissible grounds.

Accordingly, the Defendant's asserted defense of academic freedom should be rejected.

### C.    Dr. Lee's Amended Complaint States a Claim for Breach of Contract

The contours of Dr. Lee's appointment to the Yale faculty cannot be decided on a 12(b)(6) motion as asserted by Yale.  To allege a breach of contract, Plaintiff must plead 1) formation of an agreement  2) performance  by  one  party,  3) breach  by  the  other  party,  and  4)  damages. *Wnorowski v.University of New Haven*, No. 3:20-cv-01589 (MPS), 2021 U.S. Dist. LEXIS 144741, at *13 (D. Conn. Aug. 3, 2021 ) citing, *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 87 A.3d 534, 540 (2014). The contract consists of "documents, such as the catalogues [sic], bulletins, circulars, and regulations of an institution, as well as the oral and written expressions of the parties. *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 529 (D. Conn. 2020). When there is definitive language, an issue of law is presented. *Id.*

Yale proffers two letters (which Yale drafted) as *evidence* that there was no breach. See, Def. Br. p. 4.  (Dr. Krystal threatened Dr. Lee that if her public discourse continued, "we will have no alternative but to terminate your teaching role at Yale University. As you have no other duties at Yale, termination of your teaching role would also terminate your faculty appointment.[6]" (Def.

---

[6] The title Plaintiff held, see ¶45 of the Amendment Complaint, of Assistant Clinical Professor, is described as a rank for those persons who have made academic contributions documented in at least one of the following ways: (1) publication or other evidence of substantial contribution to their disciplines; (2) exemplary teaching; (3) well-recognized clinical expertise. Def Ex. E, p. 104. In contrast to Dr. Krystal's representation, it does not appear that a formal teaching role was a requirement of this title.

Br., Exh. C, May 17, 2020, Letter).  Defendant also claims that its September 4, 2020, letter to Dr.

Lee conclusively establishes the facts in this case.  In contrast to Dr. Lee's allegations of the

complaint, Yale asserts this post hoc termination letter established the term and parameters of  Dr.

Lee's appointment.[7]   To the contrary, contractual relationships between parties may involve

numerous pieces of evidence, which at this stage, are not before the court.  As explained in *Perry v.*

*Sindermann*, 408 U.S. 593, 601-02 (1972)[8]

> "For example, the law of contracts in most, if not all, jurisdictions long has employed  a
> process by which agreements, though not formalized in writing, may be "implied." 3 A.
> Corbin on Contracts §§ 561-572A (1960). Explicit contractual provisions may be
> supplemented by other agreements implied from "the promisor's words and conduct in the
> light of the surrounding circumstances." (Id., at § 562) And "the meaning of [the
> promisor's] words and acts is found by relating them to the usage of the past." (Id.) A
> teacher, like the respondent, who has held his position for a number of years, might be able
> to show from the circumstances of this service -- and from other relevant facts -- that [she]
> has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be
> a "common law of a particular industry or of a particular plant" that may supplement a
> collective-bargaining  agreement, *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574,
> 579, so there may be an unwritten "common law" in a particular university that certain
> employees shall have the equivalent of tenure.

Fed. R. Civ. Proc. 8 requires a short plain statement of a party's claim, and neither are all

facts supporting a claim to be pled nor the evidence which supports it. (Id.)  The truth of Yale's

asserted reasons for terminating her appointment are also not before the Court.  Rather, the Court

simply reviews the allegations of the Amended Complaint for their plausibility.

---

[7] Defendant also submits Exhibit H, an email to Dr. Lee stating her appointment was from July 1, 2017-June 30, 2020.
However, the Court should note that this email was sent almost a month *after* July 1, on July 28, and says nothing
concerning any parameters of the appointment, duties or responsibilities, or supposed requirements that a "formal"
teaching role was required as a material term of the relationship between the parties.  It is, on its face, perfunctory,
and consistent with Dr. Lee's allegations.  Furthermore, it is evidence that an appointment could continue beyond a
specific date even if Yale said nothing beforehand.

[8] Perry asserted that a university's nonrenewal of his appointment violated his constitutional rights. *Perry v.
Sindermann*, 408 U.S. 593, 596 (1972) The Court held " the respondent's lack of a contractual    or tenure right to re-
employment, taken alone,[did not] defeat[] his claim that the nonrenewal of his contract violated the First and
Fourteenth Amendments." The Court further stated that Perry's lack of a contractual or tenure "right" to reemployment
was immaterial to his free speech claim, and nonrenewals of nontentured public school teachers contracts may not be
predicated on the exercise of First Amendment.

Dr. Lee has alleged a continuing course of dealing, had continuously held her faculty appointment, had been approved for teaching in the Fall of 2020, and alleges she could fulfill her responsibilities in numerous ways. *Wnorowski v.University of New Haven*, No. 3:20-cv-01589 (MPS), 2021 U.S. Dist. LEXIS 144741, at *13-14 (D. Conn. Aug. 3, 2021)(contract terms may include a course of dealing).

Neither can the Plaintiff's rights and expectations of faculty academic freedom and the Defendant's promises of such, be adjudicated on a 12(b)(6) motion. Yale submits that Plaintiff selectively pled the Academic Freedom policy in the handbook, by quoting the entirety of the first paragraph, but not the second. Then the Defendant asks this Court to conclusively determine Yale's policy on faculty academic freedom is solely contained in Section II of the faculty handbook, second paragraph, which discusses interference with the exercise of academic freedom. (Def. Br., p. 22).  The failure of the allegations, says the Defendant, is that "Plaintiff does not allege that she could not express her views due to physical restriction, coercion, or intimidation, or that any of her work on the Yale campus was blocked."[9]  Thusly submitted, the Defendant's purported Academic Freedom policy is one where Dr. Lee could not state a claim unless she was *e.g.*, assaulted, harassed, or surrounded by a mob.  Nonetheless, the parsimonious reading of the policy would plausibly be met because Plaintiff did allege that she was summarily summoned to a meeting with Dr. Krystal by an accusatory email, based upon the demand of Prof. Dershowitz, and then her appointment was terminated  These allegations plausibly allege Yale attempted to intimidate her from voicing her opinions.

