**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------x
                              :
BANDY LEE                     :    Civ. No. 3:21CV00389(SALM)
                              :
v.                            :
                              :
YALE UNIVERSITY               :    August 30, 2022
                              :
------------------------------x
```

**RULING ON MOTION TO DISMISS [Doc. #32]**

Defendant Yale University ("Yale" or "defendant") has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [Doc. #32]. Plaintiff Bandy Lee ("plaintiff") has filed a memorandum in opposition to the Motion to Dismiss [Doc. #35], to which Yale has filed a reply. [Doc. #38]. For the reasons stated herein, the Motion to Dismiss [**Doc. #32**] is **GRANTED**.[1]

**I.    Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); accord Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854

---

[1]The Court finds that it has subject matter jurisdiction over this action under 28 U.S.C. §1332(a) because plaintiff alleges both that "the amount in controversy is in excess of $75,000[,]" Doc. #27 at 2, and that the parties are citizens of different states. See id.

(2d Cir. 2021). In reviewing such a motion, the Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." Kaplan, 999 F.3d at 854 (citations omitted). In short, the Court's "role in reviewing a motion to dismiss under Rule 12(b)(6) is to determine if the complaint -- apart from any of its conclusory allegations -- alleges enough facts to state a plausible claim for relief." Taylor Theunissen, M.D., LLC v. United HealthCare Grp., Inc., 365 F. Supp. 3d 242, 246 (D. Conn. 2019).

"[W]hile this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or naked assertions devoid of further factual enhancement." Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678 (citations and quotation marks omitted).

Typically, a court's review of a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482

F.3d 184, 191 (2d Cir. 2007). However, the Court may also consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

In evaluating whether to consider a document at the 12(b)(6) stage,

> finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since ... the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason -- requiring notice so that the party against whom the motion to dismiss is made may respond -- that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).

Defendant has attached the following eight exhibits to its Motion to Dismiss: (a) a January 13, 2020, e-mail from the Chair of the Psychiatry Department at Yale, Dr. John Krystal, to plaintiff expressing concerns with plaintiff's public statements, see Doc. #32-2; (b) a September 4, 2020, letter from Dr. Krystal to plaintiff explaining the basis for Yale's decision not to reappoint plaintiff, see Doc. #32-3; (c) a May 17, 2020, letter from Dr. Krystal to plaintiff indicating that

her "faculty appointment in our Department and School of
Medicine will end as of June 30, 2020[,]" Doc. #32-4 at 2; (d) a
September 2020 e-mail chain between plaintiff and Yale's
President, Peter Salovey, regarding Yale's reappointment
decision, see Doc. #32-5; (e) the 2019 Faculty Handbook, see
Doc. #32-6; (f) an August 21, 2020, letter from the Dean of the
Yale School of Medicine, Dr. Nancy J. Brown, dismissing
plaintiff's appeal of defendant's reappointment decision, see
Doc. #32-7; (g) a September 8, 2020, letter from Yale Provost
Scott Strobel, denying plaintiff's appeal of defendant's
reappointment decision, see Doc. #32-8; and (h) a July 28, 2017,
e-mail from Yale's Faculty Affairs Coordinator, David Freedman,
confirming plaintiff's "reappointment as Assistant Clinical
Professor for the term of July 1, 2017-June 30, 2020 in the
Department of Psychiatry at Yale University." Doc. #32-9 at 2.

Plaintiff -- who relies on many of the documents attached
to defendant's motion to support her opposition -- does not
dispute the authenticity of these documents. See Faulkner v.
Beer, 463 F.3d 130, 134 (2d Cir. 2006) ("[E]ven if a document is
'integral' to the complaint, it must be clear on the record that
no dispute exists regarding the authenticity or accuracy of the
document."). Indeed, she acknowledges that "contractual
relationships between parties may involve numerous pieces of
evidence," but asserts that such evidence "at this stage, [is]

not before the court." Doc. #35 at 7.

The Court finds that the documents attached to defendant's motion fall into three categories: (1) those that are incorporated by reference in plaintiff's Amended Complaint; (2) those that are integral to plaintiff's Amended Complaint; and (3) those that are not properly before the Court at the 12(b)(6) stage.

"[C]ourts must consider ... documents incorporated into the complaint by reference" at the 12(b)(6) stage. Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007). The Amended Complaint expressly discusses, and incorporates by reference, the following five documents: the January 13, 2020, e-mail from Dr. Krystal to plaintiff expressing concerns with plaintiff's public statements (Doc. #32-2), see Doc. #27 at 10-11; a September 4, 2020, letter from Dr. Krystal to plaintiff explaining the basis for Yale's decision not to reappoint plaintiff (Doc. #32-3), see Doc. #27 at 16-17; a May 17, 2020, letter from Dr. Krystal to plaintiff indicating that her "faculty appointment in our Department and School of Medicine will end as of June 30, 2020[,]" Doc. #32-4 at 1, see Doc. #27 at 11, 17; the 2019 Faculty Handbook (Doc. #32-6), see Doc. #27 at 13, 15, 19; and an August 21, 2020, letter from Dr. Brown dismissing plaintiff's appeal of defendant's reappointment decision (Doc. #32-7), see Doc. #27 at 15. Accordingly, the

Court finds that consideration of these five documents is proper at the 12(b)(6) stage. See Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013) (The Court may "consider any ... documents incorporated into the complaint by reference[.]" (citation and quotation marks omitted)).

The Court will also consider the July 28, 2017, e-mail from David Freedman confirming plaintiff's "reappointment as Assistant Clinical Professor for the term of July 1, 2017-June 30, 2020 in the Department of Psychiatry at Yale University[]" because that e-mail is integral to the Amended Complaint. Doc. #32-9 at 2. Plaintiff does not expressly reference this e-mail in her Amended Complaint. The Second Circuit has "recognized, however, that in some cases, a document not expressly incorporated by reference in the complaint is nevertheless integral to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint where the complaint relies heavily upon its terms and effect." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (citation and quotation marks omitted). This e-mail "specifies the scope" of one significant aspect of the agreement that is at issue in this litigation, specifically, the term of plaintiff's appointment. Sklair v. Mike Bloomberg 2020, Inc., No. 1:20CV02495(LTS), 2022 WL 889849, at *3 (S.D.N.Y. Mar. 25, 2022). As a result, the Court finds it proper to consider the e-

mail "as integral to[]" the Amended Complaint. Id.; see also DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may [nevertheless] consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (citations and quotation marks omitted)).[2]

The Court finds that consideration of the two remaining documents attached to defendant's motion is improper at the 12(b)(6) stage. Defendant attaches correspondence from President Salovey and Dr. Strobel regarding Yale's denial of plaintiff's attempts to appeal Yale's reappointment decision. See Doc. #32-5 (President Salovey's September 25, 2020, e-mail); Doc. #32-8 (Dr. Strobel's September 8, 2020, letter). These documents are not "critically related to Plaintiffs' factual allegations and underlying legal theory[.]" McNeil v. Yale Univ., 436 F. Supp. 3d 489, 515 (D. Conn. 2020), aff'd in part, vacated in part sub nom. McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc., No. 21-639-cv, 2021 WL 5286647 (2d Cir. Nov. 15, 2021). Nor have they been incorporated by reference into the Amended Complaint. Plaintiff briefly notes that her "appeals and subsequent requests for review were summarily denied[,]" see Doc. #27 at

---

[2] The Court notes that its decision would not be altered if it did not consider this document.