---

[9] This does not comport with any concept of actual Academic Freedom and if Yale as an employer insists that it only is required not to physically threaten its employees while they engage in free expression, the policy violates Conn. Gen. Stat. § 31-51q and would be void on public policy grounds.

The promise of academic freedom to Dr. Lee is an essential allegation of the Complaint and cannot be ignored by the Defendant.  (Am. Compl., ¶¶44, 49, See also Def. Ex. E[10], Section II in its entirety).  In the September 4, 2020 Letter (Ex. H) relied upon by the Defendant, the Defendant wrote "As you know, the Department and the University publicly defended your academic freedom and your right to express your opinions as a citizen".  Thus, it appears that the policy apparent to Dr. Lee and presented to the public, and understood and relied upon by Dr. Lee (and likely others) differs from the argument Yale submits regarding a faculty member's rights of academic freedom.

These contractual obligations are also overlaid and informed by "academic custom" or "academic common law," see, e.g., *Greene v. Howard University*, 412 F.2d 1128, 1135 (D.C. Cir. 1969) ("Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is."). Thus, the practices and written policies of an institution may be interpreted by courts in light of the common understanding of the profession. See *Perry*, 408 U.S. at 601 (just as there may be a "common law of a particular industry or of a particular plan," so there may be an "unwritten 'common law' in a particular university" so that even though no explicit tenure system exists, the college may "nonetheless . . . have created such a system in practice").

Yale also uses legal authority from employment disputes at later stages of litigation, arguing they stand for the proposition that there "is no claim."  (Def.  Br., p. 17).  This is a misstatement of law and the holdings in those cases. *Daley v. Wesleyan University*, 63 Conn. App.

---

[10] Defendant submits the 2019 version of the Handbook which may not be conclusive, due to Dr. Lee's long-standing service.   Even so, the paragraph cited by the Plaintiff calls for unfettered protection of Dr. Lee's right to academic freedom.

119, appeal denied, involved a denial of tenure due to lack of "scholarship," which was tried to a jury.  Plaintiff challenged the trial court's jury instructions which had resulted in a defense verdict. The Appellate Court held,

> As we previously intimated, we conclude that a decision that, on its face, is based exclusively on a faculty member's "teaching," "scholarship" and "colleagueship," is an academic decision. Accordingly, we conclude that the tenured faculty's decision in this case not to recommend the plaintiff for tenure is, on its face, an academic decision.   Because an academic institution is afforded considerable discretion when, through its employees, it exercises its professional judgment on academic matters,   the plaintiff was required to prove by a preponderance of the evidence that the tenured faculty's decision not to recommend him for tenure was made arbitrarily, capriciously or in bad faith." (See Id.), at 595.

The Appellate Court found no error in the jury instructions.  Thus, Daley did not hold there was "no claim," but rather, stands for the appropriate legal standard which may be employed and charged to the jury when a tenure decision is based exclusively as an academic decision. *Daley*, 63 Conn. App. at 133-34.  Here, Dr. Lee alleges her appointment was terminated due to extramural protected activity under the First Amendment and Connecticut Constitution, interference, pressure and demand by an outside, high-profile alum and donor, who was also the then attorney to the former president. (See generally, Am. Compl,).  The Defendant kowtowed to outside interests and retaliated against the Plaintiff.   Therefore, this is not a case of pure academic scholarship, and the Plaintiff has alleged sufficient facts to plausibly meet even an arbitrary and capricious standard. *See also Craine v.Trinity College*, 259 Conn. 625, 660, 791 A.2d 518 (2002) (distinguishing *Daley* and sustaining a plaintiff's verdict based on changing standards and misrepresentations).

Yale also relies on the case of *Gutpa v. New Britain General Hosp* as authority to dismiss the breach of contract claims.  (Def. Br. pp. 19-20).   However, general policy arguments on deference to academic decision making are insufficient to dismiss a claim. *Morris v. Yale University School of Medicine*, Docket No. 05cv848 (JBA), 2006 U.S. Dist. LEXIS 15692, at *10 (D. Conn. Apr. 3, 2006)("While defendant is correct that Connecticut courts have resisted a tort of

"educational malpractice" in light of the principle of according educational institutions deference in their academic decisions, the Connecticut Supreme Court has nevertheless quite clearly recognized "at least two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services." *Gupta v. New Britain General Hosp.*, 239 Conn. 574, 590-92, 687 A.2d 111 (Conn. 1996).  Further, *Gupta* is inapposite; Dr. Lee was not a student, and is not alleging an educational malpractice claim, like the medical resident in *Gupta*.  *Craine v. Trinity* expressly rejected Defendant's posture:

> The Defendant relies upon *Gupta v. New Britain General Hospital*, supra, 239 Conn. at 586, in support of its argument that the trial court should have given an academic judgment instruction on the contract claim. This reliance is misplaced. *Gupta* involved the dismissal of a medical resident for poor performance. This court used a functional analysis" of the residency agreement to determine that its purpose was educational. In other words, the purpose of a residency and the residency agreement is to educate a medical student, albeit in the context of a job at a hospital. Dismissal for poor performance was therefore an educational decision, akin to giving a poor grade to a student in class. This academic decision deserves deference from the courts. *In contrast, the relationship between the plaintiff and  the defendant in the present case is one of employer and employee.  That the employment relationship is in an academic setting does not mean that the defendant has absolute discretion on its employment decisions. Our deference extends only as far as the employment decision is based on an academic judgment. The defendant is not given deference as to its interpretation of the standards for tenure review as set forth in the employment contract.*

*Craine v. Trinity College*, 259 Conn. 625, 663-64, 791 A.2d 518 (2002)(emphasis added.)