16, but she does not specifically cite or reference either President Salovey's September 25, 2020, e-mail (Doc. #32-5) or Dr. Strobel's September 8, 2020, letter (Doc. #32-8). Consideration of these documents is not proper (or necessary) at the 12(b)(6) stage.

In sum, the Court will consider the following exhibits when resolving this motion: Doc. #32-2, Doc. #32-3, Doc. #32-4, Doc. #32-6, Doc. #32-7, and Doc. #32-9. However, the Court will not consider Doc. #32-5 or Doc. #32-8.

## II. **Background**

The Court accepts the following allegations as true, solely for purposes of this Motion to Dismiss.

Plaintiff is a resident of the state of New York, and a graduate of Yale School of Medicine. See Doc. #27 at 2. In 2003, Yale appointed plaintiff "as Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine." Id. Dr. Lee continued in that role for seventeen years, with her most recent term spanning from "July 1, 2017-June 30, 2020[.]" Doc. #32-9 at 2.

Pursuant to the Yale Faculty Handbook, plaintiff's "appointment as Assistant Clinical Professor is listed under the 'Voluntary Ranks[.]'" Doc. #27 at 13. Voluntary faculty members "typically do not receive compensation or benefits from the School[,]" id. (citation and quotation marks omitted), and

plaintiff does not allege that Yale paid her for her services as an Assistant Clinical Professor.

Despite her classification as a volunteer, however, plaintiff alleges that she was required to "participate in four hours of student-related, teaching, or supervisory activities per week. These activities could be satisfied through teaching a course, lectures, through advising students in connection with their thesis preparation, supervising residents, participating in seminars and grand rounds, engaging in scholarly activity, participating in department administration, and other activities." Id. at 3-4.

"In exchange for her student-related and teaching activities, Dr. Lee received benefits, privileges, and opportunities, as well as related compensation and other indirect but significant remuneration, that she would not have otherwise received but for her academic affiliation with Yale." Id. at 4. Specifically,

> Dr. Lee was entitled to receive and did receive ... : office space, facilities, libraries, subscription-based access to research databases and journal articles, statisticians, laboratories, statistical programs and software, IT and technology services, computer programs and software, media studios (radio and television), and campus transportation, all of which she used for her research, writing, to assist with her speaking engagements, advocacy and other professional obligations. Notably, Dr. Lee was informed Division Head Dr. Howard Zonana, that in connection with her faculty appointment, she was covered by Yale's professional malpractice insurance policy for her forensic

consultations.

<u>Id.</u> (sic).

Plaintiff's allegations regarding the conflict underlying this action largely begin with events occurring in January 2020. <u>See</u> <u>id.</u> at 9.[3]

> [O]n January 2, 2020, University of Minnesota Law Professor and Yale Law School alumnus Richard Painter tweeted and tagged Dr. Lee to Mr. Dershowitz's characterization of his "perfect sex life," stating that Dershowitz's phrasing was similar to Trump's recount of the "perfect" call. Dr. Lee responded, "Alan Dershowitz's employing the odd use of 'perfect' ... might be dismissed as ordinary influence in most contexts." She added that "given the severity and spread of 'shared psychosis' among just about all of Trump's followers, a different scenario is more likely," and that scenario was "that he has wholly taken on Trump's symptoms by contagion."

<u>Id.</u>[4]

"[O]n January 11, 2020, Mr. Dershowitz sent an email to, <u>inter alia</u>, Yale spokesperson Karen Peart, University President Peter Salovey's Chief of Staff Joy McGrath, and Yale Law School Dean Heather Gerken[.]" <u>Id.</u> at 10. Mr. Dershowitz's e-mail stated:

---

[3] It appears from certain documents incorporated into the Amended Complaint that, from Yale's perspective, the conduct eventually giving rise to the non-renewal of plaintiff's appointment began as early as 2017. <u>See</u>, <u>e.g.</u>, Doc. #27 at 16 (quoting letter form Dr. Krystal to Dr. Lee discussing concerns relating to plaintiff's conduct "[s]ince 2017[]").

[4] The Court presumes familiarity with the meaning of the terms "tweet" and "tagged" as those terms are used in the Amended Complaint.

> Dr. Bandy Lee of the Yale Medical School has publicly 'diagnosed' me as 'psychotic,' based on my legal and political views, and without ever examining or even meeting me. ... This constitutes a serious violation of the ethics rules of the American Psychiatric Association. I am formally asking that association to discipline Dr. Lee. By this email, I also formally ask Yale University, Yale Law School and its medical school to determine whether Dr. Lee broke any of its rules.

Id. (citation and quotation marks omitted).

On January 13, 2020, Dr. Krystal sent plaintiff an e-mail that stated, in part:

> It seems to me, and my impression is supported by my discussion with Howard, that the published quotes suggest that you are not making cautious, reasoned, statements qualified by the limitations of the information that you have or considering alternatives to the conclusions that you present. Worse, the recklessness of your comments creates the appearance that they are self-serving in relation to your personal political beliefs and other possible personal aspirations.

> Here is the problem for me. It seems to me that you have been increasingly reckless and irresponsible in your public statements. I have tried very hard to find a path that would enable you to continue your teaching role. However, you are putting me in a position where I have to ask, "Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?" I have consulted Howard Zonana on this question and he is equally concerned that you are not showing good medical judgement in your public statements. It is our shared opinion that if your behavior does not change, we will have no alternative but to terminate your teaching role at Yale University. As you have no other duties at Yale, termination of your teaching role would also terminate your faculty appointment.

> I think that the three of us should meet to review your recent comments and your plans for future comments. Perhaps we can find a path forward. I will ask Halppen

Donoghoe to set up this meeting.
Doc. #32-2 at 2.

On January 17, 2020, "Dr. Krystal called Dr. Lee to a meeting that included three additional faculty members." Doc. #27 at 11. There, "Dr. Lee was told that she had breached psychiatric ethics by 'diagnosing' Mr. Dershowitz, a conclusion with which Dr. Lee strongly disagreed." Id. During the meeting, "Dr. Lee expressed her desire for a discussion and asked for an investigation, as she felt that what constitutes psychiatric ethics had been distorted under the Trump presidency. Yale refused to have further discussions with Dr. Lee and refused to investigate the matter." Id.

On May 17, 2020, Dr. Lee received what she describes as a "termination letter" from Dr. Krystal. Id. That letter stated that in reviewing Dr. Lee's "candidacy for reappointment to the voluntary faculty of the Yale Department of Psychiatry, we became aware that you no longer have a formal teaching role in the Division of Law and Psychiatry. As a result, your faculty appointment in our Department and School of Medicine will end as of June 30, 2020." Doc. #32-4 at 2.

> After multiple informal attempts to elicit an opportunity to be heard from her department failed, Dr. Lee filed an appeal related to her termination on or about August 14, 2020 with Dr. Nancy J. Brown, Dean of the School of Medicine. Her appeal was not considered. Rather, on or about August 21, 2020, her appeal was dismissed by Dr. Brown, for procedural reasons. On or

about August 25, 2020, Dr. Lee filed a letter of appeal
with Dr. Scott A. Strobel, Yale's Provost, and then to
President Salovey, Yale's President, on or about
September 24, 2020. These appeals and subsequent
requests for review were summarily denied.

Doc. #27 at 15-16.

Dr. Krystal sent plaintiff a letter on September 4, 2020.