Furthermore, in *Frank v. Dept. of Children & Families*, 312 Conn. 393, 414, 94 A.3d 588 (2014), the Connecticut Supreme Court again explained the basis of Gupta's claim.

> We noted that the plaintiff's claim in Gupta raised issues such as standard of care, the existence of a duty, and reasonableness that "are difficult, if not impossible, to apply in the academic environment;" (Id., at 591); and, partially for this reason, we concluded that "[j]udicial noninterference is especially appropriate in cases like the present one, in which the focus of a breach of contract claim is an allegedly inadequate residency program."" (Id., at 592).[11]

---

[11] The Court declined to require deference to the decision of the board of education as to its investigation of the matter.

Thus, the Defendant's argument that the Plaintiff has a burden to prove there was no "rational basis" for the Defendant's termination of her faculty appointment is erroneous and should be rejected by the Court.[12]  Plaintiff need not allege this standard of proof either.

Just as in this Court's recent case, *Wnorowski v.University of New Haven*, No. 3:20-cv-01589 (MPS), 2021 U.S. Dist. LEXIS 144741, at *13-14 (D. Conn. Aug. 3, 2021), there are differing interpretations of what the agreement was between the parties.  This Court rejected a similar argument made by UNH, where the defendant contended that it never explicitly promised what plaintiff alleged.  *Id.*  Similarly, the Plaintiff requests that the Court find that the interpretation of the Parties agreement and intent is a question of fact, "one not susceptible to resolution on a motion to dismiss."

### D.    Dr. Lee has adequately alleged that the Defendant plausibly breached a duty of good faith and fair dealing with her.

Yale's brief further argues that it did not violate the covenant of good faith and fair dealing.  Dr. Lee should be permitted to further her claim instead of the Court summarily dismissing it.  Dr. Lee's contract based claims are not based on any singular document.  See, *supra*, Section C.  The Defendant asserts that statements in the Handbook and its self-serving letter of explanation are conclusive and warrant dismissal of Dr. Lee's case.  However, in the absence of definitive contract language or where the relevant language is ambiguous, the court's interpretation of an agreement presents a question of fact subject to the clearly erroneous standard of review. *Landry v. Spitz*, 102 Conn. App. 34, 47, 925 A.2d 334 (2007) (citing *Histen v. Histen*, 98 Conn. App. 729, 733, 911 A.2d 348 (2006)).  Connecticut imposes a duty of good faith and fair dealing in employment

---

[12] *Craine v. Trinity* is cited elsewhere in Defendant's brief, making it difficult to understand why Defendant would even posit that the Court use *Gutpa* in this manner.  There is absolutely no Connecticut caselaw that has applied a lack of rational basis standard as the burden of proof in a faculty termination case.  The standard was taken from an academic dismissal of a student at the University of Chicago. 239 Conn. at 586.

contracts. *Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 568-69, 479 A.2d 781 (1984). Furthermore, "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the . . . finder of fact." *Id.* (citing 23 S. Williston, § 63:22, p. 507); *see also Renaissance Management Co. v. Connecticut Housing Finance Authority*, supra, 281 Conn. 240 ("[w]hether a party has acted in bad faith is a question of fact"); *Mis v. Fairfield College Preparatory School*, No. FBTCV166057613, 2018 Conn. Super. LEXIS 6228, at *27 (Super. June 12, 2018) (denying summary judgment based on question of fact of plaintiff's expectations). To the extent that there was any discretion to be invoked by the Defendant, that discretion had to be employed reasonably, and not in contravention of public policy. Plaintiff's allegations support a violation of public policy in her exercise of academic freedom, First Amendment rights, rights under the Connecticut Constitution, and to be free from retaliation. *See Thomes v.Clairol, Inc.*, No. CV000181452S, 2001 Conn. Super. LEXIS 1363, at *8 (Super. May 17, 2001) (denying motion to strike based on right to be free from retaliation); *Cf.*, *Scaife v.City of Meriden* , 493 F. Sup. 3d 1, 17 (D. Conn. 2020) (granting summary judgment because plaintiff had a statutory remedy under §31-51q).

### E.      Dr. Lee has stated a claim for negligent misrepresentation

In *Craine v.Trinity College* , 259 Conn. 625, 660-61, *supra*, the Connecticut Supreme Court also upheld a jury verdict on the plaintiff's negligent misrepresentation claim, explaining:

> Even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. . . . The governing principles are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Citations omitted;

internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 575, 657 A.2d 212 (1995).

"[A]n action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Coppola Construction Co. v. Hoffman Enterprises Ltd. Partnership*, 309 Conn. 342, 351-52, 71 A.3d 480 (2013) (internal quotation marks omitted); *Jauhari v.Sacred Heart University, Inc.*, No. 3:16cv680 (DJS), 2019 U.S. Dist. LEXIS 230470, at *40-41 (D. Conn. Aug. 13, 2019). "A negligent misrepresentation action does not seek to enforce the underlying contract; rather, it seeks damages for reliance on misrepresentations that may have been made in relation to that contract." *Sovereign Bank v. Licata*, 116 Conn. App. 483, 501-02, 977 A.2d 228 (2009) (emphasis omitted)." *Id*.  Plaintiff has alleged that statements were made to her in various forms providing assurances of her faculty appointment, that they were false or the Defendant or its agents should have known were false, reasonable reliance and damage.  There are factual issues which cannot decided at this juncture. See, e.g *Jauhari v.Sacred Heart University, Inc.*, No. 3:16cv680 (DJS), 2019 U.S. Dist. LEXIS 230470, at *46 (D. Conn. Aug. 13, 2019)(denying summary judgment due to issues of fact).

Furthermore, "a promissory representation (i.e., a statement of future intention) is actionable on a theory of fraudulent misrepresentation if, at the time the statement is made, the speaker did not intend to honor the promise." *See, e.g., Paiva v. Vanech Heights Construction Co.*, 159 Conn. 512, 515, 271 A.2d 69 (1970); *Sallies v. Johnson*, 85 Conn. 77, 80, 81 A. 974 (1911).;

*Symes v. Quinnipiac University*, Docket No. NNHCV166059859, 2017 Conn. Super. LEXIS 296, at *8 (Super. Feb. 10, 2017)(Ecker, J.[13]).