See id. at 16. The letter "explain[ed] the basis of the decision

to terminate her faculty appointment." Id. The letter stated, in

full:

> Dear Dr. Lee:
>
> Provost Strobel has shared with me your belief that you
> did not have an adequate opportunity to understand and
> respond to the concerns that caused the Department of
> Psychiatry to deny your request for reappointment.
> Provost Strobel has asked me to explain to you the basis
> of the Department's decision, and I am happy to do so.
>
> As you know, on January 17, 2020, a review committee,
> composed of Dr. Kapoor, Dr. Rohrbaugh, Dr. Zonana and
> me, met with you for an hour-long discussion of your
> role in the Department, which consisted of teaching and
> mentorship in the Division of Law and Psychiatry.
> Although, at one time, you supervised forensic
> psychiatry fellows working with the Yale Law School
> clinics, you ceased doing so a few years ago. In recent
> years, you mainly provided case evaluations and acted as
> a consultant to law students in the clinical program. At
> the beginning of this year, that role came to an end,
> partly due to a concern that your psychiatric opinions
> were open to challenge in court. In addition, your
> attendance at key didactic seminars within the
> Department, such as Friday case conferences, dwindled in
> 2019. By the beginning of this year, you had no formal
> Departmentally-sanctioned teaching activities. Your
> only teaching role was outside the Department, as
> supervisor to two undergraduates and a medical student
> doing projects on prison violence
>
> Given these circumstances, the review committee needed

to consider whether the Department could offer you a
continuing teaching role, and we met with you to help us
make that decision. The key question in our minds was
whether you had the clinical judgment and
professionalism to teach trainees key aspects of their
profession. Your diagnostic impressions of President
Trump and several other public figures and your
recommendations for treating President Trump played a
role in our discussion. This was not because of the
political content of your speech. As you know, the
Department and the University publicly defended your
academic freedom and your right to express your opinions
as a citizen. As detailed below, the Committee's concern
was what your diagnoses and treatment recommendations
said about your clinical abilities and professionalism.

Since 2017, you have taken the position that you have a
"duty to warn" the public that President Trump presents
a threat to public safety. The duty to warn derives from
the Tarasoff decision and subsequent legal developments,
and it applies to clinicians in a treatment relationship
with a potentially dangerous person. It has never been
applied outside that context. In public comments, you
said that President Trump was incapacitated by a
psychiatric disorder, and you identified symptoms such
as aggressive speech, sexual misconduct, incitement to
violence, belief in conspiracies, declining cognitive
functioning, and neurological deficits. Initially, you
did not identify the disorder causing these supposed
symptoms. In December 2019, you said publicly that
President Trump exhibited a "pattern of delusions," was
"lacking rational decisionmaking capacity," and had
"definitive signs of severe pathology" that required "an
advanced level of care." In January 2020, you called for
"an involuntary evaluation" of President Trump, and you
said, "I am beginning to believe a mental health hold
... will become inevitable." That same month, you
publicly suggested that President Trump, Rudolph
Giuliani and Alan Dershowitz had a "shared psychosis."

I want to emphasize that you did not make these
statements as a layperson offering a political judgment;
you made them explicitly in your professional capacity
as a psychiatrist and on the basis of your psychiatric
knowledge and judgment. For that reason, the committee
decided it was appropriate to consider how these
statements reflected your ability to teach trainees.

We began our discussion by asking you to address whether your diagnosis of President Trump and your treatment recommendations should have included a disclaimer regarding limited evidence, whether they adequately reflected the process of differential diagnosis, and whether you applied any recognized standards when you determined on the basis of his public statements that President Trump presented a danger to the public health. Your responses failed to address any of these points.

Our discussion then turned to your statement that President Trump and Mr. Dershowitz had a shared psychosis. You told us that "someone doesn't have to be psychotic in order to have a psychosis;" that your observations had convinced you that the strong emotional bond between President Trump and his followers "is a group phenomenon of shared psychosis;" and that, in the presence of this bond, "the default is that you would expect a shared psychosis." You further claimed that you were misquoted; that, in fact, you had said President Trump and Mr. Dershowitz "may" have a shared psychosis; and that you meant to say that they have a shared delusional disorder. We asked you to explain in detail the basis for this diagnosis, and none of the evidence you offered met the DSM-5 criteria for shared delusional disorder. The committee also noted that you explored no other explanations that might have accounted for the data that led you to your diagnosis.

Following our discussion with you, the committee considered whether the information that you shared with us was relevant to your capacity to teach trainees the core competencies required by the ACGME. We decided that our discussion with you implicated three of the six competencies: medical knowledge, interpersonal and communication skills, and professionalism.

In regard to medical knowledge, the ACGME requires trainees "to demonstrate knowledge about established and evolving biomedical, clinical, and cognate sciences and the application of this knowledge to patient care." Our discussion of your diagnosis of shared psychosis or, as you preferred, shared delusional disorder convinced the committee that you do not adequately understand or choose not to follow current methods for diagnosing psychotic disorders, which are common in the psychiatric

practice that our trainees will enter.

In regard to interpersonal communication skills, the ACGME requires trainees "to demonstrate interpersonal and communication skills that result in effective information exchange and teaming with patients, patients' families, and professional associates." In our lengthy discussion with you, you were unable to explain to four trained colleagues the basis of a very serious diagnosis. In addition, you have made many conflicting, confusing, and sometimes inaccurate public statements about psychiatric diagnosis and the profession's duty to warn.

Finally, the ACGME requires trainees "to demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population." Although the committee does not doubt that you are acting on the basis of your personal moral code, your repeated violations of the APA's Goldwater Rule and your inappropriate transfer of the duty to warn from the treatment setting to national politics raised significant doubts about your understanding of crucial ethical and legal principles in psychiatry.

In light of the above concerns, the Committee concluded that the Department should not seek a new teaching role for you. The Committee report was shared with the Executive Committee of the Department of Psychiatry and discussed at length. Its recommendation, that your teaching duties not be reinstated, was endorsed unanimously by the Executive Committee. In the absence of a formal teaching role, your voluntary appointment lapsed.

I hope that this letter clarifies the process leading to the Department decision to not reinstate your teaching responsibilities. We recognize that without formal teaching responsibilities your appointment could not be reinstated.

Doc. #32-3 at 2-4.

Plaintiff asserts that her "faculty appointment was governed by a Faculty Handbook, policy statements," Doc. #27 at

19, the parties' course of conduct, see id. at 3, and statements
made by Yale administrators, see id. at 12.

Plaintiff describes the parties' course of conduct as
follows:

> Dr. Lee served as a faculty member of the Law and
> Psychiatry Division at Yale School of Medicine for 17
> years. ... Dr. Lee was not required to apply for any
> "renewal" of her reappointment; it appeared to be
> automatic. Oftentimes, Dr. Lee would not receive any
> written notification about any purported "renewal" of
> her appointment; it was understood by both the Plaintiff
> and Defendant that her appointment was ongoing, and she
> would continue in her role without any specific end date.
> She served on Yale's faculty and Yale accepted her
> services through a continuing course of dealing.

Id. at 3.

Plaintiff further describes certain conversations she had
with Yale administrators. Specifically, plaintiff alleges: (a)
"Dr. Lee discussed with Division Head Dr. Zonana the curriculum
and timetable for the course [she intended to teach] to
commence, and he indicated approval and appreciation for her
efforts[,]" id. at 12; (b) "Prior to Mr. Dershowitz's
communication to Yale, Division Head Dr. Zonana complimented her
on how she was handling her public statements[,]" id.; and (c)
"Prior to Mr. Dershowitz's communication to Yale, Dr. Krystal
also commended Dr. Lee's work." Id.