Thus, the Defendant's motion should be denied.

**F.     Plaintiff has pleaded sufficient facts to support a claim for Conn. Gen. Stat. § 31-51q.**

Conn. Gen. Stat. § 31-51q states:

Any employer . . ., who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . .[14]
Absent from the statute are definitions for "employer" or "employee."

The courts have created two tests for determining whether an employment relationship exists—the right to control test and the remuneration test. *See State v. Housing Authority of Bridgeport*, 157 Conn. 428, 431 (1969) (analyzing definition of "employee" under Social Security Act); *Varley v. First Student, Inc.*, 158 Conn. App. 482, 498-501 (2015) (collecting various dictionary and statutory definitions of "employer"); *see also Comm'n on Human Rights and Opportunities v. Echo Hose Ambulance*, 322 Conn. 154 (2016) (adopting remuneration test under CFEPA).  Under either analysis, Dr. Lee was an employee of the defendant and therefore defendant is liable for unlawfully terminating her employment following her comments regarding President Donald Trump and Alan Dershowitz's "shared psychosis."

---

[13] This case was heard by Connecticut Supreme Court Justice Ecker when he sat in the J.D. of New Haven as a trial judge.

[14] Defendant has not moved to dismiss on the basis that Dr. Lee did not engage in protected speech and thus, for purposes of this opposition to Defendant's Motion to Dismiss, it will not be discussed at length here. Dr. Lee has sufficiently pleaded facts to support her Conn. Gen. Stat. § 31-51q claim as she engaged in protected speech as alleged in her Amended Complaint.

In the alternative, dismissal of Count Three is not appropriate as the determination of an individual's employment status is a question of fact to be decided by the fact finder. *See Pemrick*, 67 F.Supp.2d 149, 162 (E.D.N.Y. Nov. 8, 1999) (summary judgment denied where there was "at the very least a question of fact" that would arise regarding the employment relationship between the parties); *see also Pastor v. P'ship for Children's Rights*, No. 10-cv-5167 (CBA) (LB), 2012 U.S. Dist. LEXIS 140917, at *1 (E.D.N.Y. Sept. 27, 2012) ("[T]o the extent that the determination of plaintiff's employment status for a Title VII claim depends on disputed facts, courts in this district have frequently reserved judgment on this issue for summary judgment.").

1.    *"Employee" has not been defined for purposes of General Statutes § 31-51q, and here, Dr. Lee is an employee under the commonly approved usage of the term.*

Defendant has attempted to create a definition of employee by simply taking the inverse of "employer" as defined in *Varley v. First Student, Inc.*, 158 Conn. App. 482, 497 (2015) (employer defined as "[o]ne who employs the services of others; one for whom employees work and who pays their wages or salaries"). Despite this approach, there exists no appellate authority concerning the definition of "employee" for purposes of § 31-51q. "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." *Perodeau v. Hartford*, 259 Conn. 729 (2002). This court may look to outside sources to determine the common usage of an undefined term. Conn. Gen. Stat. § 1-2z. Black's Law Dictionary defines "employee" as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of the work performance." *Employee,* Black's Law Dictionary (11th ed. 2019).

This court should not as a matter of law, determine that, pursuant to any "common usage," "employee" has been defined for purposes of General Statutes § 31-51q. Such a determination is heavily fact-based and therefore should be left for a jury to decide. Dr. Lee's employment with

16

Defendant could be compared to that of student athletes, which the National Labor Relations Board ("NLRB") recognizes as employees.   On September 29, 2021, Jennifer A. Abruzzo, NLRB General Counsel, issued a memorandum providing that student-athletes are employees and therefore enjoy statutory protections under Section 8(a)(1) of the National Labor Relations Act, 29 USC § 151, *et seq.* ("NLRA"). In determining individuals' employee status, the NLRB applies common-law agency rules, which states that an employee includes a person "who perform[s] services for another and [is] subject to the other's control or right of control" and "[c]onsideration, *i.e.*, payment, is strongly indicative of employee status." *Boston Medical Center*, 330 NLRB 152, 160 (1999). Here, Dr. Lee performed services–lectures, student-related services, received grants– for Defendant. (Am. Compl. ¶¶ 11, 12, 20). She was also subject to Defendant's control or right to control. If Dr. Lee did not perform her student-related obligations or maintain a formal teaching role, her employment could be terminated. (Am. Compl. ¶ 12). Defendant established how many hours per week Dr. Lee had to provide to students. (Id.) As such, Defendants controlled Dr. Lee's employment.

Though Defendant classified Dr. Lee as a "volunteer," this does not foreclose this court from determining that Dr. Lee is an employee. Defendant's reliance on *O'Connor v. Davis*, 126 F.3d 112 (2d Cir. 1997) and *Tadros v. Coleman*, 898 F.2d 10 (2d Cir. 1990) to stand for the proposition that a volunteer faculty member is not an employee is misplaced.