The Amended Complaint also asserts that "[r]ights of
academic freedom and freedom of expression are expressly
preserved in the Faculty Handbook[.]" Id. at 13. However, the

lone provisions of the Faculty Handbook quoted by plaintiff
pertain to compensation for voluntary faculty members and
procedures that certain faculty members are entitled to when a
decision not to reappoint those faculty members is made. See id.
at 13-14.

Finally, the Amended Complaint relies on a variety of Yale
policies that are not alleged to be found in the Faculty
Handbook. Specifically, plaintiff alleges that Yale maintains
the following policy:

> Yale University is committed to the free expression of
> ideas by members of the University community, including
> expression of political views; and to the freedom of
> students and faculty to engage in scholarship related to
> political life and discourse. The Woodward Report ...
> reinforces these commitments, and reminds us that within
> the diversity of the Yale community there coexist many
> points of view.

Id. at 14-15 (quotation marks omitted).

Plaintiff quotes the "Woodward Report" as stating:

> We value freedom of expression precisely because it
> provides a forum for the new, the provocative, the
> disturbing, and the unorthodox. Free speech is a barrier
> to the tyranny of authoritarian or even majority opinion
> as to the rightness or wrongness of particular doctrines
> or thoughts.
>
> If the priority assigned to free expression by the nature
> of a university is to be maintained in practice, clearly
> the responsibility for maintaining that priority rests
> with its members. By voluntarily taking up membership in
> a university and thereby asserting a claim to its rights
> and privileges, members also acknowledge the existence
> of certain obligations upon themselves and their
> fellows. Above all, every member of the university has
> an obligation to permit free expression in the

university. No member has a right to prevent such
expression. Every official of the university, moreover,
has a special obligation to foster free expression and
to ensure that it is not obstructed.

The policy of academic freedom is incorporated in the
Faculty Handbook, and other policy statements, rules,
guidelines and regulations of the University, and
constitutes an essential restraint against interference
by the administration and university of its exercise by
the faculty.

Id. at 15.

Plaintiff asserts that "Yale terminated Dr. Lee's faculty
appointment in violation of her right to academic freedom and
other rights contained within Yale's Faculty Handbook, policy
statements, guidance, regulations, and rules applicable to her
faculty appointment." Id. at 19.

## III. **Discussion**

Plaintiff brings four claims against Yale. Count One
asserts a claim for breach of contract, alleging that "Yale
terminated Dr. Lee's faculty appointment in violation of her
right to academic freedom, and other rights contained with
Yale's Faculty Handbook, policy statements, guidance,
regulations, and rules applicable to her faculty appointment."
Id. Count Two asserts that Yale breached the implied covenant of
good faith and fair dealing "when it deprived Dr. Lee of her
right to academic freedom and/or the rights and guarantees
provided by the Faculty Handbook, policy statements, guidance,
regulations and rules applicable to her faculty appointment,

thereby depriving Dr. Lee of the benefit of the contract." Id. Count Three asserts that Yale wrongfully terminated Dr. Lee for "her exercise of her protected speech rights[]" in violation of Connecticut General Statutes §31-51q. Id. at 20. Count Four asserts a claim for negligent misrepresentation on the grounds that "the representations made in the Handbook, as well as its policy statements, guidance, regulations, and rules, were false, and they were known or should have been known to be false by Yale." Id. at 21.

**A.   Breach of Contract**

Yale moves to dismiss plaintiff's claim for breach of contract. Plaintiff contends that "Yale terminated Dr. Lee's faculty appointment in violation of her right to academic freedom and other rights contained within Yale's Faculty Handbook, policy statements, guidance, regulations, and rules applicable to her faculty appointment." Id. at 19.

Plaintiff explains that her breach of contract claim is not "based on any singular document." Doc. #35 at 12. The Court therefore construes the Amended Complaint to assert that the parties formed an implied contract that Yale would not decline to reappoint plaintiff, regardless of whether it found that plaintiff was no longer qualified for the position, based at least in part on her public statements. See Doc. #27 at 19. Reading the Amended Complaint generously, plaintiff appears to

base her claim that such an implied contract existed on the parties' course of conduct, the statements made by Yale administrators, the Faculty Handbook, and Yale's policy statements.

"An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties." <u>Vertex v. City of Waterbury</u>, 898 A.2d 178, 190 (Conn. 2006). Under Connecticut law, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." <u>Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.</u>, 87 A.3d 534, 540 (Conn. 2014). The Court finds that plaintiff has failed to adequately allege that she had an implied contract with Yale that Yale would not decline to reappoint plaintiff regardless of whether it found that she was no longer qualified for the position, based at least in part on her public statements.

"A contract implied in fact, like an express contract, depends on actual agreement." <u>Coelho v. Posi-Seal Int'l, Inc.</u>, 544 A.2d 170, 173 (Conn. 1988); <u>see</u> <u>also</u> <u>Ezold v. Wellpoint, Inc.</u>, No. 3:06CV00381(AWT), 2007 WL 1238725, at *2 (D. Conn. Apr. 28, 2007). "[T]he party charged must have agreed, either by words or action or conduct, to undertake a contractual commitment to the party seeking to enforce such a commitment."

Peralta v. Cendant Corp._, 123 F. Supp. 2d 65, 83 (D. Conn. 2000).

A contractual commitment "cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." Christensen v. Bic Corp., 558 A.2d 273, 277 (Conn. App. 1989). "In order to support contract liability, the defendants' representations must be sufficiently definite to manifest a present intention on the part of the defendants to undertake immediate contractual obligations to the plaintiff." Burnham v. Gelb, 717 A.2d 811, 813 (Conn. App. 1998) (citation and quotation marks omitted). In the employment context, "[s]uch an agreement may be based on an employer's representations to the effect that the employee will not be terminated under certain circumstances or except for good cause or that employment will continue as long as certain conditions are met." Jarnutowski v. Pratt & Whitney, 103 F. Supp. 3d 225, 240 (D. Conn. 2015) (citation and quotation marks omitted).

Plaintiff asserts that the parties' course of conduct, statements made by Yale administrators, provisions of the Faculty Handbook, and Yale policy statements, gave rise to an implied contract. Each basis on which plaintiff contends a contract was formed is flawed. Together, they do not support a finding that Yale intended to enter into an implied contract with the terms alleged by plaintiff.

First, plaintiff relies on the parties' course of conduct. Specifically, plaintiff asserts: "Oftentimes, Dr. Lee would not receive any written notification about any purported 'renewal' of her appointment; it was understood by both the Plaintiff and Defendant that her appointment was ongoing, and she would continue in her role without any specific end date." Doc. #27 at 3.

Plaintiff fails to acknowledge, in arguing that she expected her appointment to be effectively automatically renewed, that the Faculty Handbook expressly provides: "The reappointment of persons holding term appointments is not automatic at Yale." Doc. #32-6 at 23. As noted elsewhere, plaintiff expressly relies on the Faculty Handbook where she believes it supports her claims, but disregards this express statement of the Faculty Handbook that undermines her claims.