In *O'Connor*, summary judgment was granted in favor of the defendant because the court determined that the plaintiff was not an employee due in part to the absence of a "hiring" or some sort of economic benefit to the defendant. *O'Connor*, 126 F.3d at 116. O'Connor was a college student who was placed by her college at a psychiatric hospital to perform field work. *Id.* at 113. After her supervisor allegedly sexually harassed her, she sued the hospital, not the college. *Id.* at

114. Here, it is clear that Defendant hired Dr. Lee as Dr. Lee worked directly for the Defendant. Unlike the plaintiff in *O'Connor* and as stated above, both parties received economic benefits from the employment relationship. Dr. Lee's appointment required that she provide at least four hours of student-related teaching, or supervisory work per week. (Am. Compl. ¶ 12). In exchange for her affiliation with Defendant, Dr. Lee received numerous benefits, which, in turn, resulted in a benefit for Defendant. As part of her relationship with Defendant, Dr. Lee received access to office space, facilities, library, subscription-based access to research databases and journal articles, statisticians, laboratories, statistical programs and software, IT and technology services, and, when necessary, coverage under Defendant's malpractice insurance policy. (Id. ¶ 14). All these services provided Dr. Lee with the ability to conduct research; to write extensively about her findings; and to participate in national and international speaking engagements and advocacy. (Id. ¶ 14). As a direct result of her continued research, development in academia, and association with Defendant, Dr. Lee provided clinical work at maximum-security prisons and state hospitals, as well as acting as an expert witness in state and federal courts. (Id. ¶ 15). Dr. Lee, through her affiliation with Defendant, and as a result of her continued research and teachings, has been invited and has provided her expertise to national and international organization, including the World Health Organization, none of which would have been possible without the Defendant's ties to her work. (Id. ¶ 16).

Defendant also received direct benefits from its relationship with Dr. Lee. She was instrumental in the development of Defendant's Global Health Initiative and created a Global Health Studies course at the university. (Id. ¶ 17). Students sought out Dr. Lee directly to seek academic guidance from inside and outside the university. (Id. ¶ 19). Finally, she received

numerous research grants, from which the Defendants benefitted and which were awarded due largely in part to her affiliation with Defendant. (Id. ¶ 20).

In *Tadros*, the plaintiff was a volunteer faculty member at Cornell University Medical College. There, unlike here in part, the plaintiff received no salary or fringe benefits and had no teaching assignments, no research laboratory, and no campus office. *Tadros v. Coleman*, 717 F.Supp. 996, 998 (S.D.N.Y. June 22, 1989). "The district court found, essentially, that Tadros' position at Cornell was nothing more than a paper position, an honor without meaning." *Pemrick*, 67 F.Supp.2d at 163. Here, Dr. Lee had teaching assignments, was required to dedicate a set number of hours per week to working with students, conducted research, had a campus office, had access to the university facilities and more. (Id. ¶¶ 12, 14). Her position was more than just a "paper position." Despite Defendant's contention that she cannot be considered its employee because it recognized her as a voluntary faculty member, this should not influence the court as based on the above, Dr. Lee was Defendant's employee and therefore protected by § 31-51q.

2.      *Dr. Lee is an employee under the remuneration test.*

The remuneration test instructs courts to "conduct a [two-step] inquiry by requiring that a volunteer first show remuneration as a threshold matter before proceeding to the second step–analyzing the putative relationship under the [common-law] agency test. Remuneration may consist of either direct compensation, such as salary of wages, or indirect benefits that are not merely incidental to the activity performed." *Comm'n on Human Rights and Oppo. v. Echo Hose Ambulance*, 322 Conn. 154 (2016). "This remuneration need not be a salary . . . but must consist of 'substantial benefits not merely incidental to the activity performed.'" *United States v. City of N.Y.*, 359 F.3d 83 (2d Cir. 2004). "Volunteers and interns constitute employees under Title VII . . . . only if they receive some kind of direct or indirect financial benefit or promise thereof from an employee." *Pastor v. P'ship for Children's Rights*, No. 10-cv-5167 (CBA) (LB), 2012 U.S. Dist.

LEXIS 140917, at *1 (E.D.N.Y. Sept. 27, 2012); *see also Mohr v. United Cement Masons' United Local 780*, No. 15 CV 4581 (AMD) (CLP), 2016 U.S. Dist. LEXIS 155105, at *17 (E.D.N.Y. Nov. 7, 2016) ("Both direct and indirect financial benefits are considered in determining whether a defendant is an 'employer' for purposes of a Title VII discrimination claim"). This two-part test, "[requires that] and employer [1] compensates and [2] controls an employee's work." *Nelson v. Beechwood Org.*, No. 03 Civ. 4441, 2004 U.S. Dist. LEXIS 25622, at *3 (S.D.N.Y. Dec. 21, 2004).

Though she did not receive traditional compensation, Dr. Lee's relationship with Defendant yielded substantial tangible and intangible benefits for both parties. The court in *Pemrick v. Stracher*, 67 F.Supp.2d 149 (E.D.N.Y. Nov. 8, 1999) considered whether a non-paid, non-tenure professor at the State University of New York ("SUNY") was an employee for purposes of Title VII sex discrimination claims. SUNY employed the plaintiff in a non-paid position so that she would have sponsorship for grants that she had received. Thereafter, she was appointed to an assistant professor position, though a private third-party foundation paid her salary; SUNY did not pay her. During the ten years that she worked for SUNY, she received multiple grants and served on committees at the university. She maintained a research lab and office space and worked with students in several capacities. After being passed over for a tenure-track faculty position, the plaintiff sued alleging that she had been subject to sexual discrimination for the better part of five years. The defendants moved for summary judgment on the grounds that the plaintiff was not an employee because as part of her voluntary, temporary appointment, she received no salary or fringe benefits and therefore it was could not be subject to liability under Title VII. The plaintiff countered that based on the nature of her relationship with SUNY, she was an employee.

> [A]lthough she was paid for by the Research Foundation of SUNY, her relationship with SUNY-DMC nevertheless was one of master-servant. She asserts that SUNY staff . . . controlled the terms and conditions of her work, and that because of the defendant institution's sponsorship of her research grant applications, it was only

through SUNY-DMC that she could have obtained her grants in the first place . . . . Pemrick also argues that because of her affiliation with SUNY-DMC, she obtained valuable economic benefits, primarily the opportunity to apply for and receive grants to continue her research, the pay her salary, and to purchase laboratory equipment. Moreover, Pemrick argues that she maintained her affiliation with SUNY-DMC for at least a decade, awaiting the day when Stracher would fulfill his promise to appoint her to a tenure-track SUNY-funded faculty position. In this regard, Pemrick argues that it defied common sense to believe that SUNY-DMC considered her a "temporary" employee, because their affiliation lasted more than ten years.