Second, plaintiff points to specific, isolated statements made by Yale administrators. Specifically, plaintiff asserts: (a) "Dr. Lee discussed with Division Head Dr. Zonana the curriculum and timetable for the course [she intended to teach] to commence, and he indicated approval and appreciation for her efforts[,]" id. at 12; (b) "Prior to Mr. Dershowitz's communication to Yale, Division Head Dr. Zonana complimented her on how she was handling her public statements[,]" id.; and (c) "Prior to Mr. Dershowitz's communication to Yale, Dr. Krystal

also commended Dr. Lee's work." Id.

These three alleged generic expressions of "approval and appreciation" or commendation are insufficient to even suggest a promise of continued appointment, much less support a contractual commitment. Even if the Court were to treat these statements as "favorable performance evaluations" of plaintiff, such "isolated positive feedback" does not support a finding that Yale intended to guarantee plaintiff continued appointment. Rubinow v. Boehringer Ingelheim Pharms., Inc., 496 F. App'x 117, 119 (2d Cir. 2012) (affirming grant of summary judgment for defendant on employment discrimination claim); see also Emanuel v. Oliver, Wyman & Co., LLC, 85 F. Supp. 2d 321, 332 (S.D.N.Y. 2000) (observing that favorable letter of reference emphasizing plaintiff's positive traits did not undermine basis for plaintiff's termination).

Third, the Amended Complaint asserts that "[r]ights of academic freedom and freedom of expression are expressly preserved in the Faculty Handbook[.]" Doc. #27 at 13. However, the lone provisions of the Faculty Handbook quoted by plaintiff pertain to compensation for voluntary faculty members and procedures that certain faculty members are entitled to when a decision not to reappoint those faculty members is made.[5] See id.

---

[5] Specifically, the Amended Complaint asserts that Yale did not follow certain notice procedures described in the handbook when

at 13-14. Plaintiff's vague assertion that some unspecified provision in the Faculty Handbook creates a right to "academic freedom" is plainly insufficient to show that defendant undertook a contractual commitment to guarantee plaintiff continued reappointment. See Brescia v. Leff, No. 3:04CV01680(PCD), 2005 WL 8167031, at *4 (D. Conn. Sept. 30, 2005) ("Although Plaintiff asserts the existence of an implied contract, she has not set forth any allegations, which if taken as true, would demonstrate Defendants' intention to be contractually liable to Plaintiff.").

Fourth, plaintiff relies on Yale's "formal policy and practice of providing for academic freedom for all its faculty, whether tenured or not." Id. at 14. Specifically, plaintiff first points to an alleged policy statement, from an unspecified source, which states:

> Yale University is committed to the free expression of ideas by members of the University community, including expression of political views; and to the freedom of students and faculty to engage in scholarship related to political life and discourse. The Woodward Report ...

---

declining to renew plaintiff's appointment. See Doc. #27 at 14. Yale has moved to dismiss plaintiff's claims under this theory, asserting that the notice provisions relied upon by plaintiff expressly do not apply to voluntary faculty. See Doc. #32-1 at 18, 20. Plaintiff's memorandum in opposition does not respond to this aspect of the motion to dismiss. The Court therefore finds this claim has been abandoned by plaintiff. See Malik v. City of N.Y., 841 F. App'x 281, 284 (2d Cir. 2021) ("[A] court may infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned[.]" (citation and quotation marks omitted)).

reinforces these commitments, and reminds us that within
the diversity of the Yale community there exists many
points of view.

Id. at 14-15 (quotation marks omitted).

Plaintiff then quotes the following excerpt of the Woodward

Report:

> We value freedom of expression precisely because it
> provides a forum for the new, the provocative, the
> disturbing, and the unorthodox. Free speech is a barrier
> to the tyranny of authoritarian or even majority opinion
> as to the rightness or wrongness of particular doctrines
> or thoughts.
>
> If the priority assigned to free expression by the nature
> of a university is to be maintained in practice, clearly
> the responsibility for maintaining that priority rests
> with its members. By voluntarily taking up membership in
> a university and thereby asserting a claim to its rights
> and privileges, members also acknowledge the existence
> of certain obligations upon themselves and their
> fellows. Above all, every member of the university has
> an obligation to permit free expression in the
> university. No member has a right to prevent such
> expression. Every official of the university, moreover,
> has a special obligation to foster free expression and
> to ensure that it is not obstructed.
>
> The policy of academic freedom is incorporated in the
> Faculty Handbook, and other policy statements, rules,
> guidelines and regulations of the University, and
> constitutes an essential restraint against interference.

Id. at 15.[6]

---

[6] In its Motion to Dismiss, defendant refers to a provision of
the Faculty Handbook stating: "Members of this University have
freely associated themselves with Yale and in doing so have
affirmed their commitment to a philosophy of mutual tolerance
and respect. Physical restriction, coercion, or intimidation of
any member of the community is contrary to the basic principles
of the University." Doc. #32-1 at 28. Plaintiff does not cite

Such generalized statements of principles are not
sufficient to manifest the intent to form a contract for
guaranteed reappointment. See, e.g., Pecoraro v. New Haven Reg.,
344 F. Supp. 2d 840, 844 (D. Conn. 2004) ("[A]ny promises in the
employer's anti-discrimination policy are general statements of
adherence to the anti-discrimination laws, and standing alone
they do not create a separate and independent contractual
obligation." (citation and quotation marks omitted)); Peralta v.
Cendant Corp., 123 F. Supp. 2d 65, 84 (D. Conn. 2000) ("The
language of the anti-harassment policy that plaintiff urges as
the basis of his implied contract claim does not indicate that
defendant is undertaking any contractual obligations towards the
plaintiff[.]").

The parties' course of conduct, the statements made by Yale
administrators, the Faculty Handbook, and Yale's policy
statements -- taken individually or in combination -- are, as a

---

this provision of the Faculty Handbook in her Amended Complaint,
but argues in her opposition memorandum that Yale breached this
provision when it "summarily summoned [plaintiff] to a meeting
with Dr. Krystal by an accusatory email, based upon the demand
of Prof. Dershowitz[.]" Doc. #35 at 8. It is insufficient to
raise a claim in briefing, rather than in the Complaint, but in
any event, the claim lacks merit. Plaintiff's interpretation of
this provision would effectively prohibit supervisors from
requiring faculty members to meet with them regarding
performance issues; such an interpretation would lead to absurd
results. See Doc. #38 at 8; cf. Konover v. Kolawoski, 200 A.3d
1177, 1184 (Conn. App. 2018) (declining to interpret language in
a manner that would lead to absurd results).

matter of law, insufficiently definite to create the contract
that plaintiff seeks to enforce. Plaintiff has "pluck[ed] out of
context" various statements indicating that she was previously
successful in her role, and expressing that Yale values academic
freedom. Gunn v. Penske Auto. Grp., Inc., No. 3:17CV00757(AWT),
2018 WL 7374285, at *5 (D. Conn. Mar. 30, 2018). Plaintiff has
failed, however, to point to any facts, "which if taken as true,
would demonstrate Defendants' intention to be contractually
liable to Plaintiff" for declining to reappoint her regardless
of whether it found that she was no longer qualified for the
position. Brescia, 2005 WL 8167031, at *4.

Absent such facts, Yale's generalized comments regarding
plaintiff's job performance and its stated commitment to
academic freedom are simply too vague to create a contractual
commitment that Yale would not decline to reappoint plaintiff
even when it found that she no longer had "the clinical judgment
and professionalism to teach trainees key aspects of their
profession." Doc. #32-3 at 2; see Anderson v. Post/Newsweek
Stations, No. 2:90CV00583(PCD), 1992 WL 92399, at *3 (D. Conn.