*Pemrick*, 67 F.Supp.2d at 161-62.

The court denied summary judgment finding that there existed issues of material fact, "[s]uch as those regarding the tangible and intangible benefits received both by SUNY-DMC and by Pemrick as a result of their decade-long association . . . . [C]ommon sense dictates that SUNY-DMC benefitted, materially or otherwise, from having significant sums of grant monies awarded to Pemrick as an Assistant Professor at SUNY-DMC (albeit a 'voluntary' and 'temporary one')." *Id.* As a matter of law, the court held, it could not say that no employment relationship existed. *See also Rafi v. Thompson*, No. 02-2356 (JR), 2005 U.S. Dist. LEXIS 51222, *26 (D.C. Cir. Sept. 30, 2005) (12(b)(6) motion denied where it was probable that volunteer could be classified as an employee after having the opportunity to go through discovery).

Here, as in *Pemrick*, despite Defendant's claim that Plaintiff was a voluntary faculty member, Plaintiff has alleged substantial and tangible benefits amounting to remuneration.  At minimum, there is a question of fact concerning the relationship between Plaintiff and Defendant. Like in *Pemrick*, Dr. Lee has worked for Defendant for not an insignificant period of time (17 years compared to the 10 years that the plaintiff in *Pemrick* worked for SUNY). (Am. Compl., ¶ 9). As a result of her time spent at the university, there have been obvious tangible and intangible benefits to the Defendant. Dr. Lee performed research at the Defendant's campus and in return for being able to do so, Defendant required that she provide at least four hours of student-related

teaching or supervision per week, which she exceeded. (Id., ¶ 12). As part of her relationship with Defendant, Dr. Lee was likewise provided numerous, substantial tangible and intangible benefits. Like the plaintiff in *Pemrick*, Dr. Lee was given access to the university's libraries, subscription-based research materials, office space, the university's facilities. She was also covered under the Defendant's malpractice insurance. (Id., ¶ 14). Through her association with Defendant, she secured prestigious appointments with domestic and international organizations, received research grants based on her academic affiliation and developed and implemented programs within the Yale School of Medicine. (Id. ¶¶ 15-17). These, like grant awards, are highly beneficial to the university, which can capitalize on its ties to Dr. Lee's successes and her academic offerings. Common sense dictates that Defendant, through Dr. Lee's 17-yearlong affiliation, has benefitted "materially or otherwise" from Dr. Lee's successes, there was an employment relationship in that Dr. Lee was Defendant's employee, and Defendant was Dr. Lee's employer.

      3.    *Dr. Lee is an employee under the common-law agency and right to control test.*

"Once [a] plaintiff furnishes proof that her putative employer remunerated her for services she performed," then the court must "look to 'the thirteen factors articulated by the Supreme Court in [*Reid*] to determine whether an employment relationship exists". *City of N.Y.*, 359 F.3d at 92. The factors, which derive from the federal common law of agency, are:

> the hiring party's right to control the manner and means by which the product is accomplished[;] the skill required; the sources of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52. *See also* Restatement (Second) of Agency § 220(2).

Though no one factor is dispositive; *Id.*; *see also Hilton International Co. v. NLRB*, 690 F.2d 318, 321 (2d Cir. 1982); the Second Circuit has held that the "hiring party's right to control the manner and means of creation, the skill required, the provision of employee benefits, the tax treatment of the hired party, and whether the hiring party has the right to assign additional projects to the hired party will usually be highly probative and should be given more weight in the analysis." *Horror Inc. v. Miller*, 335 F.Supp.3d 273 (D. Conn. Sept. 28, 2018).

It is evident that over the course of Dr. Lee's 17-year employment with Defendant, that she was subject to the Defendant's control. In order to maintain her position, Dr. Lee was required to provide at least four hours of student-oriented work each week, as well as teach courses. (Id. ¶ 12). The courses taught were subject to review by the Defendant, which had the ultimate control over the coursework. Though Dr. Lee's work took her across the globe, the work that was required as part of her employment with Defendant was to take place at the university. Though Dr. Lee had the ability to decide how long she would work on some of her research, Defendant required a certain amount of time each week be dedicated to work it dictated. Moreover, Defendant is in the business of providing education to students and hired Dr. Lee to provide such a service. Based on the foregoing, Defendant had the right to control Dr. Lee and exercised that control over the course of 17 years. For purposes of § 31-51q, Defendant employed Dr. Lee and therefore are subject to § 31-51q.

G. **Defendant's termination of Dr. Lee's employment by stripping her of her teaching duties and refusing to renew her contract was a discipline and a discharge.**

Defendant's affirmative act of stripping Dr. Lee of her teaching duties and then improperly using that to justify its termination of her employment despite actually terminating her for her protected speech amounts to a discipline and discharge prohibited by General Statutes § 31-51q. Moreover, Dr. Lee successfully established the prima facie case for a § 31-51q claim and therefore,

the burden should now shift to Defendant "*at the summary judgment stage* to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (emphasis added) (citations omitted). *See also Perez-Dickson v. Bridgeport Bd. of Educ.*, No. FBTCV136033116, 2016 Conn. Super. LEXIS 3233, at *3 (Conn. Super. Ct. Dec. 5, 2016) (explaining that the *McDonnell Douglass* framework "applies to free speech claims made pursuant to . . . 31-51q"); *Fasoli v. City of Stamford*, 64 F. Supp. 3d 285, 296 (D. Conn. Nov. 24, 2014) ("[A]lthough the evidentiary framework for analyzing First Amendment retaliation claims under . . . Conn. Gen. Stat. § 31-51q is not expressly referred to in the case law as falling under the *McDonnell Douglass* rubric, it still essentially the same"). In her amended complaint, Dr. Lee has established the *prima facie* case that Defendant violated § 31-51q and therefore Defendant's Motion to Dismiss should be denied. Where there is no dispute that the plaintiff satisfied the *prima facie* case, the "only remaining question is whether the complaint alleges circumstances that provide at least minimal support for an inference of discriminatory intent." *See Menaker*, 935 F.3d at 30-31. Dr. Lee has satisfied the *prime facie* case and has demonstrated that Defendant's conduct was retaliatory in violation of §31-51q.