Feb. 3, 1992) ("The 'promise' that plaintiff would receive 'full
support' and the like, from his superiors is simply too vague to
expect that plaintiff would have reasonably relied on it."); cf.
Medina-Corchado v. Univ. of New Haven, No. 3:21CV00132(JAM),
2022 WL 279871, at *5 (D. Conn. Jan. 31, 2022) ("The fact that

an educational institution may issue a policy does not tend to suggest that the policy creates a contract for which a student may sue the institution for breach of contract if the institution does not follow its policy.").

This is especially true in light of the <u>express</u> disavowal, in at least two places in the Faculty Handbook, of any guarantee of reappointment. <u>See</u> Doc. #32-6 at 23 ("The reappointment of persons holding term appointments is not automatic at Yale."); <u>id.</u> at 30 ("Faculty members on term appointments do not have a right to reappointment[.]"). It is not reasonable to believe that the other portions of the Faculty Handbook, a few stray supportive remarks, and a history of consistent reappointment somehow negates these express statements of intent by Yale.

Plaintiff effectively asks this Court to hold that a private university, by reappointing a voluntary faculty member on several occasions, being complimentary of her work, and expressing general support for academic freedom, undertakes a <u>contractual commitment</u> to <u>guarantee</u> reappointment to that faculty member, <u>regardless of whether the university finds that the faculty member is no longer qualified for the position</u>. <u>See</u> Doc. #32-3 at 2-4 (Dr. Krystal's letter explaining defendant's conclusion that plaintiff was lacking in three of the six required competencies and that her "clinical abilities and professionalism[]" were insufficient to support reappointment).

That would be an extraordinary and unreasonable result, and the Amended "complaint here falls well short of alleging non-conclusory facts to show that" Yale undertook such a contractual commitment to plaintiff. Medina-Corchado, 2022 WL 279871, at *4.

Plaintiff has thus failed to adequately allege that Yale undertook a contractual commitment to reappoint plaintiff even if it found that she was no longer qualified for the position, based at least in part on public statements she made. Because plaintiff has failed to adequately allege that such a contract was formed, her claim for breach of contract is dismissed.

The Court need not -- and does not -- decide whether Yale's failure to reappoint plaintiff would breach such an agreement, had it existed. The Court notes, however, that a decision not to reappoint a voluntary faculty member is an academic decision that "concerns a requirement representative of an academic relationship ... that is strongly associated with institutions of higher learning, ... and ... has little to do with the normal attributes of an employee relationship." Daley v. Wesleyan Univ., 772 A.2d 725, 736 (Conn. App. 2001) (citation and quotation marks omitted). "Because an academic institution is afforded considerable discretion when, through its employees, it exercises its professional judgment on academic matters, the plaintiff" must allege facts showing that the faculty's decision not to reappoint her "was made arbitrarily, capriciously or in

bad faith[.]" Id. To satisfy this standard, plaintiff would have to allege facts showing that "the [University's] decision had no discernible rational basis." Gupta v. New Britain Gen. Hosp., 687 A.2d 111, 121 (Conn. 1996) (citation and quotation marks omitted).

The Court does not reach whether Yale's reappointment decision in this case was an academic decision entitled to deference, because the Court finds no contract existed. Nor does it reach whether Yale had a discernible rational basis for its decision. It is notable, however, that the Amended Complaint alleges that Yale informed plaintiff that she was not being reappointed because of "the Committee's concern [regarding] what [plaintiff's] diagnoses and treatment recommendations said about [her] clinical abilities and professionalism." Doc. #27 at 16. To prevail on her claims, plaintiff would have to show that Yale had no "discernible rational basis" to deny plaintiff reappointment. Doe v. Wesleyan Univ., No. 3:19CV01519(JBA), 2021 WL 664010, at *11 (D. Conn. Feb. 19, 2021) (emphasis in original).

In sum, plaintiff has failed to adequately allege the existence of an implied contract because she has not alleged facts which, if proven, would demonstrate that Yale undertook a contractual commitment to reappoint plaintiff even if it found that plaintiff was no longer qualified for the position, based

at least in part on public statements she made. Consequently, plaintiff's claim for breach of contract is dismissed.

**B.   The Implied Covenant of Good Faith and Fair Dealing**

Plaintiff claims that Yale breached the implied covenant of good faith and fair dealing because it "did not act in good faith when it deprived Dr. Lee of her right to academic freedom and/or the rights and guarantees provided by the Faculty Handbook, policy statements, guidance, regulations and rules applicable to her faculty appointment, thereby depriving Dr. Lee of the benefit of the contract." Doc. #27 at 19.

Defendant moves to dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing, arguing: (1) "Because Plaintiff's breach of contract claim fails, her breach of the implied covenant of good faith and fair dealing claim also fails[,]" Doc. #32-1 at 33 (citation and quotation marks omitted); and (2) plaintiff "has not plausibly alleged bad faith." Id. at 34. The Court need not reach defendants' bad faith argument, because it agrees that the dismissal of the breach of contract claim dictates dismissal of the implied covenant claim.

Under Connecticut law, the "duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. In other words, every contract carries an implied duty requiring that neither party do anything that will injure

the right of the other to receive the benefits of the agreement." Capstone Bldg. Corp. v. Am. Motorists Ins. Co., 67 A.3d 961, 986 (Conn. 2013) (citation and quotation marks omitted). "[T]he existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing." Hoskins v. Titan Value Equities Grp., Inc., 749 A.2d 1144, 1146 (Conn. 2000); see also Valls v. Allstate Ins. Co., No. 3:16CV01310(VAB), 2017 WL 4286301, at *5 (D. Conn. Sept. 27, 2017), aff'd, 919 F.3d 739 (2d Cir. 2019) (Where a plaintiff has "not plead a plausible claim for breach of contract, their claim for breach of the implied covenant of good faith and fair dealing also fails.").

As discussed above, plaintiff has failed to adequately allege the existence of an implied contract between the parties. Dismissal of the breach of contract claim requires dismissal of the implied covenant claim that relies upon it. See, e.g., Lawrence v. Richman Grp. of Conn., LLC, 407 F. Supp. 2d 385, 391 (D. Conn. 2005). Accordingly, plaintiff's claim for breach of the implied covenant of good faith and fair dealing is dismissed.

## C.   Section 31-51q

Plaintiff has failed to state a claim under Connecticut General Statutes Section 31-51q. This statute provides, in part:

Any employer ... who subjects any employee to discipline

or discharge on account of the exercise by such employee
of rights guaranteed by the first amendment to the United
States Constitution or section 3, 4 or 14 of article
first of the Constitution of the state, provided such
activity does not substantially or materially interfere
with the employee's bona fide job performance or the
working relationship between the employee and the
employer, shall be liable to such employee for damages
caused by such discipline or discharge[.]

Conn. Gen. Stat. §31-51q (superseded effective July 1, 2022).[7]

Plaintiff alleges that Yale's "termination of Dr. Lee's
faculty appointment on account of Dr. Lee exercising rights
guaranteed by the first amendment to the United States
Constitution or section 3, 4, or 14 of article first of the
Connecticut Constitution violated Conn. Gen. Stat. §31-51q."
Doc. #27 at 20.