Moreover, determining whether an employer has taken retaliatory "adverse employment action" against employee of violation of first amendment "is a heavily fact-specific, contextual determination." *Zelnik v. Fashion Institute of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006). *See also Browne*, No. NNHCV176067843, 2017 Conn. Super. LEXIS 4605, at *13 (Conn. Super. Ct. Oct. 10, 2017) (due to "fact-specific, context-driven assessment required to determine what constitutes 'discipline' in any particular case," it is difficult for defendant to obtain summary dismissal of § 31-51q claims). Given the highly fact-specific analysis needed to determine whether an employee

24

who brings a § 31-51q claim has been disciplined, this court should deny Defendant's motion to dismiss.

        1.      *Defendant disciplined Dr. Lee as a direct result of her protected speech.*

"[T]here is no Connecticut appellate decision providing any direct guidance about what exactly constitutes 'discipline' as that word is used in § 31-51q." *Browne*, 2017 Conn. Super. LEXIS 4605, at *6-7 (Conn. Super. Ct. Sept. 27, 2017); *see also Matthews v. Dep't of Pub. Safety*, HHD-CV-11-6019959-S, 2013 Conn. Super. LEXIS 1291, at *33 (Conn. Super. Ct. May 31, 2013) (looked to dictionary, clues within the statutory text, legislative history, and use of "discipline" in other Connecticut statutes to determine definition).

In the absence of appellate authority, the Connecticut Superior Courts have attempted to define "discipline," though no one definition is controlling. *See Browne*, 2017 Conn. Super. LEXIS 4605, at *7.

The court in *Bombalicki v. Pastore* applied a narrow standard in defining "discipline." "'Discipline' involves affirmative acts of punishment that (at least while the punishment is being inflicted) leave the recipients in a less happy state than that which they enjoyed before the punishment began." *Bombalicki v. Pastore*, No. CV-378772, 2000 Conn. Super. LEXIS 1259 (Conn. Super. Ct. May 10, 2000). Despite requiring an affirmative act, "[t]he question remains, however, as to precisely what level of affirmative conduct constitutes 'discipline' under § 31-51q. The legislative history provides no meaningful guidance." *Matthews*, 2013 Conn. Super. LEXIS 1291 at *38.

Conversely, the court in *Weinstein v. Univ. of Conn.*, No. HHDCV116027112S, 2018 Conn. Super. LEXIS 850 (Conn. Super. Ct. Apr. 25, 2018) rejected the "less expansive" definition of "discipline" in favor of a more liberal interpretation of the term. The court defined "discipline" as "any adverse material consequence relative to a right, term, condition or benefit of employment

that existed at the time of the protected speech." *Id.* at *17-18 (citing to *Browne*, 2017 Conn. Super. LEXIS 4605 at *3). In doing so, the court held that a discipline is not limited solely to an employer's affirmative actions and may instead encompass the *omission* of certain conduct that may also result in an adverse material consequence. *Id.*

Relying on either standard of "discipline" yields the same result: Defendants disciplined Dr. Lee for engaging in protected speech. While refusing to renew a contract does not amount to a discipline, stripping an employee of his/her job duties, such as a formal teaching role, does. Discipline does not require "official" action, rather it can be a collection of "smaller incidents and conduct, so long as that conduct is affirmative in nature." *Matthews*, 2013 Conn. Super. LEXIS 1291, at *37. ("[I]t does not matter whether or not individually those acts might not quality as 'discipline'"). Connecticut General Statutes § 31-51q is concerned with retaliatory conduct. "Whether an act is retaliatory deals more with the intent of the actor and the proposed effect of the act on the subject of the retaliation. It is entirely possible for an employer, through a series of unofficial acts, perhaps seemingly benign on their own to seek retaliation." *Id.* at *39. A removal of duties is an affirmative act that can be considered a discipline. *See Matthews*, 2013 Conn. Super. LEXIS 1291 at *41 (removal of job duties may be viewed as a demotion). "[Section] 31-51q was clearly intended to protect an employee from de facto demotion and retaliatory employer actions that diminish the happiness and status of an employee." *Matthews*, 2013 Conn. Super. LEXIS 1291. The affirmative action of removing the job duties satisfies the *Bombalicki* standard.

The result is the same when applying the *Weinstein* standard. As a direct result of Dr. Lee's protected speech, Defendant stripped her of her official teaching roles, a term of her employment.

In this case, Dr. Lee had been planning a course with Law School faculty, with a curriculum and timetable which Dr. Zonana had approved. (Am. Compl. ¶ 38). However, as an immediate

response to Alan Dershowitz's emails to Defendant faculty members, Dr. John Krystal, the Chair

of Psychiatry Department, sent an email to Dr. Lee warning her that the department would be

compelled to "terminate [her] teaching role at Yale University" if her "behavior d[id] not change."

(Id. at ¶ 34). Furthermore, he added, because Dr. Lee had "no other duties . . . termination of your

teaching role would also terminate your faculty appointment." (Id. at ¶ 34); *see also* Exh. A.

Shortly thereafter, Defendant removed her from her formal teaching role and Yale Law School

and its Legal Clinic ceased its referral of student cases to Dr. Lee, including one that was actively

in progress. (Id. at ¶¶ 35, 37). In its analysis, Defendant has conflated its disciplinary conduct with

Dr. Lee's discharge. Dr. Lee does not allege that her termination was discipline, rather the

discipline was the removal of her job duties due to her protected speech, which then resulted in

her discharge. Notably, in its September 4, 2020 letter to Dr. Lee, Defendant stated it could have

reinstated her teaching role and responsibilities, but it elected not to do so because of her protected

speech. Exh. B. Thus, Defendant's decision to terminate Dr. Lee's formal teaching roles was

retaliatory in nature and violative of § 31-51q.