Defendant moves to dismiss this claim, arguing that: (1)
plaintiff "Has Not Alleged an Employment Relationship Within The
Meaning of §31-51q[,]" Doc. #32-1 at 36; (2) plaintiff "Has Not

---

[7] This statute has recently been amended by Public Act No. 22-24,
which took effect on July 1, 2022. The amendment largely
consists of additions to the language of §31-51q, and provides
employees with a remedy if they have been disciplined or
discharged based upon the "refusal to (A) attend an employer-
sponsored meeting with the employer or its agent, representative
or designee, the primary purpose of which is to communicate the
employer's opinion concerning religious or political matters, or
(B) listen to speech or view communications, the primary purpose
of which is to communicate the employer's opinion concerning
religious or political matters[.]" Conn. Gen. Stat. §31-51q(b).
The Court finds that the amendments do not impact the analysis
of the pending motion, and relies upon the version of the
statute that was in effect when the events underlying the
Amended Complaint occurred, and when this action was filed.

Alleged a 'Discipline or Discharge' Within the Meaning of §31-51q[,]" id. at 40; and (3) "Section 31-51q Does Not and Cannot Limit a University's First Amendment Rights." Id. at 46. Because the Court finds that plaintiff's failure to allege an employment relationship is dispositive to her claim, it does not reach defendant's remaining grounds for dismissal.

"[A]n employer-employee relationship is required to establish standing" under Section 31-51q. Varley v. First Student, Inc., 119 A.3d 643, 652 (Conn. App. 2015) (citation and quotation marks omitted). The term "employee" is undefined in Section 31-51q. "Generally, when a statutory term is not defined, [the Court] presumes that it was intended to have its ordinary meaning as expressed in standard dictionaries." State v. Wright, 135 A.3d 1, 16 (Conn. 2016).

The parties advance competing definitions of the term "employee." Relying upon the Connecticut Appellate Court's interpretation of the term "employer" under Section 31-51q, defendant asserts: "As the Connecticut Appellate Court found in Varley, an 'employer' within the meaning of Section 31-51q is 'one for whom employees work and who pays their wages or salaries.'" Doc. #32-1 at 36 (quoting Varley, 119 A.3d at 653). Based on this holding, defendant contends that "an employee is necessarily someone who works for an employer and is paid a wage or salary." Doc. #32-1 at 36.

Plaintiff relies on Black's Law Dictionary, which defines an employee as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of the work performance." Doc. #35 at 16 (citation and quotation marks omitted).[8]

The only published Connecticut case law interpreting the term "employee" under Section 31-51q does not address the term's dictionary definition. See Young v. City of Bridgeport, 42 A.3d 514 (Conn. App. 2012). Rather, when determining whether the plaintiff was an "employee" under Section 31-51q, the Connecticut Appellate Court utilized the so-called "control test." Id. at 519. There, the court held:

> The legal incidents of the employer-employee relationship, on the one hand, and the employer-independent contractor relationship, on the other, are well established. An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as

---

[8] The Court notes that Black's Law Dictionary defines the verb "hire" as follows: "To engage the labor or services of another for wages or other payment." Black's Law Dictionary (11th ed. 2019) (emphasis added). Thus, the definition of "employee" relied upon by plaintiff could be read as: "Someone who works in the service of another person (the employer) under an express or implied contract for wages or other payment, under which the employer has the right to control the details of the work performance." That definition defeats plaintiff's claim, because (1) there was no contract here and (2) plaintiff did not receive wages or other payment.

> to the result of his work. The fundamental distinction
> between an employee and an independent contractor
> depends upon the existence or nonexistence of the right
> to control the means and methods of work. It is not the
> fact of actual interference with the control, but the
> right to interfere, that makes the difference between an
> independent contractor and a servant or agent.

Id. at 520 (citation and quotation marks omitted).

Here, however, the question is not whether plaintiff was hired as an independent contractor or an employee. Rather, the question is whether plaintiff was hired at all. Therefore, the "control test" utilized by the Court in Young is not terribly helpful. More useful guidance can be drawn from the Connecticut Supreme Court's decision in Comm'n on Hum. Rts. & Opportunities v. Echo Hose Ambulance, 140 A.3d 190, 191 (Conn. 2016). There, the Connecticut Supreme Court was "called upon to decide what test should be applied to determine whether an unpaid volunteer is an 'employee' for purposes of the Connecticut Fair Employment Practices Act (CFEPA)[.]" Id.

In making that determination, the Court did not focus on the dictionary meaning of the term "employee." Instead, the Court evaluated "whether a volunteer must satisfy the predominant 'remuneration test' used to resolve similar federal causes of action or Connecticut's common-law 'right to control' test." Id. As described above, "[t]he right to control test is based on the common law of agency, which considers various factors to determine the hiring party's right to control the

manner and means by which the product is accomplished by the
hired party." Id. at 193 (citation and quotation marks omitted)
(emphasis in original).

> The remuneration test arose to address circumstances in
> which, in contrast to the employee versus independent
> contractor situation, it was not clear that the putative
> employee had been "hired" in the first instance, and
> accordingly, approximated the conventional master-
> servant relationship. The remuneration test instructs
> courts to conduct a [two step] inquiry by requiring that
> a volunteer first show remuneration as a threshold
> matter before proceeding to the second step -- analyzing
> the putative employment relationship under the [common-
> law] agency test. Remuneration may consist of either
> direct compensation, such as a salary or wages, or
> indirect benefits that are not merely incidental to the
> activity performed.

Id. at 193-94 (citation and quotation marks omitted).

After examining state and federal case law, as well as
CFEPA's legislative history, the Court concluded that the
remuneration test applies when determining whether a volunteer
is an employee under CFEPA because it "provides a threshold step
to resolve the factual premise that the right to control test
assumes -- a hiring party and a hired party." Id. at 194.
Similarly, here, the question is whether plaintiff "had been
hired in the first instance[.]" Id. at 193 (citation and
quotation marks omitted). Consequently, the Court looks to the
remuneration test to determine whether plaintiff was an employee
under Section 31-51q.

Under the remuneration test, the Court must "conduct a two

step inquiry by requiring that a volunteer first show remuneration as a threshold matter before proceeding to the second step -- analyzing the putative employment relationship under the common-law agency test." Id. at 194. The Court finds that plaintiff has failed to allege facts satisfying the first step of this inquiry.

To adequately allege remuneration, a plaintiff must allege "either direct compensation, such as salary or wages, or indirect benefits that are not merely incidental to the activity performed." Id. (citation and quotation marks omitted). As the Connecticut Appellate Court has explained, such indirect benefits include "health insurance, vacation, sick pay, a disability pension, survivors' benefits, group life insurance, scholarships for dependents upon death, or other indirect but significant remuneration." Comm'n on Hum. Rts. & Opportunities v. Echo Hose Ambulance, 113 A.3d 463, 471 (Conn. App. 2015) (citation and quotation marks omitted), aff'd, 140 A.3d 190 (2016).

Plaintiff concedes that she "did not receive traditional compensation" from Yale. Doc. #35 at 20. Nevertheless, plaintiff contends that her "relationship with Defendant yielded substantial tangible and intangible benefits for both parties." Id. Plaintiff asserts that she "was given access to the university's libraries, subscription-based research materials,

office space, [and] the university's facilities." Id. at 22.
She also contends that she was "covered under the Defendant's
malpractice insurance[,]" id., for "her forensic consultations."
Doc. #27 at 4.

These alleged benefits supplied by Yale are insufficient to
satisfy the remuneration test. "Unlike a salary, vacation, sick
pay, or benefits such as health insurance, disability insurance,
life insurance, death benefits, and retirement pension, all of
which primarily benefit the employee independently of the
employer, the benefits put forward by [plaintiff] ... , were
merely incidental to the administration of the [defendant's]
programs for the benefit of [Yale] at large." York v. Ass'n of
Bar of City of New York, 286 F.3d 122, 126 (2d Cir. 2002).