2. *Defendant's termination of Dr. Lee's employment contract constitutes a dismissal.*

Defendant relies on a string of decisions to support its contention that the nonrenewal of a

contract cannot classify as a discharge for purposes of § 31-51q. However, in each instance, the

professor's contracts were not renewed, and therefore they were denied *tenure*, a lifetime

appointment at each respective university. Here, Plaintiff's contract was never a tenure-track

position and therefore these decisions should not be given serious weight.

Allegations that a non-renewal of a contract is a discharge may be sufficient to withstand

a 12(b)(6) motion. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (nonrenewal

of a contract may be determined to be an adverse employment action).[15] *See also Williams v. Alhambra Sch. Dist. No. 68*, 234 F.Supp.3d 971, 980 (D. Ariz. Feb. 10, 2017) ("[T]here is ample persuasive authority suggesting that non-renewal can be adverse employment action"). Where a party seeks renewal of a contract, subsequent nonrenewal may constitute an adverse employment action. *Id.* "An employee seeking a renewal of an employment contract, just like a new applicant or a rehire after a layoff, suffers an adverse employment action when an employment opportunity is denied and is protected from discrimination in connection with such decisions . . . . The mere fact that the employer's decision not to renew is completely discretionary does not mean that it is not an 'adverse' employment decision." *Id.* at 501. Here, Dr. Lee was in the process of developing a new course with Defendant. (Am. Compl. ¶ 38).  This collaboration should be viewed as Dr. Lee seeking the renewal of her employment contract. Moreover, the September 4, 2020 letter states that Defendant "should not seek a new teaching role for" Dr. Lee. Exh. B. Absent this decision, it is clear that Dr. Lee's appointment would have continued as it had for the prior 17 years of her relationship with Defendant. This affirmative action of removing her teaching responsibilities because of her protected speech had a direct impact on the continuity of her appointment. Defendant argues that the termination of Dr. Lee's employment relationship should be framed as a "non-renewal" when, in fact, it effectively discontinued her employment contract when it refused to find any teaching role for her. Such conduct amounts to a discharge, rather than a non-renewal. As such, Defendant violated § 31-51q as a direct result of Dr. Lee engaging in protected speech.

---

[15] Judge Blue, in deciding *Bombalicki*, held "the language of 31-51q, which as explained above is restrictive even by Connecticut standards, simply cannot compare with the expansive texts of these asserted federal counterparts." *Bombalicki*, 2000 Conn. Super. LEXIS 1259 at *12. While this language would be applicable in prohibiting an analysis of "discipline" in relation to federal antidiscrimination statues, it does not make sense that such comparisons be drawn in analyzing whether a plaintiff has been discharged (or, another way, terminated), as a discharge is a quintessential adverse employment action. *See Leibowitz*, 584 F.3d at 499 (adverse employment action can include termination).

Finally, Defendant inappropriately introduced Exhibit H and relied upon it in support of its Motion to Dismiss. This court should on this exhibit when deciding the present motion because it is outside the pleadings. The use of this extraneous evidence is improper on a Motion to Dismiss. Exceptions to this rule do not apply in this instant case. "For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . ., and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). If a complaint does not mention the material in question, the material can only be reviewed as part of the motion to dismiss in rare instances. *Benjamin v. Stevens Cty.*, 2018 U.S. Dist. LEXIS 175474, at *8 (E.D.Wa. Oct. 11, 2018). Further, "[m]erely mentioning a document in the complaint is not enough to meet [the incorporation by reference exception]; the extrinsic material must be integral to the plaintiff's claim." *Id.; see also Coto Settlement v. Eisenberg*, 593 D.3d 1031 (9th Cir. 2010) ("the mere mention of the existence of a document is insufficient to incorporate the contents of a document").

Dr. Lee did not mention nor rely on the information contained in Exhibit H, nor are they integral to the drafting of her Amended Complaint. *See Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 200 (D. Conn. Mar. 12, 2007) ("[T]here must be a demonstration that the Amended Complaint relied heavily on the terms and effect of the submitted materials"). Dr. Lee pleaded that there was no regularity in her appointments as she was not required to apply for any "renewal," nor would she receive any regular written notification about any purported "renewals." (Am. Compl. ¶10). She only received notification approximately two or three times over the course of her appointment of 17 years. (Id.) If her appointments were for up to three years at a time, per the Employee Handbook, then Dr. Lee should have received far more than two or three notifications

of renewal over the course of almost two decades working for the Defendant. Nevertheless, it is not dispositive if this court determines that the nonrenewal of an employment contract is not a dismissal, as Defendant's improper discipline of Dr. Lee directly caused her appointment to be discontinue. As such, Defendant's Motion to Dismiss as to Count VII should be denied.

WHEREFORE, the Plaintiff requests this Court to deny Defendant's Motion to Dismiss.

PLAINTIFF,
BANDY LEE, MD, MDiv

By    /s/ Melinda A. Powell
    Robin B. Kallor (ct26536)
    Cindy M. Cieslak (ct29117)
    Melinda A. Powell (ct17049)
    Rose Kallor, LLP
    750 Main Street, Suite 309
    Hartford, CT 06103
    Tel #:  (860) 361-7999
    Fax #:  (860) 270-0710
    Email:  rkallor@rosekallor.com
    ccieslak@rosekallor.com
    mpowell@rosekallor.com

## CERTIFICATE OF SERVICE

This is to certify that on this 8th day of November 2021 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Jonathan M. Freiman, Esq.
Caroline B. Park, Esq.
Wiggin and Dana LLP
265 Church Street
New Haven, CT 06508
Email: jfreiman@wiggin.com
cpark@wiggin.com

    /s/ Melinda A. Powell
    Melinda A. Powell