Plaintiff further alleges that "[t]hrough her association
with [Yale], she secured prestigious appointments with domestic
and international organizations, received research grants based
on her academic affiliation and developed and implemented
programs within the Yale School of Medicine." Doc. #35 at 22;
see also Doc. #27 at 5. As a result of these grants and
appointments, plaintiff alleges that "[a] majority of Dr. Lee's
income was derived from her faculty appointment, affiliation,
and relationship with Yale." Doc. #27 at 7. Plaintiff does not

allege, however, that this income was received <u>from</u> Yale.[9] Absent

such an allegation, plaintiff has alleged only that she received

such grants and appointments because Yale provided her with the

"vague benefit" of increased "name recognition[.]" <u>Hughes v.</u>

<u>Twenty-First Century Fox, Inc.</u>, 304 F. Supp. 3d 429, 444

(S.D.N.Y. 2018). Such a benefit is insufficient to satisfy the

remuneration requirement. <u>See</u> <u>id.</u>

   Plaintiff has thus failed to allege that she received

benefits from Yale sufficient to satisfy the remuneration test.

As a result, plaintiff has not adequately alleged that she is an

employee within the meaning of Section 31-51q. Accordingly,

Plaintiff's claim under Section 31-51q is dismissed.

   **D.   Negligent Misrepresentation**

   Plaintiff fails to state a claim for negligent

misrepresentation. "[A]n action for negligent misrepresentation

requires the plaintiff to establish (1) that the defendant made

a misrepresentation of fact (2) that the defendant knew or

_____

[9] Plaintiff's failure to allege that she received these benefits
<u>from</u> Yale distinguishes this case from <u>Pemrick</u>, upon which
plaintiff relies to argue that she has satisfied the
remuneration standard. <u>See</u> <u>Pemrick v. Stracher</u>, 67 F. Supp. 2d
149 (E.D.N.Y. 1999). There, the defendant and the third-party
foundation that compensated plaintiff were "joint, integrated
employers for purposes of Title VII," and therefore both were
"properly deemed [plaintiff's] employer for purposes of this
action." <u>Id.</u> at 165. Plaintiff does not allege that any of the
parties who provided her income were joint employers with Yale.

should have known was false, (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." <u>Coppola Const. Co. v. Hoffman Enter. Ltd. P'ship</u>, 71 A.3d 480, 487 (Conn. 2013) (citations and quotation marks omitted).

"Courts are deeply split within this District and elsewhere" regarding whether Rule 9(b)'s heightened pleading requirements "appl[y] to negligent misrepresentation claims." <u>ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.</u>, No. 3:17CV00790(JAM), 2018 WL 1368908, at *6 (D. Conn. Mar. 16, 2018). This Court need not determine whether Rule 9(b) applies to plaintiff's claim, however, because plaintiff has failed to state a claim even under Rule 8's less stringent pleading requirements.

Plaintiff rests her negligent misrepresentation claim on defendant's alleged failure to "abide by its own terms relating to academic freedom and freedom of expression when it terminated Dr. Lee's faculty appointment for pretextual reasons." Doc. #27 at 21. Specifically, plaintiff alleges that "the representations made in the Handbook, as well as its policy statements, guidance, regulations, and rules, were false, and they were known or should have been known to be false by Yale." <u>Id.</u> Plaintiff dedicates slightly more than one page of her opposition memorandum to this count. Plaintiff argues:

Plaintiff has alleged that statements were made to her

in various forms providing assurances of her faculty appointment, that they were false or the Defendant or its agents should have known were false, reasonable reliance and damage. There are factual issues which cannot decided at this juncture.

Furthermore, "a promissory representation (i.e., a statement of future intention) is actionable on a theory of fraudulent misrepresentation if, at the time the statement is made, the speaker did not intend to honor the promise."

Doc. #35 at 14 (sic) (citations omitted).

Plaintiff fails to meet the first element of a negligent misrepresentation claim: that "defendant made a misrepresentation of fact[.]" Coppola Const. Co., 71 A.3d at 487 (citations and quotation marks omitted). Plaintiff points to no specific statement of fact that was false. Plaintiff asserts that Yale made "statements ... to her in various forms providing assurances of faculty appointment[,]" Doc. #35 at 14, and that Yale did "did not abide by its own terms relating to academic freedom and freedom of expression[.]" Doc. #27 at 21. The actual statements alleged in the Amended Complaint amount to nothing more than general statements of university policy, see id. at 14-15, ¶49, and three positive comments regarding plaintiff's work, see id. at 12, ¶¶38, 39, 40.

Plaintiff has failed to allege any false statements of fact, and has failed to point to any specific "representations [that] contained false information." D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch., 520 A.2d 217, 223 (Conn.

1987). Absent an allegation that Yale made such a specific false representation, plaintiff's claim amounts to a "naked assertion[]" that defendant misrepresented some unspecified fact in some unspecified statement. Umbach v. Carrington Inv. Partners (US), LP, No. 08CV00484(EBB), 2013 WL 12288988, at *10 (D. Conn. July 19, 2013). Such an assertion is insufficient to survive a motion to dismiss. See Allen v. Verizon Wireless, No. 3:12CV00482(JCH), 2013 WL 2467923, at *6 (D. Conn. June 6, 2013) (dismissing negligent misrepresentation claim where plaintiff failed to "allege any specific fact that [defendant] purportedly misrepresented").

Moreover, even if plaintiff had adequately asserted a misrepresentation of fact, she has not alleged facts which, if taken as true, would demonstrate that Yale "knew, or should have known, [its] statements were untrue at the time they were made." Bellsite Dev., LLC v. Town of Monroe, 122 A.3d 640, 654 (Conn. App. 2015) (emphasis in original). Plaintiff's claim that Yale made statements it "kn[ew] or should have been known to be false" is a mere legal conclusion. Doc. #27 at 21. To survive a motion to dismiss, it is not enough to state, in conclusory fashion, that defendant knew or should have known its statements were false when such statements were made. Rather, plaintiff must allege facts which, if true, would bear that conclusion out. See Doe, 2021 WL 664010, at *12 (dismissing negligent

misrepresentation claim where "Plaintiff makes no claims that [defendant] knew or should have known that its Handbook would not be honored by its own officials at the time it was issued or that [defendant] knew or should have known that the promises were false at the time it wrote and published Handbook[]").

In considering a motion to dismiss, the Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020) (citation and quotation marks omitted). Plaintiff has not alleged any facts that would support her conclusory assertion that Yale knew or should have known that its statements were false at the time they were made. See Sturm v. Harb Dev., LLC, 2 A.3d 859, 873 (Conn. 2010) (dismissing negligent misrepresentation claim where plaintiff "neither alleges false statements made by the defendant nor the defendant's knowledge or duty to know the falsity of those statements"). Accordingly, plaintiff's claim for negligent misrepresentation is dismissed.

## IV.  **Conclusion**

For the reasons set forth herein, defendant's Motion to Dismiss [**Doc. #32**] is **GRANTED**.

The Clerk shall close this case.

It is so ordered at Bridgeport, Connecticut, this 30th day
of August, 2022.

/s/
_____
HON. SARAH A. L. MERRIAM
UNITED STATES DISTRICT JUDGE